1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    CR-03-0133

     -against-                    U.S. Courthouse
                                  Brooklyn, New York

ABAD ELFGEEH & AREF ELFGEEH,

          DEFENDANTS,
                                  September 12, 2005
- - - - - - - - - - - - - - - X        9:30 o'clock a.m.

          TRANSCRIPT OF TRIAL/SUPPRESSION HEARING
          BEFORE THE HONORABLE STERLING JOHNSON, JR.
          UNITED STATES DISTRICT JUDGE and a jury.


APPEARANCES:

For the Government:          ROSLYNN R. MAUSKOPF
                            United States Attorney
                            147 Pierrepont Street
                            Brooklyn, New York  11201
                            BY:  JEFFREY KNOX
                                 PAMELA CHEN
                            Assistants, U.S. Attorney


For the Defendant:          FRANK HANCOCK, ESQ.
                            For Deft Abad Elfgeeh

                            ARTHUR FRIEDMAN, ESQ.
                            For Deft Aref Elfgeeh


Court Reporter:          SHELDON SILVERMAN
                         Official Court Reporter
                         225 Cadman Plaza East
                         Brooklyn, New York 11201
                            (718) 260-2537


Proceedings recorded by mechanical stenography. Transcript
Produced By Computer Aided Transcription.

FILED
IN CLERKS OFFICE
U.S.        COURT ED  N.Y.
★  OCT 12 2005  ★
P.M. _____
TIME A.M. _____

SS       OCR       CM       CRR       CSR

2

THE CLERK:   United States versus Abad Elfgeeh and Aref Elfgeeh.

MS. CHEN:   Good morning, your Honor.

MR. KNOX:   Good morning.

MR. HANCOCK:   On behalf of Abad Elfgeeh, Frank Hancock.

THE COURT:   How is your wife?

MR. HANCOCK:   Doing much better, I appreciate that.

MR. FRIEDMAN:   Arthur Friedman for Mr. Aref Elfgeeh.

(Two Arab interpreters sworn, Fouad Kheir and Fouad Elshiekh).

MS. CHEN:   We're ready to go, slated to pick a jury, then have a suppression hearing after that.

MR. HANCOCK:   Your Honor, based upon my information, my experience, Abad Elfgeeh does not need an interpreter so there's no issue later on.

MR. FRIEDMAN:   May I discuss, bring up some matters with the court I have already discussed with the Assistant United States Attorney, but I think your Honor should be aware of them?

THE COURT:   Go ahead.

MR. FRIEDMAN:   I wanted to note for the record that we did receive the 3500 material, available Thursday afternoon.   I picked mine up Friday morning.   It's about 5,000

SS      OCR      CM      CRR      CSR

pages. I noticed in the 3500 material some of the pages have been expurgated to take out what I'm informed is sometimes personal information about witnesses.

I spoke to Ms. Chen about that. If I need that particular witness, Ms. Chen will give the personal information, but there are other 302s, FBI reports, which have fairly substantial chunks just blanked out. Ms. Chen informs that I don't want to say extraneous matter, but a matter that is not related to this case and/or related to either ongoing investigations or other investigations.

I just wanted to say I object to the self-censoring by the government of that without imprimatur for the court or even discussion with defense attorney in camera without the defendant being there if they felt it would compromise any ongoing investigations.

I also noticed in the 3500 material, with which your Honor is intimately familiar, having presided over the trial of Al-Moyad, there's a lot of information concerning terrorists, background into the investigation, undercover investigators in Germany, Yemen. I am informed by Ms. Chen that this trial, there will be no mention of terrorists, Osama Bin Ladin, Al Quida.

MS. CHEN: Unless the door is opened.

MR. FRIEDMAN: Of course.

The final part is that Ms. Chen provided me, among

4

other things, a chart dealing with the finances of my defendant as well as some other businesses.  On the chart it notes that Mr. Aref Elfgeeh did not file a tax return for three years.

I would ask your Honor that that information, unless it becomes relevant or I open the door otherwise, not be shown to the jury or not be disclosed to the jury because I don't think it has any probative value and certainly the prejudice, without an overriding relevancy, would mandate that such information be not disclosed to the jury.

THE COURT:  Ms. Chen?

MS. CHEN:    Your Honor, the government's view is that that information is highly probative to show the money that was in the Carnival French Ice Cream account was the Hawala business as opposed to the grocery business.

The only reason we're going to elicit that information, we're not going to emphasize the fact he did not file a tax return, is to show that none of the defendants or their coconspirators in any way reported they were running a money transmitting business.  Rather, they reported income from all different sources.  Therefore, our argument is that they did not account to the government in any way before the money that was running through the Carnival French ice cream account.  We want to show that money then was for Hawala and other businesses they claimed they were working in.

SS        OCR        CM        CRR        CSR

5

THE COURT:  It's rather difficult for me to rule on this at this particular point.  I'll wait to see how the case develops.  Then you'll make your argument.  There will be an objection and I'll rule on it.

MS. CHEN:  So you know, during my opening, I'm going to reference the fact we make comparison, but not mention the fact it has anything to do with Aref Elfgeeh not reporting his taxes, filing a return in any particular year.

THE COURT:  The other thing is that counsel has spoken about some information in the three 302's that haven't been expunged.  Address that, please.

MS. CHEN:  As the court is aware, we're required to turn over statements by the witnesses that relate to this particular case, the testimony.  Obviously we can do that in any format.  We out of convenience turn over 302s, redact any information that's not relevant.  Obviously we could have provided that information in a different form, given them the statements that relate to the case.  The fact we did not give him information that has nothing to do with the testimony or this case at all is obviously not a violation of the rule. It's just that he knows about it, use this form for expurgating from a document.

None of the statements redacted have anything to do with the testimony of those witnesses and relate to very far ranging investigation that the court is aware of that related

SS        OCR        CM        CRR        CSR

6

to Al-Moyad, many other terrorism cases that the FBI was looking at at the time.

THE COURT:  The original should be made available, sealed in case there's an adverse decision with respect to the defendant and the Court of Appeals can look at that.

MS. CHEN:  We've done that, set them aside.  We'll seal them if necessary.

MR. HANCOCK:  I have one issue, if I may, please. Early on, we were told by the government there wouldn't be any expert witness.  We're aware of the handwriting expert.  We've met with him, have his report.  We have no exception to that. I learned this past week there may be in fact another witness. I want clarification if he's an expert or proffered testimony would be.

MS. CHEN:  I provided notice to both defense counsel last week.  I was informed by Mr. Hancock his fax machine malfunctioned, didn't get the resume I sent.  That expert is simply an FBI analyst who analyzes telecommunications every day.  We're just going to seek to qualify him as a telecommunications analyst.  I'm happy to provide another copy to Mr. Hancock of the resume.

MR. HANCOCK:  What's the nature of the expertise?

MS. CHEN:  Analyze connections between the target phone numbers, the defendants' phone numbers and other people involved in the Hawala operation, straightforward analysis, if

you will.

MR. HANCOCK:    Thank you.

THE COURT:  We'll get the jury.

MR. FRIEDMAN:    One question before we go to the four corners of the universe.  I think both Mr. Hancock and I submitted proposed questions for the jury.  Does your Honor have like a formal ruling on that or what questions you're going to ask?

THE COURT:  I will question the jury.  I will maybe take some of the questions that counsel has submitted and maybe I won't.  I just don't know.

MR. FRIEDMAN:    I understand.

THE COURT:  Give me another copy anyway.

MR. FRIEDMAN:    I know it's a dynamic situation. Let's see if I have another one.

MS. CHEN:    We asked two additional questions.  I'll submit that.

(Jury panel enters courtroom).

THE COURT:    I wanted to let you know Thursday at 12:00 o'clock I'm finished, will be out of town on Friday, leaving Thursday afternoon.

THE CLERK:    Juror number 1, Walter Rickman.

Juror number 2, Lurline Noah.

Juror number 3, Jeffrey Lee.

8

Juror number 4, Grynberg first name Rita.

Juror number 5, Melvin Wood.

Juror number 6, David H E R R.

Juror number 7, Michael Thompson.

Juror number 8, Vincent Inglese.

Juror number 9, Wayne Ferrebee.

Juror number 10, Genevieve Maison.

Juror number 11, Michelle Marotta.

Juror number 12, Mattie Williams.

Juror number 13, Thomas Riordan.

Juror number 14, Michelle Payne.

Juror number 15, Betty Jenkins Brumfield.

Juror number 16, Cynthia Davidson.

Juror number 17, Robert Kenny.

Juror number 18, Guillermo Cano.

Juror number 19, Paul McDonald.

Juror number 20, Gerald Sanders.

Juror number 21, Robert McCormack.

Juror number 22, Janet Mendelsohn.

Juror number 23, Frederick Skellenger.

Juror number 24, Regena Batts.

Juror number 25, Cheryl Mundy.

Juror number 26, Pamala Sparacino.

Juror number 27, Raymond Basilotta.

Juror number 28, Diane Paris.

SS       OCR       CM       CRR       CSR

9

THE COURT:  Swear the panel, please.

THE CLERK:  Will all the jurors in the room please rise.

(Jury panel sworn.)

THE COURT:  Good morning, ladies and gentlemen.  It sounds like my third grade class.  My name is Judge Johnson. I am a judge in the Eastern District of New York, Eastern District comprising five boroughs, Brooklyn, Queens, Staten Island, Nassau and Suffolk Counties.  We are here to select a jury from the Eastern District and everyone must live in the Eastern District.  Is there anyone here who does not live in those five counties?

Second of all, this is a criminal case as opposed to a civil case.  In a civil case, people are suing for money or to make one person do something that they said they shouldn't have done.

In a criminal case, a person is accused of having violated criminal law.  I'm going to give you some do's, don't's and some facts.

We are here because of what they call an indictment. The indictment in this case is this document.  The indictment is the triggering mechanism that brings us all here together.

The indictment, and I will read it to you and at the end of the trial you will have the piece of paper in the jury room so you can peruse it at your leisure.

SS        OCR        CM        CRR        CSR

10

A person even though he's been indicted is presumed to be innocent in American Court's.  That presumption lasts with the defendants up until the end of trial unless you determined that the government has proven its case beyond a reasonable doubt.  I will explain to you what a reasonable doubt is.

In order to convict a person of the charges contained in the indictment, you do it by evidence.  The natural question is what is evidence?  Evidence is the sworn testimony of witnesses who will be in this chair to my left and whatever exhibits I choose to admit.

For that reason, whatever the prosecutor says is not evidence, the lawyers, whatever defense counsel say is not evidence, and whatever I say is not evidence.  It is the testimony, the sworn testimony of the witnesses and it is not the questions that's asked by the lawyers that is evidence, it is the answers given by the witnesses that is evidences.  That will determine whether the government has proven its case beyond a reasonable doubt.

When a person is indicted or accused of a crime, the government bears the burden of proving that that person committed that crime and the proof must be beyond a reasonable doubt.  I'll explain that to you before this trial is over.  It will be at the end of the trial when I give you my instructions.

SS       OCR       CM       CRR       CSR

I'm going to read the indictment to you just to let you know what the defendants have been accused of.

At all times relevant to this superseding indictment, unless otherwise indicated:

Prior to November 1st, 2001, the term "illegal money transmitting business" was defined in Title 18, United States Code, Section 1960(b)(1)(A) to include any money transmitting business that affected interstate or foreign commerce in any manner or degree and was intentionally operated without an appropriate money transmitting license in a state where such operation was punishable as a misdemeanor or a felony under state law.  After November 1st, 2001, the term "unlicensed money transmitting business" was defined in Title 18, United States Code Section 1960(b)(1)(A) to include any money transmitting business that affected interstate or foreign commerce in any manner or degree and that was operated without an appropriate money transmitting license in a state where such operation was punishable as a misdemeanor or a felony under state law, regardless of whether the operator knew that the operation was required to be licensed or that the operation was so punishable.

The term "money transmitting" was defined in Title 18, United States Code, Section 1960(b)(2) to include transferring funds on behalf of the public by any and all means, including but not limited to transfers within the

SS        OCR        CM        CRR        CSR

12

country or to locations abroad by wire, check, draft, facsimile or courier.

Pursuant to New York State Banking Law Section 650(2)(a), the operations of an unlicensed money transmitting business was punishable as a misdemeanor; pursuant to New York State Banking Law Section 650(2)(b)(1), the operation of an unlicensed money transmitting business was punishable as a felony if the business received $10,000 or more for transmission in a single transaction, $25,000 or more for transmission in a period of 30 days or less, or $250,000 or more for transmission in a period of a year or less.

At all times relevant to the superseding indictment, the currency reporting requirements provided as follows:

Transactions in currency were defined as transactions involving the physical transfer of money, as defined in Title 31, Code of Federal Regulations, Section 103.11(ii). I'll explain it later on.

Domestic financial institutions were required to file a Currency Transaction Report, sometimes referred to as CTR, with the Internal Revenue Service for each transaction of currency or other payment or transfer by, through or to a financial institution, in excess of $10,000 as required by Title 31, United States Code, section 5313 and other sections.

CTR's were filed with the IRS on forms that required, among other things, disclosure of the identity of

SS     OCR     CM     CRR     CSR

13

the individual who conducted the transaction and the individual or organization for whom the transaction was completed.

CTR's were required to be filed to assist the United States in criminal, tax and regulatory investigations and proceedings as stated in Title 31, Code of Federal Regulations.

"Structuring" financial transactions meant that the breaking down of amounts of currency into amounts of $10,000 or less prior to transacting business with one or more domestic financial institutions or businesses in an attempt to evade currency reporting requirements as defined in Title 31, Code of Federal Regulations.  Those were the definition sections.

Now this is what the defendant are accused of having done.

The allegations contained in paragraphs one through three are realleged and incorporated as if fully set forth in this paragraph.

In or about and between January, 1995 and October, 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants Abad Elfgeeh,  together with others, did knowingly and intentionally conspire to conduct, control, manage, supervise, direct and own all and part of a business, knowing that the

14

business was an illegal money transmitting business which affected interstate and foreign commerce, in violation of Title 18, United States Code, Section 1960(a).

In furtherance of the conspiracy and to effect its objectives, within the Eastern District of New York and elsewhere, the defendant Abad Elfgeeh, together with others, committed and caused to be committed among others, the following.

On or about October 23rd, 1995, the defendant Abad Elfgeeh and a coconspirator caused a wire transfer in the amount of $30,000 to be made from a bank account in Brooklyn, New York in the name of Carnival French Ice Cream Supermarket to a bank accounted in Italy.

On or about May 23rd, 1996, the defendant Abad Elfgeeh and a coconspirator caused a wire transfer in the amount of $50,000 to be made from a bank account in Brooklyn, New York, in the name of Carnival French Ice Cream Supermarket to a bank account in Switzerland.

On or about June 8th, 2001, the defendant Abad Elfgeeh and a coconspirator caused a wire transfer in the amount of $140,000 to be made from a bank account in Brooklyn, New York, in the name of Carnival French Ice Cream Supermarket to a bank account in Yemen.

Count two. The allegations contained in paragraphs one through three are realleged and incorporated as if fully

SS        OCR        CM        CRR        CSR

15

set forth in this paragraph.

In or about and between January 19th, '95 and October, 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant Abad Elfgeeh did knowingly and intentionally conduct, control, manage, supervise, direct and own all and part of a business, knowing that the business was an illegal money transmitting business, which affected interstate and foreign commerce:.

Count Three.  The allegations contained in paragraphs one through three are realleged and incorporated as if fully set forth in this paragraph.

In or about and between November, 2001 and January 2003, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants Abad Elfgeeh and Aref Elfgeeh, together with others, did knowingly and intentionally conspire to conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business, which affected interstate and foreign commerce, in violation of Title 18, United States Code.

In furtherance of the conspiracy and to effect its objectives within the Eastern District of New York and elsewhere, the defendants Abad Elfgeeh and Aref Elfgeeh, together with others, committed and caused to be committed,

16

among others, the following.

On or about November 6th, 2001, the defendants Abad Elfgeeh and Aref Elfgeeh and a coconspirator caused a wire transfer in the amount of $25,000 to be made from a bank account in Brooklyn, New York, in the name of Carnival French Ice Cream Supermarket to a bank account in Thailand.

On or about January 10th, 2002, the defendants Abad Elfgeeh and Aref Elfgeeh and a coconspirator caused a check drawn on a bank account in the names of "Aref A. Elfgeeh" and "Mahmood Elfgeeh" in the amount of $9,000 to be deposited in a bank account in Brooklyn, New York in the name of Carnival French Ice Cream Supermarket.

On or about January 11th, 2002, the defendants Abad Elfgeeh and Aref Elfgeeh and a coconspirator caused a wire transfer in the amount of $10,000 to be made from a bank account in Brooklyn, New York in the name of Carnival French Ice Cream Supermarket to a bank account in Thailand.

Count four. In or about and between November, 2001 and January, 2003, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants Abad Elfgeeh and Aref Elfgeeh, together with others, did knowingly and intentionally conduct, control, manage, supervise, direct and own all and part of an unlicensed money transmitting business which affected interstate and foreign commerce.

SS        OCR        CM        CRR        CSR

Count five.  In or about and between January, 1995 and January, 2003, both dates being approximate and inclusive, within the Eastern District of New York, the defendant Abad Elfgeeh together with others, for the purpose of evading the reporting requirements of Section 5313(a) of Title 31, United States Code, and the regulations prescribed thereunder, and as part of a pattern of illegal activity involving more than $100,000 in a twelve-month period, did knowingly and intentionally structure and assist in structuring transactions with domestic financial institutions by breaking amounts of currency in excess of $10,000 into amounts of less than $10,000 and depositing the smaller amounts of currency into an account in a financial institution.

That's basically the five charges.  The defendants, as I've said before, have been indicted, accused of these particular times and I'll elaborate later on.

The defendant Abad Elfgeeh, would you please rise? Does anybody know Mr. Abad Elfgeeh?

You may be seated.

He's represented by frank Hancock.  Anybody know Mr. Hancock?

MR. HANCOCK:   Good morning, ladies and gentlemen.

THE COURT:  The defendant Aref Elfgeeh, would you please stand?  Anybody know Mr. Aref Elfgeeh?

He's represented by Mr. Arthur Friedman.

SS        OCR        CM        CRR        CSR

18

MR. FRIEDMAN:    Good morning.

Also at the table --

MR. HANCOCK:    My paralegal, Mr. Burton Pugash.

THE COURT:  This case is being brought by the United States Attorney's office and the United States Attorney for the Eastern District of New York by a lady by the name of Roslynn Mauskopf.  You'll also find out that I am terrible with names.  I butcher names, do it to my own children.  Don't take offense.

Does anybody know Ms. Roslynn Mauskopf?

We have two assistants, Ms. Pamala Chen and Mr. Jeffrey Knox.  Anybody know them?  Seated at the table, FBI agent Brian Murphy and Sharon Hassa.

Does anybody know anybody in the Office of the United States Attorney?

Does anybody know anybody in the FBI?  I'll take these people, just the first 28.  When you do speak, if I ask a question and you speak,, can you give your number because right now we have the court reporter who takes everything down, everything that has to do with this case is being taken down by a very able and good looking court reporter.  It's hard for him to put that down.

When you speak, just say number so and so and then you'll respond to the question.

Does anybody know anybody in the New York City

SS        OCR        CM        CRR        CSR

19

Police Department, any law enforcement agency?  Juror number three.

THE PROSPECTIVE JUROR:    Yes.

THE COURT:    Who do you know?

THE PROSPECTIVE JUROR:    Coaches of my son's soccer team, New York City cops.  One is a sky marshal.

THE COURT:    The fact that you know somebody in law enforcement, would this impair your ability to deliberate fairly and impartially if you were chosen as a juror?

THE PROSPECTIVE JUROR:    No.

THE COURT:    You could be fair and impartial?

THE PROSPECTIVE JUROR:    Yes.

THE COURT:    Juror number eight.

THE PROSPECTIVE JUROR:    My son is in the police department, transferred over to the fire department.

THE COURT:    Both good organizations?

THE PROSPECTIVE JUROR:    Absolutely.

THE COURT:    Would that impair your ability to deliberated fairly and impartial in this case if chosen?

THE PROSPECTIVE JUROR:    No.

THE COURT:    Juror number 11?

THE PROSPECTIVE JUROR:    I have friends and family on the job and also I'm a bail bondsman.

THE COURT:    Where?

THE PROSPECTIVE JUROR:    In Brooklyn.

SS          OCR          CM          CRR          CSR

20

THE COURT:    Would that impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR:    No, your Honor.

THE COURT:    Juror number 12?

THE PROSPECTIVE JUROR:    My neighbor, she's in the police department.  That itself wouldn't affect me, but I'm of the mind if I didn't see this I can't say guilty or not guilty.

THE COURT:    I don't understand you if you didn't see this:

THE PROSPECTIVE JUROR:    Like you're talking about the defendant?

THE COURT:    Yes.

THE PROSPECTIVE JUROR:    In a case where something happened, if I didn't see it, I can't say that he did it.

THE COURT:    This is what a trial is all about.  Some events occurred sometime in the past.  Witnesses will come and they're going to testify under oath as to what they saw, what they heard, what they did.  Based upon that, then if you are asked to make a decision whether the government has proved this case beyond a reasonable doubt, that's all.  Can you do that?

THE PROSPECTIVE JUROR:    I don't know.  It would be hard even though I hear what you're saying.

SS        OCR        CM        CRR        CSR

21

THE COURT:   Counsel?

MR. HANCOCK:   No objection.

MS. CHEN:   No objection, your Honor.

THE COURT:   We're going to send you down to another jury.

THE PROSPECTIVE JUROR:   I would rather stay here.

THE COURT:   No, you have to go to another jury. Okay.

THE CLERK:   Juror number 11, David Eilbert. Sorry, juror number 12.

THE COURT:   Juror number 12, have you heard my questions, any responses to them?

THE PROSPECTIVE JUROR:   I have an aunt who is in the FBI in Washington.

THE COURT:   What does she do in the FBI?

THE PROSPECTIVE JUROR:   She's an executive secretary, I forget exactly which department.

THE COURT:   The fact you have a relative in the FBI, would this impair your ability to deliberate fairly and impartially in this case if you're chosen?

THE PROSPECTIVE JUROR:   No.

THE COURT:   Juror number 13?

THE PROSPECTIVE JUROR:   My father is a retired Nassau cop, my brother is a city cop at Penn station.

THE COURT:   Would that impair your ability to

22

deliberate fairly and impartially if chosen?

THE PROSPECTIVE JUROR:    No.

THE COURT:    Juror number 15?

THE PROSPECTIVE JUROR:    Two sisters-in-law police officers.

THE COURT:    Which department?

THE PROSPECTIVE JUROR:    New York.

THE COURT:    Where?

THE PROSPECTIVE JUROR:    One in East New York, the other in Bushwick.

THE COURT:    Would that impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR:    No, sir.

THE COURT:    Juror number 16?

THE PROSPECTIVE JUROR:    I know a woman who is in Homeland Security.

THE COURT:    Keep your voice up.

THE PROSPECTIVE JUROR:    I know a woman who works for Homeland Security, a detective.  She works in Long Island, I'm not sure.

THE COURT:    Would that impair your ability to deliberate fairly and impartial in this case if you were chosen?

THE PROSPECTIVE JUROR:    No, sir.

SS        OCR        CM        CRR        CSR

23

THE COURT:  Another thing, let me inform you, ladies and gentlemen, that if you are selected, you will not be able to talk about this case to anyone, not your husband, your wife, significant other.  You can't even talk about the case amongst each other until the case is all over, until there's a summation, give you the charges, then you can go, talk about the case.

The other thing, too, is I have to remind you since we are picking an impartial jury from five counties, if you are selected, you might see some participants in this trial walking through the hallways and they might not speak to you because they do not want you contaminated.  If they do, for want of a better word, if they do speak to you, they'll say hello, how are you doing.  Don't hold that against them.  If I see you and you're walking through the hallways, the street, I'll always say hello.

THE COURT:   Number 17.

THE PROSPECTIVE JUROR:   Retired New York City detective.  I have four active members of my family that are on the job right now.

THE COURT:   Where did you work?

THE PROSPECTIVE JUROR:   Brooklyn Robbery Squad, 70 squad, 67 squad, my three sons are patrolmen in the 71, 67 and transfer 30.  My wife is a legal secretary for the deputy commissioner of trials at one Police Plaza. Thought I would

SS      OCR      CM      CRR      CSR

24

let you know.

THE COURT:    Would that impair your ability to deliberate fairly and impartial in this case?

THE PROSPECTIVE JUROR:    No.

THE COURT:    Anybody else?  Juror number 19?

THE PROSPECTIVE JUROR:    A brother-in-law, a police officer.

THE COURT:    Would that impair your ability to be fair and impartial in this case if you were chosen?

THE PROSPECTIVE JUROR:    No.

THE COURT:    Juror number 25.

THE PROSPECTIVE JUROR:    My cousin is a police officer in Suffolk County.  I'm a retired probation officer Suffolk County, juvenile.  My husband retired from the Suffolk County District Attorney's Office, investigator, and my brother-in-law was a Nassau County probation officer, a sister who retired from probation.

THE COURT:    Because of your personal and your relatives in law enforcement, would that impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR:    No, your Honor.

THE COURT:    Juror number 26?

THE PROSPECTIVE JUROR:    My father and my uncle were with the NYPD when I was a baby.  They went to the fire

SS        OCR        CM        CRR        CSR

25

department.

THE COURT:   Would that impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR:   No.

THE COURT:   Number 27.

THE PROSPECTIVE JUROR:   As far as being impaired of anything, I do have some friends that are cops.  Just going over what was told to me, my position at work, my mind is basically on my work and from what I've heard about what these gentlemen have done already, I kind of already --

THE COURT:   Just a second.  These are allegations.

THE PROSPECTIVE JUROR:   Understood.  I still have it in my mind already.

THE COURT:   Counsel?

MR. HANCOCK:   Absolutely no objection.

MS. CHEN:   No objection, your Honor.

MR. FRIEDMAN:   No objection.

THE COURT:   We'll send you to another jury.

THE CLERK:   Juror number 27, Felip Villatoro, F E L I P, second name V I L L A T O R O.

THE COURT:   Have you heard the questions I've asked, Mr. Villatoro?

THE PROSPECTIVE JUROR:   Yes.  I want to talk to you.  I don't understand much English.

SS        OCR        CM        CRR        CSR

26

THE COURT:   Pardon me?

THE PROSPECTIVE JUROR:   I don't understand much English, you know.  Can I give you this?

THE COURT:   Let's see what you have.  Come up.

(Pause.)

THE COURT:  Let the record reflect juror number 27 has just given me a summons for jury service.  That's all it was. My question to you, any questions that I've asked, do you have any comments made?

THE PROSPECTIVE JUROR:   No.

THE COURT:   Can you be fair and impartial if you were chosen?

THE PROSPECTIVE JUROR:   No.

THE COURT:   You cannot?

THE PROSPECTIVE JUROR:   That's why I say I don't understand much English.

MR. HANCOCK:   No objection.

MR. KNOX:   No objection.

MR. FRIEDMAN:   No objection.

THE COURT:  I'm going to send you downstairs to another jury.

THE CLERK:  Juror number 27, Rebecca S C H I E R E N.

THE COURT:   Ms. Schieren, have you heard the questions I've asked?

SS        OCR        CM        CRR        CSR

27

THE PROSPECTIVE JUROR:    Yes, I have.

THE COURT:    Any responses to any of those questions?

THE PROSPECTIVE JUROR:    No.

THE COURT:    Juror number 28.

THE PROSPECTIVE JUROR:    I have a niece in the corrections department in Queens.

THE COURT:    Would that impair your ability to deliberate fairly and impartial in this case if you were chosen?

THE PROSPECTIVE JUROR:    No.

THE COURT:    Ladies and gentlemen, I have to say this.  When you come to a court in the United States, all persons are equal;  rich, poor, black, white.  We have defendants who have a mid-eastern name.  I'm instructing you that you are not to hold this against them.  Is there anybody who cannot abide by this?

THE PROSPECTIVE JUROR:    Juror number five.  I know somebody in 9/11 World Trade Center.

THE COURT:    This is not about this case.

THE PROSPECTIVE JUROR:    I know that.

MR. HANCOCK:    No objection.

MR. FRIEDMAN:    No objection.

MS. CHEN:    No objection.

THE COURT:    You're excused.

SS       OCR       CM       CRR       CSR

28

THE CLERK:  Juror number five, Richard Scaranoz.

THE COURT:  Have you heard my questions, juror number five?

Any responses to any of those questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  I would like to ask you, have you or any of your relatives or close friends ever transmitted money in any form out of the United States?

THE PROSPECTIVE JUROR:  No.

THE PROSPECTIVE JUROR:  Juror number nine, I've transmitted money to China, I have a business.

THE COURT:  Would that impair your ability to deliberate fairly and impartial in this case if you were chosen?

THE PROSPECTIVE JUROR:  No, your Honor.

(Continued on next page.)

SS     OCR     CM     CRR     CSR

29

THE COURT:  Do you know anyone who is involved in sending or transmitting money for others outside of the United States?

Any of you ever worked for the Department of Justice, Homeland Security, FBI, U.S. Attorney's office?

THE PROSPECTIVE JUROR:  What did you say after FBI?

THE COURT:  Homeland Security.  Any law enforcement agency, U.S. Attorney's office, any of your friends or family?

Have any of you ever been the victim of a crime?

Second row?

THE PROSPECTIVE JUROR:  Juror No. 15.  I was mugged.

THE COURT:  How long ago?

THE PROSPECTIVE JUROR:  14 years now.

THE COURT:  Did they ever catch the person?

THE PROSPECTIVE JUROR:  Yes, they did.

THE COURT:  Did you have to testify in court?

THE PROSPECTIVE JUROR:  No, I didn't.

THE COURT:  Because of this experience, would this impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR:  No, it would not.

THE PROSPECTIVE JUROR:  Juror 16.  My home was robbed.

THE COURT:  How long ago?

THE PROSPECTIVE JUROR:  1982.

30

THE COURT: Would that impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR: No.

THE PROSPECTIVE JUROR: Juror No. One. House. Breakin, 1990.

THE COURT: Would that impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR: No.

THE PROSPECTIVE JUROR: Number 24, robbery.

THE COURT: I can't hear you?

THE PROSPECTIVE JUROR: Juror No. 24. It was a robbery.

THE COURT: When you say a robbery, what do you mean.

THE PROSPECTIVE JUROR: My purse was taken.

THE COURT: How long ago was that?

THE PROSPECTIVE JUROR: More than 20 years ago.

THE COURT: Would that impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR: No.

THE PROSPECTIVE JUROR: Juror No. 25. Home burglary 16 years ago.

31

THE COURT:  Would that impair your ability to deliberate fairly and impartially if you were chosen?

THE PROSPECTIVE JUROR:  No.

THE PROSPECTIVE JUROR:  Juror No. 26.  I was robbed ten years ago and I had a gun pulled on me nine years ago.

THE COURT:  Was anybody apprehended?

THE PROSPECTIVE JUROR:  Not in the former case but in the latter case, yes.

THE COURT:  Would that impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR:  No.

THE PROSPECTIVE JUROR:  No. 27.  I had my house broken into on two occasions and I was mugged many, many years back.

THE COURT:  Would this impair your ability to deliberate fairly and impartially if you were chosen?

THE PROSPECTIVE JUROR:  No.

THE COURT:  How long ago was it that with your house was broken into?

THE PROSPECTIVE JUROR:  About three years ago. Before that about 16 years ago.

THE COURT:  Do you have any belief that the offenses charged here are such that you would find it difficult to keep an open mind until the end of the case?

BHS      OCR      CM      CRR      CSR

32

THE PROSPECTIVE JUROR:  Repeat that.

THE COURT:  Do you have any belief that the offenses charged here are such that it would be difficult for you to keep an open mind until the end of the case?

This case will be a week?

MS. CHEN:  About a week.

THE COURT:  Maybe about a week.  You will keep an open mind.  I'll always tell you to keep an open mind.

Once the jury is selected there will be an opening statement by the government and the government will tell you what they intend to prove, they will tell you what they say this case is all about.

The defense, they don't have to do anything at all, they can remain mute, they don't have to make an opening statement, they don't have to put on any witnesses and you are not to hold that against them.

If they do decide to make a statement, the lawyers will tell you what they think the case is all about. Remember, whatever the lawyers say is not evidence, the evidence is the witnesses.

After the opening statement they will put witnesses on, the government will put witnesses on.  There will be what they call direct examination and then there will be cross-examination.  Then there will be redirect and then there will be recross..

BHS    OCR    CM    CRR    CSR

33

After all the testimony is over with, there will be what they call closing arguments or summations.  The government will tell you what they have proved, they will summarize all of the evidence or the testimony of the witnesses.

The defendants, if they choose to make a closing argument, they will tell you what the government did not prove, whatever they want to say, and then after that I will read the law to you, I will read the charges, what are called the charges.  It will explain many of the things that occurred during the course of the trial.

Then, after that, when I say "now you can discuss the case," you go in the back and discuss the case and you'll render a verdict, if you can.

As I said before, before you can find a defendant guilty you must find from the evidence that he has been proven guilty beyond a reasonable doubt.

Is there anyone who cannot do that?

Do you know of any reason why you may be prejudiced for our against the defendant or the government because of the nature of the offenses charged in this indictment, or for any other reason?

THE PROSPECTIVE JUROR:  Juror No. Six.  Because they transmitted money to the Middle East, I have --

THE COURT:  That is an allegation.

BHS       OCR       CM       CRR       CSR

34

THE PROSPECTIVE JUROR: They allegedly transmitted money to the Middle East, that bothers me quite a bit. I'm not sure where that money ended up. That's all.

MR. HANCOCK: No objection.

MR. FRIEDMAN: No objection.

MS. CHEN: No objection, your Honor.

THE COURT: All right. We'll send you down to another jury.

(Excused.)

THE CLERK: Juror No. Six, Geneva Gilmore.

THE COURT: Have you heard my questions?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Any responses to any of those questions?

THE PROSPECTIVE JUROR: No.

THE COURT: Okay.

THE PROSPECTIVE JUROR: Juror No. Nine, your Honor. As a business person, I guess I'm perplexed by the allegations thus far, but I'm troubled by the fact that they might have adversely affected another business.

THE COURT: The indictment just alleges what the indictment alleges.

THE PROSPECTIVE JUROR: Only money transfer?

THE COURT: That's what it alleges. You have to determine whether they did this or not beyond a reasonable doubt.

35

THE PROSPECTIVE JUROR:  All right.

THE COURT:  They are presumed to be innocent.

Who else?

THE PROSPECTIVE JUROR:  May I approach?

THE COURT:  Yes.

(Sidebar.)

THE PROSPECTIVE JUROR:  I'm Juror No. Three.  In 1985 I had a brother who was shot and killed and people who did it, they were from Eastern descent.  I came in here, I felt very good, but this is beginning to bother me now.

MS. CHEN:  No objection, your Honor.

MR. HANCOCK:  No objection.

MR. FRIEDMAN:  No objection.

THE COURT:  All right.  We'll send you down to another jury.

(Open court.)

THE CLERK:  Juror No. Three, Yolanda Perez Wilson.

THE COURT:  We will wait for the other juror to return.

(Pause.)

THE PROSPECTIVE JUROR:  I have travel plans.

THE COURT:  Just a second.

(Pause.)

THE COURT:  Have you heard the questions that I posed and the responses?

BHS        OCR        CM        CRR        CSR

36

THE PROSPECTIVE JUROR: Yes.

THE COURT: Any responses to any of those questions?

THE PROSPECTIVE JUROR: I can't be open-minded.

THE COURT: You cannot?

THE PROSPECTIVE JUROR: No.

THE COURT: Mr. Hancock.

MR. HANCOCK: No objection.

MR. FRIEDMAN: No objection.

MS. CHEN: Can you do a little further inquiry?

THE PROSPECTIVE JUROR: Can I approach the bench?

THE COURT: I want everybody to know that as American citizens very little is required of us. In times of conflict some of us had to go into the Armed Forces -- I did, maybe some of you did too -- every April 15th you have to give money, you do, I do.

Every now and then you're called upon to serve on a jury. I was called to serve on a jury but they wouldn't pick me, so nobody will be excused unless I deem it legally sufficient to do so.

You still say you can't be open-minded?

THE PROSPECTIVE JUROR: No, I can't be.

THE COURT: Come to the side.

(Sidebar.)

THE PROSPECTIVE JUROR: I was in a criminal case before, a criminal case, and I didn't agree with the law as

BHS      OCR      CM      CRR      CSR

37

much, so I was in a case and because I didn't agree with the law, I think I decided without -- that I didn't make the right decision.  I don't want to go through that again.

MS. CHEN:  No objection, your Honor.

MR. HANCOCK:  No objection.

THE PROSPECTIVE JUROR:  I mean, I served on jury before, don't get me wrong, but when you start the case --

MR. FRIEDMAN:  No objection.

THE COURT:  We'll excuse you and send you back down to another jury.

THE PROSPECTIVE JUROR:  Fine.

(Open court.)

THE CLERK:  Juror No. Three, Willie Rabsatt.

THE COURT:  You heard my questions, ma'am?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Any response to them?

THE PROSPECTIVE JUROR:  No..

THE COURT:  Now, all of you have a piece of paper that was on your chair, you have it on your lap now.  I'd like to begin with Juror No. One and work our way through.  I want you to respond to those questions.  When it says, Where do you live, I don't want your address, just the neighborhood.  I live in Bush wick or Kings Park, or whatever it is.

THE PROSPECTIVE JUROR:  Juror No. One.  I lived in Bayside for six years.  My occupation is manager meat

38

department.  Employer is Fresh Direct and Online Grocer.

I am retired from -- retired two times.  One, I was a circuit supervisor, U.S. Department of Agriculture, meat inspection; and number two, I'm retired from the U.S. Army.

Married.  Occupation is -- my wife is in sales, women's clothing.  Children, I have one daughter.  She's a pharmacist.

Schooling, I have high school plus.  I sat on a jury.  I have sat on a jury before.

THE COURT:  State or federal?

THE PROSPECTIVE JUROR:  State.

THE COURT:  Criminal or civil?

THE PROSPECTIVE JUROR:  Both.

THE COURT:  How many times?

THE PROSPECTIVE JUROR:  Six, seven times.

THE COURT:  When was the last time?

THE PROSPECTIVE JUROR:  About six years ago or so.

THE COURT:  When is the last time you sat on a federal jury?

THE PROSPECTIVE JUROR:  Two years ago.  I was not actually selected -- I'm sorry, I was selected.  We never actually sat.

THE COURT:  Was it a civil or criminal case?

THE PROSPECTIVE JUROR:  It was civil.

THE COURT:  In this building?

BHS      OCR      CM      CRR      CSR

39

THE PROSPECTIVE JUROR:  Yes.  Grand jury, no, I've never served on a grand jury.

I was -- never was involved in a criminal case as a complainant or defendant.

THE COURT:  Or witness?

THE PROSPECTIVE JUROR:  Or witness.  Any reason why I could not listen to the evidence?  No, there is no reason.

THE COURT:  You can be fair and impartial if you're chosen?

THE PROSPECTIVE JUROR:  Yes, your Honor.

THE COURT:  Thank you.  Next.

THE PROSPECTIVE JUROR:  Juror No. Two.  I live in Flatbush.

THE COURT:  Can you keep your voice up.

THE PROSPECTIVE JUROR:  Okay.  I live in Brooklyn, Flatbush area.  My occupation is direct care coordinator with United Cerebral Palsy.

I'm married.  My husband work at Waldorf Astoria Hotel.  No other children.  I have secondary schooling.

THE COURT:  Where, where did you go to school?

THE PROSPECTIVE JUROR:  Jamaica.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I sat on a jury once, it was a criminal case.  It was about six years -- five, six years ago.

40

THE COURT:  State or federal?

THE PROSPECTIVE JUROR:  Federal.

THE COURT:  In this building?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Did it come to a conclusion?

THE PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  It was a conclusion.  I've never been a grand juror, never been involved in a criminal case.  I have no reason that I can't render a fair judgment.

THE COURT:  Thank you.

THE PROSPECTIVE JUROR:  I'm sorry, I left my glasses and I have no paper over here.

THE COURT:  We'll give you paper and I'll lend you my glasses.

THE PROSPECTIVE JUROR:  I'm not being funny.  I can't see.

THE COURT:  That's all right.

MR. FRIEDMAN:  Your Honor, I have a pair of glasses that are basically magnifying glasses.

THE COURT:  I'll read it to you.  Try those.

THE PROSPECTIVE JUROR:  If you could read it maybe I can answer it better.  All right.

I live in Brooklyn, New York for about 30 years.  Occupation, clerical, New York City Law Department.  Currently

41

working.  Married.

THE COURT:  When you saw Law Department, is that Cardozo?

THE PROSPECTIVE JUROR:  Corporation Counsel.

THE COURT:  Just a second, ma'am.  Is that Cardozo?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I'm married.  Adult children, I have --

THE COURT:  What does your husband do?

THE PROSPECTIVE JUROR:  Retired Transit.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Adult children.  I have two children.  One child is a para with the Board of Education. My other child is -- he attends day programs.  He's mentally incapable.  Schooling, high school plus.

I have sat on a jury before, civil.

THE COURT:  State or federal?

THE PROSPECTIVE JUROR:  State.

THE COURT:  How long ago was that?

THE PROSPECTIVE JUROR:  Maybe five years.

THE COURT:  Did the case come to a resolution?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  Grand juror, no.

BHS        OCR        CM        CRR        CSR

42

THE COURT:  You never served on a grand jury?

THE PROSPECTIVE JUROR:  No.  Ever been involved in a criminal case?  No, I haven't.  Any reason why you could not listen to the evidence?  No reason why I can't listen.

THE COURT:  Can you be fair and impartial?

THE PROSPECTIVE JUROR:  Well, what actually what I see as fair may not be what you mean by fair.  Is that okay?

THE COURT:  No, being fair is meaning you're listening to all of the evidence and after the evidence is over, you'll decide whether the government has proven its case beyond a reasonable doubt.

THE PROSPECTIVE JUROR:  Your Honor, I could be fair as far as I'm concerned, but it may not be fair to another person.  I know it's complicated.  I may think something is fair and she may not, so my answer to that probably I couldn't be fair, not to the other person.

MR. HANCOCK:  No objection.

MR. FRIEDMAN:  No objection.

MS. CHEN:  No objection, your Honor.

THE COURT:  All right.  We'll send you to another jury.

THE PROSPECTIVE JUROR:  Thank you.

THE CLERK:  Juror No. Three, Paul Lips.

THE COURT:  Have you heard my questions, sir?

THE PROSPECTIVE JUROR:  Yes, I have.

43

THE COURT:  Any responses to any of them?

THE PROSPECTIVE JUROR:  My only concern is the type of work I'm in.  I'm a university professor, and like I canceled my class this morning, it was the first of the semester.  That is my only concern.

THE COURT:  That is no concern.  If it's a choice between serving on a jury for yours truly and being in a classroom, guess who wins?

THE PROSPECTIVE JUROR:  Fair enough.

THE COURT:  Where do you teach?

THE PROSPECTIVE JUROR:  Two schools, New York Institute of Technology and Offstage University.

THE COURT:  What do you teach?

THE PROSPECTIVE JUROR:  Computer graphics.

THE COURT:  Could you read those questions.

THE PROSPECTIVE JUROR:  I live in Long Island.  I've lived there for 30 years.  My occupation is I am a professor and I told you my employment -- employer.

I'm married.  She is a teacher.  I do not have any adult children.  I have two children in public school.

I have a masters of fine art.  I have not sat on a jury before.  I have not sat on a grand jury before.  I have not been involved in a criminal case.

There is no reason I can't be fair and impartial.

THE COURT:  Very good.  Thank you.

44

THE PROSPECTIVE JUROR:  Juror No. Four.  I also live in Nassau County.  I have been living there for nine years. I'm a New York City high schoolteacher with the Department of Education.  I am married.  My husband's is an accountant.

What counts as an adult child?

THE COURT:  Pardon me?

THE PROSPECTIVE JUROR:  What counts as an adult child?

THE COURT:  I've seen three-year OLDS that are adults.

THE PROSPECTIVE JUROR:  I have two children, but they both live at home.  One of them is employed part-time. As for schooling, I have done post-graduate work in educational readership.  I have been on a jury before.  It was a civil case.  It did come to a conclusion.  I have never been a --

THE COURT:  Was it a federal case or state case?

THE PROSPECTIVE JUROR:  State.

THE COURT:  How long ago was that?

THE PROSPECTIVE JUROR:  About five or six years. That was in Nassau County.  I've never been involved in a criminal case and there is no reason I cannot listen to the evidence and be impartial.

THE COURT:  Thank you very much.

THE PROSPECTIVE JUROR:  Juror No. Five.  I have been

BHS        OCR        CM        CRR        CSR

45

living in Suffolk County for about 35 years.  My occupation is a systems warfare technician.  I work for Lockheed-Martin.

I am married.  My wife's occupation is inspector.

THE COURT:  What does she inspect?

THE PROSPECTIVE JUROR:  Electronics, circuit boards. I have one adult child.  He graduated college last year.  Art major.  Not working yet.

I have two years of college.  I have sat on a jury -- sat on two juries before.  Never been on a grand jury.

Never been involved in a criminal case and yes, I could listen to the evidence and be impartial.

THE COURT:  Fair and impartial?

THE PROSPECTIVE JUROR:  Yes.

Juror No. Six.  I live in Staten Island.  I have been there for 14 years.  My occupation is I work for FIA. I'm a manager.

THE COURT:  What is FIA?

THE PROSPECTIVE JUROR:  Family Independence Administration.  I'm married.  My husband is a laborer, he operates machinery.  I have no children.  I have two years college.  I've been a juror before two years ago.

THE COURT:  Federal or state?

THE PROSPECTIVE JUROR:  Federal.

THE COURT:  This building?

THE PROSPECTIVE JUROR:  In this building.

BHS      OCR      CM      CRR      CSR

46

THE COURT:  Criminal or civil?

THE PROSPECTIVE JUROR:  Civil.

THE COURT:  Did it come to a resolution?

THE PROSPECTIVE JUROR:  Yes, it did.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  And I haven't been involved in a criminal case before.  I can listen to the evidence and be fair and impartial.

THE COURT:  Thank you very much.

THE PROSPECTIVE JUROR:  I'm Juror No. Seven.  I live in East New York for the past 19 years.  I'm a real estate salesperson.  I'm married.  I have four adult children.  One is in the navy, one is a cable man, one is a student, one is a landscaper.

I have secondary school education from Jamaica, West Indies.  I've never sat on a jury before.  I've never been a grand juror.  I was involved in a case, criminal case, a complaint of my wife against me.  I was charged with menacing.

THE COURT:  Charged with what?

THE PROSPECTIVE JUROR:  Menacing.  I have no reason why I can't listen to this case and be partial and impartial.

THE COURT:  Be fair and impartial?

THE PROSPECTIVE JUROR:  Be fair and impartial.

THE COURT:  Thank you.

THE PROSPECTIVE JUROR:  Juror No. Eight.  I live in

BHS    OCR    CM    CRR    CSR

47

Suffolk County for about 40 years. I'm in construction, heavy construction. My employer is Glenwood management, Uniondale, 1200 Union Turnpike.

My wife is a secretary for Chase Manhattan Bank in Melville. I have three adult children, two still live at home. My daughter is a graphic artist. I have a son that works in the Intensive Care Unit at Cornell University Hospital. My youngest is in high school grade. I've never been on a juror before. I could be very partial --

THE COURT: Fair and impartial?

THE PROSPECTIVE JUROR: Fair and impartial, yes.

THE COURT: Okay.

MS. CHEN: May we have that sidebar for a moment?

(Sidebar.)

MS. CHEN: What the jury said made me think that you might want to follow-up because there will be extensive evidence about a bank account used at J.P. Morgan/Chase. I don't know if the fact that his wife works at J.P. Morgan/Chase would affect his ability to be fair and impartial. It could obviously go either way in terms of his in particular blaming the bank or, conversely, thinking it is more credible because J.P. Morgan Bank is a good institution. There will be a lot of evidence about J.P. Morgan/Chase related in this case.

THE COURT: How would you have me pose this

48

question?

MS. CHEN:  There will be a lot of evidence about bank accounts held at J.P. Morgan/Chase that were used as part of the alleged criminal activity.  Would that affect his ability to be impartial?

MR. HANCOCK:  There will be extensive testimony and evidence concerning J.P. Morgan/Chase Bank and the fact that your wife is employed there, could you be fair and impartial --

MR. KNOX:  There is also the other banks.  Do you want me to identify the banks?

THE COURT:  No.

(Open court.)

THE COURT:  Ladies and gentlemen, we just had what is called a sidebar.  A sidebar is where the lawyers and the judge discuss issues of law, and it has nothing to do with you the jury because you don't understand the law and I have to make certain rulings.

Notwithstanding these sidebars, everything that is concerned with this trial is being taken down by a court reporter and there is a record of it.

Now, who was it whose wife works in a bank?  There is going to be some testimony in this case about J.P. Morgan Bank and several other banks.

The mere fact that there is going to be testimony,

BHS      OCR      CM      CRR      CSR

49

would this impair your ability to deliberate fairly and impartially in this case if you were chosen?

THE PROSPECTIVE JUROR:  Not at all, your Honor.

THE COURT:  All right.  Next.

THE PROSPECTIVE JUROR:  Juror No. Nine.  I've lived in Park Slope for eight years.  I have two occupations.  I work as a temporary paralegal for Deutsche Bank, and then I'm running my own company.

I don't have a spouse or any children.  I have a bachelor's degree.  I've never sat on a jury before.  I've never been involved in a criminal case and there is no reason why I could not listen to the evidence, follow the instructions as to the law and render a fair and impartial verdict.

THE COURT:  All right.

THE PROSPECTIVE JUROR:  Juror No. Ten.  I live in Queens for about four years.  I'm compliance manager at AI.  I'm single and I have no children.

I have a DJ.  I've never sat on a jury before.  Never been a grand juror and I have not been involved in a criminal case and there is no reason why I could not be fair and impartial.

THE COURT:  Next.

THE PROSPECTIVE JUROR:  Juror No. 11.  I live in Brooklyn 33 years.  Occupation, I am a bail bondsman and I

BHS     OCR     CM     CRR     CSR

50

also work as an assistant property manager.

Bail bondsman, I own my own company and my other employer is Granada Trust.  I am not married, I have no children.  I have my bachelor's degree, I have never been picked to sit on a jury or grand jury.  I have been involved in criminal cases of course due to my occupations, and I can be fair and impartial.

THE COURT:  Next.

THE PROSPECTIVE JUROR:  Juror No. 12.  I live in Hauppauge for a little over 30 years.  I'm an optometrist, sole practice.  I am self-employed.

Married.  She does dance sales product.  I have three children.  One is 21-year-old, part-time school, he sells computers, sells and repairs computers and does Internet sales, has an Internet Website for sales.  My other two children, one in college and one in high school.

Schooling.  College and doctor of optometry.  I have sat on a jury before.

THE COURT:  State or federal?

THE PROSPECTIVE JUROR:  It was state.

THE COURT:  How long ago?

THE PROSPECTIVE JUROR:  The last one was about three and a half, four years ago.  Also in California twice.

I was dismissed on one, came to a conclusion on another.

BHS     OCR     CM     CRR     CSR

51

I have been involved in a civil case but no criminal.  Fair and impartial?  I certainly could be fair and impartial.  Obviously, I mean, I'm probably in the same boat as many people, this would -- you know, every day that I'm out is difficult on my practice, but --

THE COURT:  It will be about a week I say, but I told the lawyers that we're going to sit up until Wednesday -- Thursday and Friday I'll be out.  You won't be here, and then we'll sit a couple of days next week.  Okay?

MS. CHEN:  Are we sitting a half day on Thursday or no?

THE COURT:  A half day.  It depends on how it goes.  Next.

THE PROSPECTIVE JUROR:  Juror No. 13.  I live in Nassau County for four years.  Occupation, bus driver for the MT. I'm not married, I have no children.  I went to two years of college.  Never sat on a jury, never been a grand juror, never been involved in a criminal case.

I could be fair and impartial.

THE COURT:  Thank you.

THE PROSPECTIVE JUROR:  Juror No. 14.  I live in Bay Shore in Suffolk County, I've been there my entire life.  I am currently a substitute teacher in the Brentwood School District.  Prior to that I was in the mortgage business as an underwriter and worked for Chase Manhattan Bank in their

52

mortgage department.

I'm not married. I do not have any adult children. I am currently completing my masters in education. I've not sat on a jury before. I have never been a grand juror. I was never in a criminal case. I can be fair and impartial.

THE PROSPECTIVE JUROR: Number 15. Brooklyn, Brighton Beach, 25 years. Teacher New York City Department of Education. Husband retired.

THE COURT: From where?

THE PROSPECTIVE JUROR: New York City Transit. Two adult children. One a social worker, one works in a chemical plant.

My schooling. Graduate. Yes, I've sat on a jury before, civil and criminal. Yes, the case went to a verdict. No, I've never sat on a grand jury. Yes, I have been involved in -- I have been a witness in a criminal case.

THE COURT: How long ago?

THE PROSPECTIVE JUROR: Ten years. There is no reason why I wouldn't be able to be fair and impartial in this case.

THE COURT: Thank you.

THE PROSPECTIVE JUROR: Juror No. 16. I live in -- I've lived in Suffolk County for seven years. I am a university administrator. My employer is Stony Brook University.

BHS      OCR      CM      CRR      CSR

53

I am not married.  I don't have any adult children. I have a doctorate in English and working on postgraduate work.

THE COURT:  What school are you getting your doctorate from?

THE PROSPECTIVE JUROR:  I got my doctorate already. I'm taking classes in Stony Brook now.  I have not sat on a jury before or been a grand juror.

I have not been involved in a criminal case and there is no reason I cannot listen to the evidence and render a fair and impartial verdict.

THE COURT:  Thank you.

THE PROSPECTIVE JUROR:  Number 17.  I live in Bay Ridge, Brooklyn for the last 32 years.  I'm retired.  My former occupation, New York City Police Department as a detective.  My wife --

THE COURT:  Third grade, second, or first?

THE PROSPECTIVE JUROR:  Excuse me?

THE COURT:  Third grade, second grade, or first grade?

THE PROSPECTIVE JUROR:  Second grade.  I'm married, my wife is a legal secretary for the Commissioner of Trials at the New York City Police Department.

I have four adult children, three of which are active police officers.  My daughter is -- works for the phone

54

company.  I got high school plus.  I've never sat on a jury before.  I've never been a grand juror.

I have been involved in many criminal cases as a witness and the arresting officer.  I can serve as a fair and impartial juror.

THE COURT:  Thank you.

THE PROSPECTIVE JUROR:  I live in Nassau County for 11 years.  Juror 19.  My occupation is tennis teaching pro.

THE COURT:  Is what?

THE PROSPECTIVE JUROR:  Tennis teaching pro.

THE COURT:  A tennis teaching pro?

THE PROSPECTIVE JUROR:  Right.  My --

THE COURT:  This is your season now?

THE PROSPECTIVE JUROR:  Yes.

THE PROSPECTIVE JUROR:  Great Neck Park District. I'm married.  I have no grown-up children.

I have a high school equivalency.  I been a juror before in a civil case.  I never been a grand juror.  I never been involved in a criminal case.  No reason why I cannot listen to the evidence.

THE COURT:  You can be fair and impartial?

THE PROSPECTIVE JUROR:  Fair and impartial, yes.

THE COURT:  Okay.  Next.

THE PROSPECTIVE JUROR:  I've lived in. Bedford-Stuyvesant 49 years.

55

THE COURT:  Four years?

THE PROSPECTIVE JUROR:  49 years.  I'm not married.

THE COURT:  Pardon me?

THE PROSPECTIVE JUROR:  I'm not married.  I don't have no children.  I got 12 years of high school.

THE COURT:  12 years of high school?

THE PROSPECTIVE JUROR:  Yes, I went to high school, I finished high school in the twelfth.

THE COURT:  You went to high school for four years?

THE PROSPECTIVE JUROR:  Yeah, four years.

THE COURT:  You said 12?

THE PROSPECTIVE JUROR:  I'm sorry.  I have 12 years of school.  Okay.

I been a juror before.  I served on a criminal case and --

THE COURT:  Federal or state?

THE PROSPECTIVE JUROR:  State.

THE COURT:  Did it come to a conclusion?

THE PROSPECTIVE JUROR:  I just served on it.

THE COURT:  I thought you said you served on it?

THE PROSPECTIVE JUROR:  Yes, I did, I served, yes, I did serve on the state.

THE COURT:  Did the case come to a resolution?

THE PROSPECTIVE JUROR:  Yeah.  The verdict was guilty.

BHS    OCR    CM    CRR    CSR

56

THE COURT:  Go ahead.

THE PROSPECTIVE JUROR:  I served on a grand jury before for three years.

THE COURT:  State or federal?

THE PROSPECTIVE JUROR:  Federal.  Federal, three years ago.

THE COURT:

In this building?

THE PROSPECTIVE JUROR:  No, the old building.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I was a witness to a crime.

THE COURT:  How long ago was that?

THE PROSPECTIVE JUROR:  That was over ten years ago.

THE COURT:  Okay.  Is there any reason why you could not listen to the evidence, follow the court's instructions and be fair and impartial?

THE PROSPECTIVE JUROR:  I could be a fair and impartial juror.

THE COURT:  Okay.  Next.

THE PROSPECTIVE JUROR:  Juror No. 20, Charles Sanders.  I live in Nassau County for about 40 years. Retired.  My former occupation, I was a printing sales executive.

I'm married.  My wife is also retired.  I have two adult children.  One lives out of town, he's a business

consultant and personal coach.  The other one lives in New York, a housewife.

I have two years of college.  Never sat on a jury before.  Never sat on a grand jury.  Never been involved in a criminal case.  The only reason that -- one of the reasons that I couldn't listen to the evidence is -- the entire evidence is I have travel plans.

THE COURT:  You have what?

THE PROSPECTIVE JUROR:  Travel plans.

THE COURT:  Travel plans?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  When are these plans?

THE PROSPECTIVE JUROR:  I'm leaving -- scheduled to leave Sunday for four nights.

MR. HANCOCK:  No objection.

MS. CHEN:  No objection.

MR. FRIEDMAN:  No objection.

THE COURT:  Where are you going?

THE PROSPECTIVE JUROR:  Going to Lake Seneca, Geneva, New York, Finger Lakes.

THE COURT:  Have a good time.

THE PROSPECTIVE JUROR:  Thank you.

THE CLERK:  Juror No. 20, Maria Demartinez.

THE COURT:  Miss Demartinez, have you heard the questions I've asked?

58

THE PROSPECTIVE JUROR:  No, not all.

THE COURT:  You didn't hear them?

THE PROSPECTIVE JUROR:  No.  What did you say?

THE COURT:  All of the questions I have been. Asking --

THE PROSPECTIVE JUROR:  Oh, yeah.

THE COURT:  Any responses to any of those questions?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Can you read that paper that is on your seat and answer those questions.

Where do you live?

THE PROSPECTIVE JUROR:  I live in Suffolk County.

THE COURT:  How long have you lived there?

THE PROSPECTIVE JUROR:  I live for 30 years over there.

THE COURT:  And what is your occupation?

THE PROSPECTIVE JUROR:  Health aide.  I work in Nassau University Medical Center.

THE COURT:  How long have you been there?

THE PROSPECTIVE JUROR:  I was 17-year and then I laid off and I come back this year.

THE COURT:  Are you married?

THE PROSPECTIVE JUROR:  Yes, I am.

THE COURT:  And what does your husband do?

THE PROSPECTIVE JUROR:  He working in nursing home.

BHS     OCR     CM     CRR     CSR

59

He's a cook.

THE COURT:  Do you have any adult children?

THE PROSPECTIVE JUROR:  Yes, I have four children, one daughter and three son.

THE COURT:  What do they do?

THE PROSPECTIVE JUROR:  Two work -- three working and two -- and one going to school.

THE COURT:  Have you ever sat on a jury before?

THE PROSPECTIVE JUROR:  Yes, I do.  But --

THE COURT:  You sat on a jury before?

THE PROSPECTIVE JUROR:  I was there but I don't stay.  I didn't stay in the case.

THE COURT:  Have you ever served on a grand jury?

THE PROSPECTIVE JUROR:  I was calling but I never was in there stay in the case.

(Continued next page.)

60

THE COURT:  Could you listen to the evidence in this case, follow the court's instructions, my instructions and render a fair and impartial verdict if you were chosen?

THE PROSPECTIVE JUROR:  Well, I can be positive. For me, you know, it's difficult for English, but, you know, every day, if you wanted I stay.

MR. HANCOCK:  No objection.

MS. CHEN:  No objection.

THE COURT:  We won't keep you.  Thank you for your effort.

THE CLERK:  Juror number 20 will be Carmen Morales, M O R A L E S:

THE COURT:  Ms. Morales, have you heard my questions?

THE PROSPECTIVE JUROR:  Yes, I have.

THE COURT:  Any responses to any of those questions?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Can you read the piece of paper that your former colleague was reading?

THE PROSPECTIVE JUROR:  I live in Brooklyn for 47 years.  I am a medical records specialist, my employer is the Health and Hospital Corporation.  I've been there for 18 years.  I'm not married.  I do have two children, one of those, one ten-year old.  One is working at a grocery store and my daughter is in school.  I have high school, fourth

SS        OCR        CM        CRR        CSR

61

year, didn't finish.  I've never sat on a jury before.  I've never been a grand juror.  I've never been on a criminal case or a complaint in any way.  I think I can render a fair and impartial verdict.  Did I get it all?

THE COURT:  Juror number 21.

THE PROSPECTIVE JUROR:  Juror number 21, live in Nassau County 33 years, portfolio manager with the Bank of New York.  My wife is a teacher, specialized teacher in Nassau County.  I have no adult children.  I have a college agree.  I've never been on a jury or a grand jury.  In 1980 I was a defendant in a criminal trial and I can give a fair and impartial verdict.

THE COURT:  Was that criminal trial state or federal?

THE PROSPECTIVE JUROR:  It was a state charge, your Honor.

THE COURT:  It was resolved in your favor?

THE PROSPECTIVE JUROR:  All charges were eventually dropped.

THE COURT:  Juror number 22.

THE PROSPECTIVE JUROR:  Juror number 22.  I live in Staten Island for over 30 years, accountant.  My employer is the Distinctive Group.  I have significant other.  His occupation is a long-term care sales insurance salesperson.  I have two adult children.  One is a physical therapist, one is

SS        OCR        CM        CRR        CSR

62

a teacher.  I've had college plus.  I have served on a jury before, a criminal case in Staten Island.  It was two years ago.  There was a verdict.  I've never been a grand juror.  I've never been involved in a criminal case at all.  There's no reason why I can't be fair and impartial.

THE COURT:  Next.

THE PROSPECTIVE JUROR:  Juror number 23.  I live in Brooklyn for 23 years, occupation is musician.  I'm self-employed.

THE COURT:  What do you play?

THE PROSPECTIVE JUROR:  Mandolin.  My wife is in the fashion industry.  I have two children, grown up.  I have a high school education.  I have served on a jury before, civil case, went to verdict.

THE COURT:  State or federal?

THE PROSPECTIVE JUROR:  State.  I haven't been a grand juror.  I have been on a criminal case, defendant, 23 years ago, convicted of a misdemeanor assault.

THE COURT:  Who was that, you?

THE PROSPECTIVE JUROR:  Yes.  There's no reason I couldn't be fair and impartial.

THE COURT:  Next?

THE PROSPECTIVE JUROR:  Juror number 24, live in Queens, Rockaway Beach, lived there 29 years, technician at Social Security, not married, no children, three years of

SS        OCR        CM        CRR        CSR

63

college.  I've sat on jury duty in civil cases.

THE COURT:  State or federal?

THE PROSPECTIVE JUROR:  State.

THE COURT:  When was the last time you sat?

THE PROSPECTIVE JUROR:  It's been a while.

THE COURT:  What do you call a while?

THE PROSPECTIVE JUROR:  About eight years ago.  I've never been a grand juror, never been involved in a criminal case.  There's no reason I can't be fair.

THE COURT:  And impartial?

THE PROSPECTIVE JUROR:  Impartial.

THE COURT:  Next?

THE PROSPECTIVE JUROR:  Juror number 25, resident of Suffolk County, retired from Suffolk County probation, my husband worked for the Suffolk County district attorney's office, no children, college graduate, never sat on a jury nor been a grand juror, no criminal case involved in and there's no reason I could not be fair and impartial.

THE COURT:  Next, please.

THE PROSPECTIVE JUROR:  Juror number 26, live in Bensonhurst, Brooklyn for seven years, supervisory service statistician for the United States Census Bureau, not married, no children, master's degree, never sat on a jury or have been a grand juror.  I was involved in a criminal case as a complainant nine years ago.  There's no reason I would not be

SS      OCR      CM      CRR      CSR

64

a fair and impartial juror.  However, I am scheduled to travel for business on Wednesday morning and return on Friday.

THE COURT:  From the Census Bureau, the government, right?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  I can order the government to do anything, but is the trip essential?

THE PROSPECTIVE JUROR:  Attendance is mandatory, all people who have the same job I do in an office, we have this yearly conference.

THE COURT:  Where is it?

THE PROSPECTIVE JUROR:  Fox Woods up in Connecticut.

THE COURT:  First year going some place good, is it?

THE PROSPECTIVE JUROR:  Yes.  Attendance is mandatory.

MR. FRIEDMAN:   I have no objection.

THE COURT:  Since you're honest with me, I'm going to let you go?

THE PROSPECTIVE JUROR:  Should I go now?

THE COURT:  Maybe after it's over you wish you had stayed?

THE CLERK:  Juror number 26, David Gutman.

THE PROSPECTIVE JUROR:  Can I come to side bar?

THE COURT:  Yes, Mr. Gutman.

(Side bar.)

SS        OCR        CM        CRR        CSR

65

THE COURT:  Yes?

THE PROSPECTIVE JUROR:  I don't know if I have a number yet.  I'm David Gutman, currently employed by two banks, National City as well as J.P. Morgan Chase, serve as a portfolio manager.  As far as reaching a fair and impartial decision based upon accusations, I don't think that I can based upon prior information dealing with colleagues that deal with similar cases as well as my personal beliefs on situations similar to what the defendant are being accused of.  It's just my personal feeling towards it.  The way I feel where the government has positioned themselves in order to bring this to trial, it's my personal belief.

MR. HANCOCK:   No objection.

MR. FRIEDMAN:   No objection.

MS. CHEN:   No objection.

(Open court.)

THE CLERK:  Juror number 26 Angel Vega, V E G A.

THE COURT:  Have you heard my questions, sir?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Any responses to any of them?

THE PROSPECTIVE JUROR:  No.  Yes, I think I got one, I think I know Mr. Friedman.

THE COURT:  Since you know Mr. Friedman, can you be fair and impartial?

SS        OCR        CM        CRR        CSR

66

THE PROSPECTIVE JUROR: Yes.

THE COURT: How do you know him?

THE PROSPECTIVE JUROR: Because he goes close to my house, I seen him near the office.

THE COURT: Will you answer the questions on that paper?

THE PROSPECTIVE JUROR: I live in Brooklyn for 27 years. My occupation I work in the Board of Education. My occupation, my wife, works in private insurance. I got one daughter is in college this year.

THE COURT: Graduates?

THE PROSPECTIVE JUROR: Just started college. I have been on a civil case, then send us home, you know, we give no decision, send us home, not finish it. I was a criminal juror case.

THE COURT: You served on a jury before?

THE PROSPECTIVE JUROR: Yes.

THE COURT: Was it civil or criminal?

THE PROSPECTIVE JUROR: Criminal.

THE COURT: Was it state or federal?

THE PROSPECTIVE JUROR: Federal.

THE COURT: In this building?

THE PROSPECTIVE JUROR: No, sorry, the state, no federal.

THE COURT: How long ago has that been?

SS        OCR        CM        CRR        CSR

67

THE PROSPECTIVE JUROR:  They called me many times. I think it was three years ago.  Once they call me in 2003.

MS. CHEN:  The government would move to strike this juror for cause.  I believe he said Mr. Friedman man did some work for him, his actual lawyer.

THE COURT:  Was it a closing?

MR. FRIEDMAN:  Not me.

MS. CHEN:  I think the juror believes it at least, your Honor.

THE COURT:  Are you saying this lawyer, Mr. Friedman, did some work for you, was your lawyer?

THE PROSPECTIVE JUROR:  I think -- are you Michael Friedman?  No?  This is the wrong lawyer.

THE COURT:  Anything else?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Can you be fair and impartial?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Juror number 27.

THE PROSPECTIVE JUROR:  Juror 27.  I live in Brooklyn, born here, lived here all my life.  My occupation is school teacher.  I work for the New York City Department of Education as a home bound teacher.  I'm not married.  I have no children.  I have a master's degree from Brooklyn College in special education.  I haven't sat on a jury before.  I've never been a grand juror before, never been involved in a

68

criminal case and there's no reason why I can't listen to the evidence and be a fair and impartial juror.

THE COURT:  Next.

THE PROSPECTIVE JUROR:  Juror number 28, live in Queens all my life, work for Citi Group, not married.  I have two adult kids that live out of state.  One is a school teacher, one is working for the telephone company.  I served on a civil case before, no grand jury, no criminal case and I can listen to evidence, be fair and impartial.

THE COURT:  Let me let you take a five-minute nature break.

(Jurors leave courtroom.)

MR. FRIEDMAN:  May we have a side bar with the attorneys?

MR. HANCOCK:  Might I get a comfort break for a second?

THE COURT:  Yes, then come back.

(Pause.)

(Side bar.)

MR. FRIEDMAN:  I want to inquire if you're going to ask any of these jurors follow-up questions or you're finished.

THE COURT:  I'm finished.

MR. FRIEDMAN:  I would respectfully ask your Honor to the people who have friends and relatives, especially one

juror who is a retired detective, three sons who are both firemen and policemen for a side bar, if any of them know people who were unfortunately killed or injured in 9/11 and whether he discussed it with them, animus towards Middle Eastern people.

THE COURT:  I asked that about the animus and I instructed them they are to be treated as American citizens and, number two, I'm not going to bring up 9-11 in this case, not part of the case.

MR. FRIEDMAN:  I understand.  All I'm worried about, this is a fellow who is a retired policeman, sons who are in the police and fire departments.  Those agencies suffered badly.  I wanted to know if he has residual effect. People don't like to admit that in front of 80 people.  They may be more --

THE COURT:  I'm not going to ask it.

MR. FRIEDMAN:  None of the questions I had on my letter your Honor is going to ask?

THE COURT:  No.  I've instructed them they are to treat everybody as equal, not to hold animus towards people of Middle Eastern decent.

MR. FRIEDMAN:  I understand that.  We've done an admirable job on that.  The issue is nobody, very few people are going to come into court like juror number five said, he even was mealy-mouthed about it, said I can't be fair to

SS      OCR      CM      CRR      CSR

70

Middle Eastern people.  I don't know how many of these people feel the same underneath the skin, but they need a little prodding before they admit.  I won't ask them to admit it in front of 80 people.  They may admit at side bar.

MS. CHEN:    I think you made a good point, which is the more you bring the 9/11 issue up --

THE COURT:  I'm not bringing it up.

MS. CHEN:    There were a number of jurors who had no problem expressing bias, not impartial.  There's no indication this jury pool at all feels intimidated about raising any biases they may have.

MR. HANCOCK:    I'm not trying to trifle with the court.  I have a challenge to the total array of this jury, not one person of Middle Eastern decent, this whole array, everybody in the room.  I want to put on the record.

MS. CHEN:    We're ready to go.  We did think one follow-up question to juror number 28, said she worked for Citi Group.  If the court would mind inquiring what she does for them, I would appreciate that.

MR. KNOX:    Citi Group is one of the banks used in this business.  We want to make sure she wasn't involved.

(Open court.)

THE COURT:  Juror number 28, you work for Citi Group?

THE PROSPECTIVE JUROR:    Yes.

SS        OCR        CM        CRR        CSR

71

THE COURT:  What do you do?

THE PROSPECTIVE JUROR:  Manager.

THE COURT:  Of what?

THE PROSPECTIVE JUROR:  Help desk for the phones.

(Continued on next page.)

72

.          (Side bar.)

MR. FRIEDMAN:    I respectfully except so the record is clear.

THE COURT:  You may.

MS. CHEN:    We're ready to start picking.

MR. FRIEDMAN:    Might I confer with cocounsel?

THE COURT:  Yes.

(Pause.)

MR. FRIEDMAN:    Mr. Hancock is going to give his challenge, point of view?

THE COURT:  What?

MR. FRIEDMAN:    His challenges?

THE COURT:    We'll do it together.

(Pause.)

THE COURT:  What happens, you get 10, they get 6, 6 and 10 is 16 and then you have 12 in the box.

THE CLERK:    I'll tell you when you get down to one challenge per round.

THE COURT:  Let me put on the record Mr. Hancock objected to this panel because there are no Middle Eastern descent.  First of all, I don't know whether they are or aren't.  You can't tell just by names.

In any event, the panel of jurors is selected from the voter registration.  However, I've been informed since 1980, not only do we use voter registration, we also use

SS      OCR      CM      CRR      CSR

73

people from the Motor Vehicle Bureau.  That's it.

MR. HANCOCK:   I have my objection noted.

THE COURT:  You do.

MR. FRIEDMAN:   When we had the side bar before, was it being taken down when I made the request for voir dire?

THE COURT:  Everything is taken down at side bar. You have the record.  The court reporter is not here only for his good looks.

THE CLERK:  Government goes first.

MS. CHEN:   Number 23.

THE COURT:  Now you have 4.

MR. FRIEDMAN:   What is that?

THE COURT:  The government's first pick is 23.  They have one.

MR. FRIEDMAN:   Peremptory challenge?

THE COURT:  Yes.

MR. FRIEDMAN:   We have a challenge for cause.

MR. HANCOCK:   Number 17.

THE COURT:  Make your record.

MR. HANCOCK:   Juror number 17 is a descendent of the New York City Fire Department, several family members also.  He has some pride it seems about his sons's activity with the New York City Fire Department.  I don't think he could be fair and impartial.

THE COURT:  He stated he could be fair and

SS       OCR       CM       CRR       CSR

74

impartial, let the record reflect that.  I was also a member of the New York City Police Department and I say that with pride.

MR. FRIEDMAN:   Take the lowest?

THE COURT:  What's going to happen is the government goes first.  Then the defense goes twice, you get two, so two times two is four.

THE CLERK:  The whole panel.  You can select from the whole panel.

MR. FRIEDMAN:   The government --

MS. CHEN:   You don't have to do it in numeric order, do it in what order you want.

MR. FRIEDMAN:   Now I understand.

MS. CHEN:   You have to pick two right now.

THE COURT:  Pick four.

MS. CHEN:   You're right, I'm sorry.

MR. HANCOCK:   We'll start with number 17 peremptorily.

THE COURT:  Three more.

MR. HANCOCK:   Number 25.

THE COURT:  You've tried cases with me before?

MR. HANCOCK:   Yes, 25, 27 and number three -- sorry, number five, please.

MS. CHEN:   The government selects 21 and then number seven.

SS       OCR       CM       CRR       CSR

75

THE CLERK:  You get another four again.

MR. HANCOCK:    Number 8, number 11, number 13 and number 19.  That's all we have.

MS. CHEN:    Number 9, number 16.

THE CLERK:  You get two more, your last two.

MR. HANCOCK:   We're set.

THE COURT:  You're waiving?

MR. HANCOCK:   Yes.

THE COURT:  We can keep these two as alternates if you want or we can go and start all over again.

MR. HANCOCK:   Want to keep them?

THE CLERK:  The government has one more first.

MS. CHEN:   Number two.

THE CLERK:  The first 12 and the last two would be able to be alternates if you want to pick alternates.

MR. HANCOCK:   I have no difficulty with those two being alternates.

THE CLERK:  28 and 26 would be alternates.

MR. FRIEDMAN:   I don't have any difficulty.  Can I look at my notes, see what happened here, who challenged whom so if I have to make another supplementary motion I could do that?

THE COURT:  Go ahead.

MR. FRIEDMAN:   One minute, your Honor?

THE COURT:  Yes.

SS        OCR        CM        CRR        CSR

76

(Pause.)

MR. KNOX:   We want the remaining jurors to go back into the pool.

MR. HANCOCK:   I'm comfortable with them now.

THE CLERK:  We'll have to get rid of 26 and 28.

MR. FRIEDMAN:   I'm fine, your Honor.

(Open court).

THE CLERK:  The following jurors are excused: 23, 17, 25, 21, 27, 5, 7, 8, 11, 9, 13, 19, 16, 2 and 26 and 28.

THE COURT:  Subject to the conversation we had at side bar, is the jury satisfactory to the defendants?

MR. HANCOCK:   Yes.

MR. FRIEDMAN:   Yes.

THE COURT:  Satisfactory to the government?

MS. CHEN:   Yes, your Honor.

THE COURT:  Please take them into the jury room and then we'll get a pool from the alternates.

(Jurors leave courtroom.)

THE COURT:  How long is your opening?

MS. CHEN:   Estimating about a half hour.

MR. HANCOCK:   Very short.

THE COURT:  What does that mean?

MR. HANCOCK:   No more than ten minutes.

MR. FRIEDMAN:   Ten minutes, your Honor.

THE COURT:  Let's pick the alternates?

77

THE CLERK:  Alternate juror number one, Walter Eberlein.

Alternate juror number two, James Robinson.

Alternate number three, K A R E N, last name M O N G I E L L O.

Number four, Daniel S C H U L T Z.

Number five, Richard K O R W E K.

Alternate number 6, K E R N E L E E, last name B O W E N.

Alternate number seven, Margarette Anderson St. Mard.

THE COURT:  Ladies and gentlemen, have you heard the questions I've asked of your colleagues who were selected? Any responses to any of those questions?

THE PROSPECTIVE JUROR:  Number three.  My connection with the police department, I volunteer, community council at the local precinct.

THE COURT:  Would that impair your ability to deliberate fairly and impartial?

THE PROSPECTIVE JUROR:  No.

THE COURT:  What precinct?

THE PROSPECTIVE JUROR:  112.

THE COURT:  Anything else?

THE PROSPECTIVE JUROR:  As far as crimes, in 1997 I was a mugging victim.  Then in 2003, someone started taking

SS        OCR        CM        CRR        CSR

78

funds out of my checking account. Those are the two crimes.

THE COURT: Did they catch the person?

THE PROSPECTIVE JUROR: In the mugging, no. In the bank issue, they kind of know who did it, but because there were circumstances, they could not arrest the person.

THE COURT: Juror number four.

THE PROSPECTIVE JUROR: My father is a retired New York City police officer.

THE COURT: Where did he work?

THE PROSPECTIVE JUROR: Central Park precinct, Queens Task Force, a 30-year career.

THE COURT: That would not impair your ability to deliberate fairly and impartial?

THE PROSPECTIVE JUROR: No.

THE PROSPECTIVE JUROR: Number five, first date of vacation, I'm going away Saturday until Tuesday.

MR. HANCOCK: No objection.

MR. FRIEDMAN: No objection.

MS. CHEN: No objection.

THE COURT: Where are you going?

THE PROSPECTIVE JUROR: Westbrook, Connecticut, waters edge resort.

THE CLERK: Alternate number five, James queen, Q U E E N.

(Continued on next page.)

SS      OCR      CM      CRR      CSR

79

THE COURT:  Have you heard my questions, sir?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Any responses to any of them?

THE PROSPECTIVE JUROR:  My grabbed father was a police lieutenant in the New York City Police Department for 33 years.  I have been the victim of assaults.

THE COURT:  When was the last time?

THE PROSPECTIVE JUROR:  About 15 years ago.

THE COURT:  Did they ever arrest anybody?

THE PROSPECTIVE JUROR:  No.

THE COURT:  Based upon your grandfather being in law enforcement and your unfortunate encounter with somebody assaulting you, would that impair your ability to deliberate fairly in this case if you were chosen?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Will you begin by reading the paper that is on your chair.

THE PROSPECTIVE JUROR:  Can I see you over there?

THE COURT:  All right.

(Sidebar.)

THE COURT:  Yes.

THE PROSPECTIVE JUROR:  No.  Six.  My stepson was in a criminal case, but I choose not to be.

THE COURT:  Your stepson was involved in a case?

THE PROSPECTIVE JUROR:  Yes.

80

THE COURT:  In a federal court or state court?

THE PROSPECTIVE JUROR:  A state court.

THE COURT:  What happened to the case?

THE PROSPECTIVE JUROR:  I didn't want to be involved in it.

THE COURT:  Pardon me?

THE PROSPECTIVE JUROR:  I didn't want to be involved.  I did not want to know anything about it.

THE COURT:  You don't want to know anything about his case?  Could you be fair and impartial in this case?

THE PROSPECTIVE JUROR:  I'll try.

THE COURT:  Better than that, can you?  Can you?

THE PROSPECTIVE JUROR:  Yes.

MS. CHEN:  Your Honor, could you inquire whether she believes her stepson is being falsely accused or prosecuted.

THE COURT:  When you say your son was involved, what do you mean, how was he involved?

THE PROSPECTIVE JUROR:  He was doing some kind of nonsense.

THE COURT:  Some nonsense.  What happened to him, was he arrested?

THE PROSPECTIVE JUROR:  He was arrested.

THE COURT:  Was he convicted?

THE PROSPECTIVE JUROR:  I didn't want to be involved.

BHS     OCR     CM     CRR     CSR

81

THE COURT:  He doesn't want to be involved?

THE PROSPECTIVE JUROR:  No, I didn't want to be involved.  I didn't want to know anything about the case.

THE COURT:  What happened to his case now?

THE PROSPECTIVE JUROR:  It's still pending.

THE COURT:  It's still pending?

THE PROSPECTIVE JUROR:  Yes.

MR. HANCOCK:  I have no objection, Judge.

MS. CHEN:  I guess I'm a little concerned that perhaps she feels that her stepson may be unfairly arrested or being prosecuted.

THE COURT:  Was he treated fairly when he was arrested?

THE PROSPECTIVE JUROR:  They found something on him. I don't know.

MS. CHEN:  The question is whether or not --

THE COURT:  It's up to you.

MR. FRIEDMAN:  I would like to hear some more questions and answers, your Honor.

MS. CHEN:  We would move to strike her for cause based on the possibility that this may affect her ability to be fair and impartial in this case, your Honor.

THE COURT:  She says she could be fair.

MR. KNOX:  She seems hesitant.

MS. CHEN:  I believe she said I'll try, and being

BHS        OCR        CM        CRR        CSR

very honest she said I'll try.

THE COURT:  What happened with the stepson?  Tell me what you know about the case.

THE PROSPECTIVE JUROR:  What I know is he was -- they came on some people telling them they will do something for them and those things were never done.  It was credit cards.

THE COURT:  Credit cards also.  The case is still pending?

THE PROSPECTIVE JUROR:  Still pending.

MR. FRIEDMAN:  It's not like this case.

MS. CHEN:  It does involve fraud.  That is the issue.

THE COURT:  The question is, and you folks will have to decide, do you really think you can be fair and impartial in this case if you were chosen?

THE PROSPECTIVE JUROR:  I'll try.

MR. HANCOCK:  I have no objection to her being removed.

MR. FRIEDMAN:  I would like to hear some more questions and answers.

THE COURT:  That's the best you're going to get. She tried to divorce herself from this and didn't want to know anything.

MR. FRIEDMAN:  I understand that.  I have a feeling

that -- I forgot the jurors name, let's say juror No. Seven --

THE PROSPECTIVE JUROR: Seven.

MR. FRIEDMAN: Would you --

THE COURT: No.

MR. FRIEDMAN: If we rephrase the question in a slightly different manner we would get a more definite answer one way or the other.

MS. CHEN: Your Honor, may I -- perhaps you can inquire if given her situation she feels hesitant to judge somebody, to be placed in a position of having to judge someone's guilt or innocence.

THE COURT: What kind of question are you talking about?

MR. FRIEDMAN: The fact that her son has a case, she says it won't affect this case. The summation question on the sheet is can you be fair and impartial in this case.

THE COURT: She said yes reluctantly. You want her?

MR. FRIEDMAN: I don't know yet. I want to hear all the other questions about her background.

THE COURT: Is there anything else you wish to tell us about this?

THE PROSPECTIVE JUROR: No.

THE COURT: Okay. You can go back.

(Prospective juror leaves.)

THE COURT: Although she says she can be fair and

84

impartial, I think she was quite reluctant and Luke warm in that response. That is my impression. It's up to you.

MR. HANCOCK: I feel the same way. She's very equivocal.

MS. CHEN: That is what the government's position is also, she should be struck for cause.

MR. FRIEDMAN: I don't think she should be struck for cause, not right now.

THE COURT: She's struck for cause.

MR. HANCOCK: Judge, the Juror No. Three, Alternate No. Three, she's in the 112 Precinct council. I was in the council for years. I was former head of Forest Hills Little League. I was very active.

I still am pro bono counsel for them and sponsor teams there. I don't want her in the middle of the trial to have some sort of epiphany and remember my name.

THE COURT: You want me to ask her if she knows you?

MR. HANCOCK: Yes. I live in Forest Hills. My office is in Forest Hills. I don't want any problems.

(Open court.).

THE COURT: Juror No. Three, do you know Mr. Frank Hancock?

THE PROSPECTIVE JUROR: Frank --

THE COURT: Hancock?

THE PROSPECTIVE JUROR: No.

BHS      OCR      CM      CRR      CSR

85

THE COURT:  There goes your popularity.

Juror No. Seven, we'll let you go.

THE CLERK:  Juror No. Seven, Monica Abbott.

THE COURT:  Have you heard my questions, ma'am?

THE PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Any responses to any of them?

THE PROSPECTIVE JUROR:  No, sir.

THE COURT:  Juror No. One, can you begin with answering those questions on the piece of paper you have?

THE PROSPECTIVE JUROR:  Yes, sir.  I live in Queens, New York for 36 years.  My occupation is a HVAC technician. My employer --

THE COURT:  HVAC is air-conditioning?

THE PROSPECTIVE JUROR:  Yes, heating, ventilation and air conditioning.  My employer is Falk Technical.  I am married.  No adult children.  Schooling, trade school, high school.  And I never been on a jury before.  And I can render a fair and impartial verdict.

THE COURT:  You can?

THE PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Next.

THE PROSPECTIVE JUROR:  Number two.  I live in Queens, New York for the past 31 years.  My occupation is standard review specialist.  My employer is New York City Department of Correction.

BHS     OCR     CM     CRR     CSR

86

THE COURT:  What do you do in the Department of Correction?

THE PROSPECTIVE JUROR:  I'm a coordinator for the Grievance Resolution Program.

THE COURT:  Who is grieving, the correction officers having grievance?

THE PROSPECTIVE JUROR:  Inmate population.  Conflict resolution.

THE COURT:  You resolve the inmates' grievance too?

THE PROSPECTIVE JUROR:  Right.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  I have been working for the Department of Corrections for 30 years.  I am single.  I have no adult children.  Schooling, high school and college.  Yes, I sat on a jury before.  I've sat on several criminal and federal cases before.

No, I never been on a grand jury.  No, I never been in a criminal complaint or defendant or witness in a case. No, I see no reason that I cannot render a fair and impartial verdict.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Number three.  I have lived in Queens County for 26 years.

Currently I am an analyst grant manager with New York City Human Resources Administration.

BHS     OCR     CM     CRR     CSR

87

I am single, I have no adult children.  I have a masters degree in business.  I have served on a jury in 1997.  It was a criminal case in the state court in Queens.

I have never been on a grand jury.  I have never been involved in a criminal case and, yes, I can be fair and impartial.

THE COURT:  Thank you.  Next.

THE PROSPECTIVE JUROR:  Juror No. Four.  I have lived in Nassau County for the past year.  Prior to that I spent eight years in Suffolk County.

My occupation, I'm director of logistics.  The company I work for is Canon U.S.A.

THE COURT:  That is the cameras?

THE PROSPECTIVE JUROR:  Yes, your Honor.

I'm married.  My wife is a stay-at-home mother.  I have a bachelor's of science degree.  I have sat on a jury before, however, the case did not go to verdict.  It was a criminal case.

I have never been involved in a criminal case as a complainant, defendant or witness.  I feel that I will be able to give a fair and impartial verdict.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Juror No. Five.  I've lived in Nassau County for 51 years.  I'm currently retired.  My last job was a teacher of meditation.  I'm not married, I have

88

no children.  I have a masters in engineering science, a masters in applied science with statistics, a masters in business administration.

I've never been on a jury before.  I've never been on a grand jury.  I have never been involved in a criminal complaint.  There is no reason that I can't render a fair and impartial verdict.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Juror No. Six.  I have lived in Queens for nine years.  My occupation, I'm a check service representative.  I work with Reserve Management Corporation.

I'm not married.  I don't have any children.  I have a bachelor's degree in business administration.  I have not sat on a jury before.  I haven't been on a grand jury.  I have not been involved in a criminal case, and there was no reason why I can't listen to the evidence and follow the court's instructions and render a fair and impartial verdict.

THE COURT:  Okay.

THE PROSPECTIVE JUROR:  Number seven.  I live in Comma.  I'm there 20 years.  I'm a certified nursing assistant at St. James Health Care facility.  I am married.  My husband is in shipping and receiving.  I have five children, three of which are adults.  I have associates plus.  I have never been on a jury.  I've never been on a civil or criminal case.  I have never been a grand juror.  Never a witness.  I definitely

BHS    OCR    CM    CRR    CSR

89

could be a fair and impartial juror.

THE COURT:  All right.  Come up.

(Sidebar.)

MR. FRIEDMAN:  How many peremptory challenges do we have?

THE COURT:  Two and two.

MS. CHEN:  Three.

MR. HANCOCK:  Number one, please.  Number seven, please.

THE CLERK:  The government, the last.

MS. CHEN:  Five.

(Open court.)

THE CLERK:  The following jurors are excused: Alternate one, alternate three, you're excused, alternate five, you're excused.  Alternate seven.

THE COURT:  Subject to your motion, Mr. Hancock, are the alternates satisfactory?

MR. HANCOCK:  Yes, sir.

THE COURT:  Mr. Friedman?

MR. FRIEDMAN:  Yes, your Honor.

THE COURT:  The government?

MS. CHEN:  Yes.

THE COURT:  The jurors in the back of the room are excused.  Return to the Central Jury Room.

(Prospective jurors leave.)

THE COURT:  Bring in the rest of the jurors, please.

(Jurors present.)

THE COURT:  Ladies and gentlemen, we're going to let you go until 3 o'clock.  We have some other business to take care of.  You return at 3 o'clock.  You'll go to this room right here.  All right.

(Jurors leave.)

(Continued next page-Suppression hearing follows.)

BHS        OCR        CM        CRR        CSR

THE COURT:  It is my understanding there are is a motion to suppress pretrial statements and post-trial statements?

MS. CHEN:  Just pretrial, your Honor.

THE COURT:  Pretrial.  Do you have a witness?

MR. KNOX:  We do.  Shall we start now?

THE COURT:  Yes.

MR. KNOX:  The government calls Special Agent Brian Murphy.

B R I A N    M U R P H Y,

    called as a witness, having been first duly sworn,

    was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KNOX:

Q    Where do you work?

A    With the FBI.

Q    What do you do?

A    I'm a special agent.

Q    How long have you been working for the FBI?

A    For over seven years.

Q    And what unit are you assigned to?

A    I am assigned to CT-1, or Counterterrorism Squad 1.

Q    What are your responsibilities as a special agent in CT-1?

A    I investigate terrorist type activities and crimes that

BHS      OCR      CM      CRR      CSR

Murphy - direct - Knox                                    92

are associated with those.

Q    Describe your experience in dealing with individuals in the Yemeni community.

A    I have had extensive dealings with people in the Yemeni community.  I probably interviewed upwards of 200 or more persons that are originally from Yemen.

         I have investigated a number of crimes involving Yemeni people and in the course of those investigations I've interviewed witnesses as well as people that had no information, etcetera.

Q    Do you have any training or education in the Arabic language?

A    Yes.

Q    Describe that.

A    I have taken six semesters of Arabic, including a full emergent program in which I went away to school for about ten weeks and spoke nothing about Arabic, and I've lived in one Middle Eastern country for an extended period of time.  I spoke Arabic there.

Q    And do you have education or training in Middle Eastern issues?

A    Yes.

Q    And describe that.

A    I am getting my masters from Columbia University in Islamic studies, which focuses on just that, the religion of

Islam.

Q    Do you have experience in evaluating whether an individual from the Yemeni community or the Middle Eastern community can speak English?

A    Yes.  I have investigated all sorts of crimes, not just Middle Eastern type of people that are involved with crimes or Arabic speakers.

From the beginning, I've worked on drug cases which involve people from all walks of life, and I've come to be able to determine whether, at least in my opinion, whether these people can understand what I'm saying and whether I have a difficulty understanding what they are saying.

Q    Directing your attention to December 21, 2003.  Did you do anything significant regarding this case on that date?

A    Yes.

Q    What?

A    I arrested Aref Elfgeeh.

Q    Where?

A    JFK Airport in Queens.

Q    Do you see Aref Elfgeeh in the courtroom?

A    Yes.

Q    Can you point him out?

A    He's the gentleman sitting at the end of the defense table.  He's got a dark --

MR. FRIEDMAN:  Indicating the defendant, your Honor.

THE COURT:  Let the record reflect the witness has identified the defendant Aref Elfgeeh.

MR. KNOX:  Aref Elfgeeh, your Honor.

Q    Where did you arrest him?

A    At JFK Airport.

Q    And did you have an arrest warrant?

A    Yes.

Q    What was Aref Elfgeeh doing at JFK Airport?

A    Arriving from originally Yemen, reentering the United States.

Q    Describe how you conducted the arrest.

A    I got a call in the morning that he had arrived.  The INS inspectors on scene had held him until I got there and then when I arrived I placed him under arrest.

Q    Did you advise him of his rights?

A    Yes.

Q    Describe how you did that.

A    I advised him of his rights several times during the arrest processing.  The first time was at JFK Airport.  I told him he was under arrest and then I read him his Miranda warnings.

Q    What did you read them from?

A    I keep an advice of rights card in my wallet at all times and I took that out and read it.

Q    Showing you what has been marked for identification as

Murphy - direct - Knox 95

Government Exhibit 1.

Do you recognize this?

A    Yes, I do.

Q    What is it?

A    This is a copy of the advice of rights card that I keep with me.

Q    Did you read these rights to Mr. Aref Elfgeeh as they are outlined in the card?

A    Yes.

MR. KNOX:  Your Honor, the government offers Exhibit 1 into evidence.

MR. FRIEDMAN:  No objection.

THE COURT:  Received.

Q    Will you please read the card.

A    Before we ask you --

MR. FRIEDMAN:  I'll stipulate what it says on the card.

MR. KNOX:  Fine.

THE COURT:  All right.

Q    What did you do next?

A    I asked him if he understood what I read to him and he advised that he did.

Q    Then what did you do?

A    I began transporting him from JFK Airport back to my office in lower Manhattan.

BHS    OCR    CM    CRR    CSR

Q    Did Aref Elfgeeh say anything during that drive?

A    Yes.  Once we were in the vehicle, he began to say he knew what it was about and that Abad Elfgeeh, his uncle, was the person to blame.  I told him not to speak about the case until we got back to my office.

Q    Was it your sense that he was eager to talk about the case?

A    It was my sense that he was looking to shift the blame to his uncle and get himself out of the situation, and it was my sense that he felt by talking about the case he might be able to do that.

MR. FRIEDMAN:  Can I object to the answer as not being responsive?

THE COURT:  First of all, you have to stand up.

MR. FRIEDMAN:  Sorry, your Honor.  I object to the answer and not being responsive to the question.

THE COURT:  I think the question was did he have a sense -- what was the question?

MR. KNOX:  Whether Agent Murphy had a sense of whether Aref Elfgeeh was eager to talk.

THE COURT:  I will allow it.

Q    What happened when you returned to the FBI?

A    Once we got to the FBI office, I brought him into an interview room and I again began to read him his rights.

I handed him an advice of rights form which was

written in both English and Arabic.

Q    I'm showing you what has been marked for identification as Government Exhibit 2.

Is this the form that you provided to Aref Elfgeeh?

A    Yes, it is.

MR. KNOX:  The government offers Exhibit 2 in evidence.

MR. FRIEDMAN:  Can I see the original?

MR. KNOX:  I do not have the original.

MR. FRIEDMAN:  Does the agent have the original that I can look at?

THE COURT:  Stand up when you talk.

MR. FRIEDMAN:  I'm sorry, your Honor.  I'm trying to multitask in my brain.

THE COURT:  What was the question?  Do you have the original?

THE WITNESS:  I have to go look for it.  I don't know where it is.

THE COURT:  Until then --

MR. FRIEDMAN:  I have no objection.

THE COURT:  All right.  Are you offering this?

MR. KNOX:  I have offered it, your Honor.

MR. FRIEDMAN:  I have no objection.

THE COURT:  All right.  Received.

Q

Murphy - direct - Knox                                    98

(So marked.)

Q    Describe the process by which you advised Aref Elfgeeh of his rights based on this document, Exhibit 2?

A    The first thing I did was tell him to read the form and then when he was done reading let me know that.

I asked him if he understood what was written.  He said yes.  I then read him the advice of rights form in English, and once I was done with that, I went over each line and had him tell me back what I said, at least what his understanding of each sentence was.  He did.

At the conclusion of that, I asked him if he wanted to speak with us.  He said he would.  I asked him to sign the form.  He did not want to sign the form.  I told him that I was going to put "refused to sign" and we began to speak.

Q    Did you believe that based on his -- your statements to him and his statements to you that he understood -- that he fully understood his rights?

A    Yes.  I would like add one more thing if I can.  In the course --

MR. FRIEDMAN:  Objection, your Honor.

THE COURT:  Sustained.

Q    Would you like to add to your prior answer?

A    Yes.

Q    Please add.

A    During the course of the reading him the rights, he asked

BHS        OCR        CM        CRR        CSR

me a question about one of the sentences.  He asked me whether he could stop answering questions at any time.  He just wanted clarification on that, of which I gave him.

I just basically explained to him again if he chose to stop answering questions when he was speaking with us, he was free to stop at any time.

Q    Then what happened?

A    Then we began to talk about the criminal case.

Q    Did you ask questions -- what language did you ask questions in?

A    In English.

Q    And what language did he answer questions in?

A    In English.

Q    What was your impression of his understanding and ability to speak English?

A    He could understand what I was saying and I could understand his responses back.

Q    Did you ask about his understanding of English and background?

A    Yes.

Q    What did he say?

A    He said that he had completed high school in Yemen and that he basically, when he arrived in the United States, he enrolled in an English program at a high school in Brooklyn and that he had also worked in stores in 1995 upon arriving

and that that was his educational level, or his understanding -- that's how he developed his understanding of English.

Q    Did there come a point in time when the questioning stopped?

A    Yes.

Q    Describe what happened.

A    We reached a point in the interview where I believe I believed that he was not telling the truth and I took a break and I asked him if he wanted something to eat.  I myself was hungry.  So I went down and got some food and that's when the break occurred.

Q    Did you get an interpreter?

A    Yes.

Q    Why?

A    It was what I would call a random decision.  I just happened to be buying water over at another area of the FBI office.  I was thinking to myself of how I could get Aref to tell what I believed to be the truth -- I thought he was lying at that point -- and I saw an interpreter who happened to be on duty and I asked him if he could assist me.

        I thought that that might be a strategy to get him to come around and tell the truth.

Q    Did you get an interpreter?

A    Yes.

BHS      OCR      CM      CRR      CSR

Murphy - direct - Knox                                           101

Q      And then what happened?

A      I told the interpreter briefly what the case was about. He came over and began to interpret questions.

Q      Then what happened?

A      That lasted about five minutes.  There were very few questions asked and the interpreter turned to me and said that Aref was tired and that he wanted his lawyer.

Q      What did you do?

A      I terminated the interview.

Q      What was -- what kind of tone did you use in the questioning?

A      It was conversational.

Q      Was Aref Elfgeeh handcuffed?

A      We uncuffed him.  He was handcuffed while being transported to 26 Federal Plaza.  Once we were there and were in the interrogation room, he was uncuffed.

Q      Did you form an impression as to whether Aref Elfgeeh was relaxed during the interview?

A      Yes.

Q      What was your impression?

A      I believe he was.

        MR. FRIEDMAN:  Objection.  Operation of another person's mind.

        THE COURT:  He's talking about his impression.

        MR. FRIEDMAN:  His impression of the --

BHS        OCR        CM        CRR        CSR

THE COURT:  I'm going to allow it.

A    I believe he was relaxed.

Q    Based on what?

A    We had had a lot of conversation not only about things involving the case but about some of the things in his personal life.

I believe that he was comfortable with us, that we were -- that we were telling the truth and he knew that, and I think he was trying to get himself out of the case and was relaxed enough to attempt to do that.

Q    Did he seem alert to you?

A    Yes.

Q    Did you ever yell at Aref Elfgeeh when you questioned him?

A    No.

Q    Did you ever threaten him?

A    No.

Q    Did you ever ask him if he want ad interpreter?

A    No.

Q    Why not?

A    Because we were talking in English the whole time and I had no problem communicating with him and he had no problem communicating back to me.

Q    How long did this interview last?

A    About an hour.

BHS        OCR        CM        CRR        CSR

Murphy - direct - Knox                                    103

Q    After the date of this interview, did you ever have occasion to hear Aref Elfgeeh speaking or communicating in English?

A    Yes.

Q    Describe that occasion or those occasions.

A    A few weeks after the arrest, I was out -- leaving my office at 290 Broadway and Aref Elfgeeh was on the street corner.  He approached me, asked he me for his property back.

     I told him that it was highly -- that it was not allowed for us to have discussions without the lawyers being present and if he wanted his property back, he needed to go through his lawyer.  And I told him that was the only way we would give it back.

Q    Were there any other occasions in which you observed Aref Elfgeeh communicating in English?

A    Yes.

Q    What?

A    The next was in May of 2005 at an interview session in the U.S. Attorney's office with his lawyer present.

Q    Describe how you observed him communicating in English.

A    He was using an interpreter during that interview; however, he responded to questions that were asked in English prior to any interpretations being done, meaning that he would give an answer sometimes in English and sometimes in Arabic.

     That did not happen all the time, but on several

Murphy - direct - Knox                                     104

occasions he understood the questions and responded back

before they were ever translated.

Q     Any other occasions?

A     Yes.

Q     When?

A     The date of the last hearing, the one prior to this court

date.  After the court broke up, I was out in the hallway and

he was in discussions with the paralegal who was sitting at

the trial table over there.

       I heard the paralegal talk to him about being on

time, about being remanded or -- not remanded, excuse me.  The

judge had talked to him about being on time and wearing a

suit, and they were discussing both those things.  It was not

a long conversation, but they were speaking in English.

       MR. KNOX:  No further questions, your Honor.

       THE COURT:  Cross.

       MR. FRIEDMAN:  Yes, your Honor.  Are we going to

take break for lunch, your Honor?

       THE COURT:  No.

       MR. FRIEDMAN:  No?

       THE COURT:  Let's go.

       (Continued next page.)

BHS      OCR      CM      CRR      CSR

CROSS-EXAMINATION:

BY MR. FRIEDMAN:

Q    Prior to your testimony today, did you have occasion to review any documents to refresh your recollection?

A    Yes.

Q    What documents were those?

A    I reviewed my 302s, the reports I wrote.  I reviewed the advice of rights form.  I reviewed every -- I mean, pretty much every document that we are presenting at this trial.

(Continued next page)

BHS       OCR       CM       CRR       CSR

CONTINUING CROSS-EXAMINATION

BY MR. FRIEDMAN:

Q     Could you tell us what time you got a call from Customs on 12-21-2003?

A     I recall I believe it was a Sunday and it was roughly around 7:00 a.m.

Q     That would indicate to you that Mr. Elfgeeh was apprehended by Customs at about that time?

A     I don't know when they detained him, but it was before that.

Q     They had detained him pursuant to you lodging a warrant with the INS system?

A     There was a criminal warrant lodged in the system that all law enforcement people have access to.

Q     That was pursuant to a complaint issued out of this court?

A     That's correct.

Q     Do you remember what time you got to the airport?

A     It was about 9:00 o'clock or 9:15, somewhere in that neighborhood.

Q     When you got to the airport, who did you speak to?

A     I went to where the Customs agents and INS agents told me to go to.  I spoke to them.  They said he's in that room over there and then I went and got him.

Q     Is that the full extent of your conversation with the

INS people that he was over there?

A     I asked him if he had anything on him of value that they had found.  I asked him if there's any property that was with him that we should take.  They said there was and they gave me that property.

Q     What property was that?

A     I believe it was personal effects, like his wallet.  He had like a plane ticket.  I know he had some luggage with him, things like that.

Q     You were with another agent at the time?

A     I was with a New York City detective.

Q     Mr. Finn?

A     Yes.

Q     Did Mr. Finn go in fact and get Mr. Elfgeeh's bag?

A     I don't recall if he did.

Q     You knew Mr. Elfgeeh was a citizen of Yemen?

A     Yes.

Q     In fact, he carried a Yemeni passport?

A     Yes.

Q     I believe that you noted that in your 302 of the arrest?

A     Yes.

Q     Prior to your arrest of Mr. Elfgeeh on December 21st, did you do any inquiry into Mr. Elfgeeh's background?

A     Yes.

Q     What kind of inquiry did you do?

SS       OCR      CM      CRR      CSR

A     Mostly financial checks, also --  really just financial checks, what his status was in the United States.  I think that was about it, and where he lived in the United States, other biographical information.

Q     Did you do any inquiry as to his education in Yemen?

A     No.

Q     Did you do any inquiry as to his education in the United States?

A     No.

Q     You knew, of course, Mr. Elfgeeh had no criminal record?

A     That's correct.

Q     Had you spoken to Mr. Elfgeeh's relatives --

A     I believe he had been arrested, I believe a minor matter, one arrest.  I was incorrect in my previous answer.

Q     Do you remember what he was arrested for?

A     I'm guessing.  I believe it was a misdemeanor.  I could be mistaken, but I think it was a misdemeanor.

Q     When was that?

A     I don't recall.

Q     Do you know the outcome of that case?

A     I do not remember.

Q     Did you speak to other people in the Yemeni community about Mr. Elfgeeh, I'm talking about prior to 12-21-2003?

A     Yes.

Q     They in fact told you he had a limited knowledge of

SS      OCR      CM      CRR      CSR

Murphy-cross-Friedman                                     109

English?

A       I never asked them.  They never told me what his English was.

Q       Do you know when he first came to the United States?

A       Yes.

Q       That was in 1995?

A       Approximately, yes.

Q       You know that he had gone back to Yemen before?

A       I knew after arriving in the United States he returned to Yemen at least twice.

Q       You knew how long he had been out of the country when he returned to Yemen?

A       No.

Q       When you first saw Mr. Elfgeeh, what did you say to him?

A       First thing I said to him are you Aref Elfgeeh?  He said yes.  Then I told him he's under arrest.  There was a federal warrant for his arrest.  I then said don't say anything.  I'm going to read you your rights.  As soon as I walked in the room, he began to talk to me, began to say I know what this is about.  I said just wait a minute, let me read you your rights first and we're not going to talk here.  That's what we did.

Q       This advice of rights form you took out of your pocket or something?

A       Yes.

Q       You read them to him in English?

SS        OCR        CM        CRR        CSR

A     That's correct.

Q     At you make any notation on the advice of rights form that you carry around with you that you gave him the rights, the date, the time, the place, anything like that?

A     The one I keep in my pocket?

Q     Yes.

A     No.

Q     How about on any Advice of Rights form did you make a notation that you read Mr. Aref Elfgeeh's rights to him at JFK at a particular time, a particular place?

A     No.

Q     After you told him -- you gave him these rights, did you have a substantive conversation with him?

A     I'm not sure what you mean by "substantive. "

Q     Conversation apart from do you understand this, do you understand what I said, did you have a conversation relating to the case?

A     Not until we got back to my office in lower Manhattan. He was trying to begin a conversation in the car ride back.

Q     Let's talk about you're now in the INS office or Customs office?

A     Yes.

Q     Let's talk about what happens just in there, okay?

      What did you say to him besides the fact, besides questions relating to this form and what you said to him about

the form, what did he say to you, what did you say to him?

A        Nothing.

Q        You told us everything, the conversation between yourself and Aref Elfgeeh was related to the advice of rights form, what he said to you in response to that, you're under arrest, then there was no other conversation?

A        No, I do recall telling him what we were going to do with him that day, what the general outline of things was going to be.

Q        What did you say to him?  Tell the court.

A        I told him we're going to take him back to our office, have an opportunity to talk to him there and we would then -- he would have an opportunity to talk to his lawyer after we had spoken, if he wanted to speak and I told him we had to process him.  I told him what I tell everybody, which is I expect he doesn't do anything to harm any of us and we will treat him appropriately.

Q        Anything else?

A        That was it.

Q        You left the INS office, let's assume it's for the sake of argument the INS office, and then you went to some kind of vehicle?

A        Yes.

Q        Who was in that vehicle?

A        Myself and Brendon Finn.

SS        OCR        CM        CRR        CSR

Q     Did you have any conversation with Mr. Elfgeeh from the walk from the INS office to the vehicle?

A     No.

Q     Did you have any conversation with Police Officer Finn and yourself concerning what was going on from the walk from the INS office to the vehicle?

A     I don't recall.  I mean it was nothing --  if anything, I'm guessing --  I don't recall what was said.

        THE COURT:  Don't guess.

A     (Continuing)I don't recall anything.

Q     Is there any document you could read to refresh your recollection?

A     No, the walk took about a minute maybe.  We parked right in front of their office.

Q     Mr. Elfgeeh had a bag; is that correct, a piece of luggage?

A     Yes.

Q     How was that piece of luggage taken from whoever it was at Kennedy to the van?

A     It was not a van.

Q     A car, sorry.

A     I don't recall if I carried it or what exactly happened at that point.  There were two other persons from Yemen or Yemeni people that were living in Brooklyn that were also there.  We had a brief conversation with them, but I can't

recall what we did with the bag, who was carrying it.

Q     Was there a conversation between you and Agent Finn about some MRI's or x-rays that he found inside the bag, or he found?

A     No.

Q     Did Mr. Aref Elfgeeh say he had an operation in Saudi Arabia?

A     I don't recall.

Q     Did he tell you his back was hurting from that operation?

A     No.

Q     Did he tell you he had a tumor removed from his spine?

A     No.

Q     He didn't tell you he was uncomfortable?

A     No.

Q     You didn't make a remark to him or to Agent Finn concerning what Mr. Elfgeeh said about that?

A     No.

Q     Agent Finn never showed you these MRI films or x-ray films?

A     No.

Q     Now we're at the point we're in your car, okay?

A     Yes.

Q     Have you described the conversation between yourself and Aref Elfgeeh in full that took place at the airport?

SS      OCR      CM      CRR      CSR

Murphy-cross-Friedman                    114

A       The conversation was --

Q       I don't want you to repeat it.  I want to know what you said was everything that was said up to that point.

A       As I recall it, yes.

Q       Prior to the arrest of Mr. Elfgeeh on 12-21-03, you had arrested foreign nationals before?

A       Yes.

Q       On how many occasions?

A       I'm not sure.

Q       More than ten?

A       Over 30, probably over 50.

Q       In fact, you were involved at that particular time in the investigation of many foreign nationals?

A       Yes.

Q       Prior to 12-21-2003, you received training with respect to the arrest of foreign nationals?

A       The FBI offers no specific training.

Q       I'll rephrase the question a little bit.  Did you, prior to that date, did you receive specialized instructions with respect to the arrest of foreign nationals?

A       No.

Q       You didn't receive any specialized procedures to be followed when you arrest a foreign national?

A       The only procedure --  no, I mean we were, at one point we've been told, depending on which country the person is

SS      OCR      CM      CRR      CSR

from, they have a right to either have their consulate in New York or embassy contacted.  They have to be asked that, but beyond that, no.

Q     Do you know what law or what treaty gives foreign nationals that, I'll call it a right?

THE COURT:  I'll sustain that.  There's no relevance to that.

Q     Are you saying that you knew that you had to advise a foreign national that he has a right to have you contact his consulate at the time of arrest?

A     Actually, what the rule is, at least in the FBI, not every country has got --  there's a listing of countries. Some, there has to be an absolute contact.  Others it's a prerogative of the person being arrested and some have neither.

Q     Let's assume that's correct.  Doesn't the arrestee, who is the foreign national, isn't it mandatory that you must advise him that he has the right to have you call his consulate?

A     Like I said, there are really three categories, depends what category they fall into.

THE COURT:  What category does the Yemeni national fall into?

THE WITNESS:  I'm not positive.  I believe it is they have the right to have the consulate contacted or not.

It's not mandatory contact.

Q     It is mandatory that you advise the foreign national that he has that right;  isn't that correct?

A     I believe it is, yes.

Q     But you chose not to tell Mr. Aref Elfgeeh at the time you said you're under arrest you have a right to have me call your consulate and advise them you're under arrest; is that correct?

A     I can't answer that yes or no.

Q     Did you tell Mr. Elfgeeh at that time when you saw him in the airport that he has a right to have you contact the Yemeni consulate and let them know that he's under arrest?

A     At the airport, no, I did not tell him that.

Q     Did you ever tell him that from the time he was arrested until the time you brought him over to the magistrate to be arraigned?

A     What I told him was that because --

Q     Excuse me.  Could you answer my question yes or no?

            MR. KNOX:    He was?

            THE COURT:  Just a second.

A     I can't answer it yes or no.

            MR. FRIEDMAN:    I'll withdraw the question in particular now.

            Your Honor, with respect to this, whatever the law requires, I would ask you to take judicial notice of it.  It's

a treaty.  I have --  I'll pass up the books and I have even an article that appeared in an FBI bulletin which I will give to the court.

THE COURT:  There's no dispute as to what the law is.

Q     I think you mentioned during the drive from the airport to FBI headquarters, the FBI office at 26 Federal Plaza, there was some conversation between yourself and Aref Elfgeeh?

A     Yes.

Q     Was Police Officer Finn in the car also?

A     Yes, he was.

Q     Where was he sitting and who was driving and where was Mr. Aref Elfgeeh?

A     I was driving.  Aref was in the back right passenger, Mr. Finn was behind the passenger seat.

Q     By the way, did you give Mr. Elfgeeh warnings, Miranda Warnings in the auto during the drive?

A     I probably told him --

THE COURT:  Do you know?

THE WITNESS:  I do recall, 20 to 30 times not to speak until we got back to 26 Federal Plaza because he kept trying to talk about the case.  I already read him his rights. I continuously told him we're not going to do it in the car, can't take notes.  We can't sit down and talk about things. I'm distracted driving.  This is not where we'll talk about

SS        OCR        CM        CRR        CSR

Murphy-cross-Friedman                                    118

it.

MR. FRIEDMAN:   Might I have the question read back to the witness?

THE COURT:  Read it back.

(Read back.).

Q    Could you answer that question yes or no?

A    No.

MR. FRIEDMAN:   I move to strike the answer.

THE COURT:  No, I'm not going to strike it.

Q    You drove Mr. Elfgeeh to 26 Federal Plaza.  Is there any reason you didn't drive him to the courthouse first?

A    I've never ever driven anybody I've arrested to the courthouse first, nor do I know of any other FBI agent to do that.  Our policy is to always bring them back to our office.

Q    In other words, you didn't lodge the defendant with the marshals?

A    We did eventually, yes.

Q    At first.

A    We were never --

THE COURT:  Asked and answered.  He said he drove him straight to Federal Plaza.

Q    The reason you took him back to 26 Federal Plaza was to interrogate him?

A    As I said, the reason we took him back to 26 Federal Plaza, our policy is always to bring the people back to 26

SS      OCR      CM      CRR      CSR

Federal Plaza, fingerprint them, take their photos, give them an opportunity to speak with us.

Q     Let me ask the question again.  One of the reasons you brought him back except for the administrative was to interrogate him; is that correct?

MR. KNOX:    Objection, asked and answered.

THE COURT:  I think it was, too.

Q     You knew that, you were hoping to get Mr. Aref Elfgeeh to make an incriminating statement; is that correct?

A     I was hoping Mr. Aref Elfgeeh would tell us the truth.

Q     Was it in your mind that you wanted him to make an admission regarding criminal conduct that you were investigating?

A     I was more interested in --

Q     Can you answer the question yes or no?

A     No.

Q     Did you feel that an incriminating statement on the part of Mr. Elfgeeh would assist the government?

A     Yes.

Q     You're an experienced agent; is that correct?

A     I believe I am, yes.

Q     How many years have you been an FBI agent?

A     About seven and a half years.

Q     Before that were you with any other law enforcement?

A     No.

Q    You knew as an experienced agent that any statement, if you got a statement, it was subject to be challenged by the defense counsel, like me.

A    Yes.

Q    If the accused successfully challenged the admissibility of this of incriminating statement, it could hurt the government's case?

A    I believe in this case the evidence is overwhelming against Mr. Aref Elfgeeh.  It's up to the judge to decide.  I do the interview.  I do it by the book.  It's up to the judge to decide whether it comes in or not.

        MR. FRIEDMAN:    Your Honor, may I --

        THE COURT:  Strike it from the record.

Q    Can you answer the question yes or no?

A    No.

Q    You can't answer that question yes or no?

        THE COURT:  Asked and answered.

        MR. FRIEDMAN:    I'm sorry, your Honor.

Q    You didn't want to do anything that would jeopardize the admissibility of any statement that you took.

A    When I'm interviewing anybody, Aref Elfgeeh or anybody, I'm conscious of the fact it has to be done the right way so that it can be admissible.  I wouldn't take statements that are not done the right way because it's just not that important to me, unless it was a matter of life and death

SS       OCR       CM       CRR       CSR

Murphy-cross-Friedman                          121

somewhere, it's just not that important to me to violate my own integrity, the principles I believe in to get some confession to be used months down the line in a trial that may or may not take place.

Q    When you say by the book, do you mean, in part, by the guidelines applicable to FBI agents?

A    Yes.

Q    In other words, you want to follow the guidelines that are applicable to FBI agents relating to the conduct, your conduct in conducting investigations?

A    Yes.

Q    And in the conduct of taking statements?

A    That's correct.

Q    And interrogating suspects?

A    Yes.

Q    Good.

      You knew at that time as an experienced agent that one of the grounds that could be raised to a statement that you took was that Mr. Elfgeeh didn't understand the rights, so-called Miranda rights; is that correct?

A    When I took the statements from Aref Elfgeeh, there was no question in my mind he understood what I was talking about. I understood his answer.

Q    I understand what you're saying.

      Could you answer my question yes or no?

SS        OCR        CM        CRR        CSR

A        I can't answer it yes or no.

Q        From now on, if you can't answer my question yes or no --

THE COURT:  No, just a second.  Ask the questions. You'll make your objections if you have one and I'll rule on them.

MR. FRIEDMAN:    Okay.

Q        So, you wanted to, and I think your words were, go by the book so that any statement that you took would not be susceptible to challenge on any ground; is that correct?

MR. KNOX:    Objection, asked and answered.

THE COURT:  I'll allow it.

A        I can't answer that yes or no.

Q        When you got to the airport, you immediately, after you said to Mr. Aref Elfgeeh you're under arrest, you read him the rights that were on that card that's in Government Exhibit number one; is that correct?

A        That's not the correct time line.  As you phrase it --

THE COURT:  No, it's not the correct time line. Next.

Q        You read him, as you testified on direct, the rights from that card?

A        Yes.

Q        In English?

A        Yes.

SS        OCR        CM        CRR        CSR

Q    When you get to 26 Federal Plaza, you give Mr. Elfgeeh this piece of paper that says "Advice of Rights " and it's in Arabic and English; is that correct?

A    That's correct.

(Continued next page.)

SS        OCR        CM        CRR        CSR

Murphy - cross - Friedman                         124

Q    At that particular time, how would you describe your fluency in Arabic, would you say I were a beginner, you were advanced; how would you describe it?

A    At that time I would probably say I was either a beginner to intermediate, somewhere in there.

Q    Okay.  Based upon your studies that you told us about on direct, you were aware that Arabic has many different dialects; is that correct?

A    Yes.

Q    Do you know what the main spoken language of Arabic is called, what it's referred to?

A    Arabic.

Q    Do you ever hear of what is called an MSA, Modern Standard Arabic?

A    You're mixing up dialects with Fusah or what you're calling Modern Standard.  They are different.  Fusah and dialects are not the same thing, completely different.

Q    A dialect is a form of a spoken language?

A    Yes.

Q    And a dialect may pertain to a particular region?

A    Correct.

Q    A particular country?

A    Yes.

Q    A particular country may have many different subdialects or different dialects?

BHS      OCR      CM      CRR      CSR

Murphy - cross - Friedman                     125

MR. KNOX:  Objection.  Relevance, your Honor.

MR. FRIEDMAN:  I'll get to that, your Honor.  Please bear with me.  I'll get off this in about two minutes.

THE COURT:  Okay.

A    Yes.

Q    Did you ever hear the term diglossia, D-I-G-L-O-S-S-I-A?

A    No.

Q    Never heard it.  Okay.  Are you aware then that people who speak one dialect of Arabic sometimes have trouble understanding people who speak another dialect of Arabic?

A    I can't answer that yes or no.

Q    Okay.  Now, when you gave him this piece of paper that is in People's -- that is Government Exhibit 2, I believe you said that you asked Mr. Elfgeeh to read it?

A    To himself, yes.

Q    Yes.  So he didn't read it out loud?

A    No.

Q    So you don't know whether he was reading it in English or in Arabic?

A    That's correct.

Q    All right.  And did he finish reading it and then asked you a question?

A    He finished reading it.  He lifted his head up.  I said, Are you finished?  And he said yes.

Q    Is that when he had asked you the question?

BHS       OCR       CM       CRR       CSR

Murphy - cross - Friedman                                126

A    No.

Q    It's before he finished reading it?

A    I then read him the rights in English.  I read each sentence and I said, Well, what did I just tell you?  And he would repeat back what I told him and we went all the way through them, and when we got to the line about could he stop answering at any time, he said, Well, if I begin talking, I can stop at any time?  And I said, Yes, you can stop at any time.

Q    Now, during this process at 26 Federal Plaza, the interrogation process, was anybody with you?

A    Myself and Brendan Finn..

Q    Prior to the interrogation of Mr. Aref Elfgeeh, did you have a conversation with Officer Finn about the procedure to be used?

A    I don't understand your question.

Q    Well, did you say, for example, "Let's go get a tape recorder, we're going to tape record this"?

A    No.

Q    Did you tell him what he should do or what he should say?

A    No.

Q    Did you discuss no tape recorder?

A    No.

Q    Did Officer Finn take notes?

A    He didn't take any notes.

BHS      OCR      CM      CRR      CSR

Q    Did you take any notes?

A    No.

Q    You took no notes about this --

A    I did take notes.  Well, did I write down notes?  No.  I had pieces of paper with evidence things, and basically I just kept those and I showed him things, noted what he said about it, and that was it.

Q    So from the time you arrived at 26 Federal Plaza till the time you were informed that Mr. Elfgeeh said, look, I'm tired, I want a lawyer, you took no handwritten notes; is that correct?

A    No, I believe I did take notes.  I do recall writing down, when I showed him documents, you know, what he said about each document.

MR. FRIEDMAN:  Can we show this to the witness?

THE COURT:  What is this?

MR. FRIEDMAN:  I want to show it to him.

THE COURT:  What exhibit is it?

MR. FRIEDMAN:  No exhibit, just --

THE COURT:  Mark it as an exhibit.

MR. FRIEDMAN:  All right.

Q    I want to show you what looks like a photocopy of a spiral bound notebook that says 12/21/03

THE COURT:  Just a second.  Mark it as Defense Exhibit number A.

MR. KNOX:  May I see that?

(Pause.)

(So marked.)

Q    I'm showing you what has been marked has Defense Exhibit A.

A    All right.

Q    Do you recognize it?

A    Yes.

Q    What is it?

A    These are the notes I took the day of the interview.

Q    At what particular time was it taken?

A    Contemporaneous with the interview.

Q    Thank you.

THE COURT:  Was this the interview at 26?

THE WITNESS:  Yes.

Q    Besides this Defendant's Exhibit A, did you take any other notes?

A    I don't recall.  I don't believe I did.  That spiral bound notebook is where I keep all my notes, which is what I was trying to describe before.

Q    Now, speaking about these notes, notes are important, aren't they?

A    Sometimes they are, sometimes they are not.

Q    Aren't notes important to refresh your recollection?

A    Yes.

BHS      OCR      CM      CRR      CSR

Murphy - cross - Friedman                    129

Q     And you may testify many months, like in this case, years after the event in question?

A     That's correct.

Q     Okay.  And it's important that the notes are accurate?

A     Yes.

Q     If you had errors in your notes, it could jeopardize the case, it could jeopardize the admissibility of statements?

A     I guess it could, yes.

Q     If there's an error in the note, it could jeopardize the government's case, too?

A     Yes, it could.

Q     And you took every effort to be accurate?

A     Yes.

Q     Because if Aref Elfgeeh made a statement that may help the government's case?

A     Sure, it could help him or hurt us.

Q     You did create a typewritten 302; is that correct?

A     That's correct.

Q     Could you tell the court how -- what the process was to create the 302.

A     I took my notes, I sat down at the computer and wrote the report from my notes.

Q     When did you do that?

A     The day that we arrested him.

Q     How much after Mr. Elfgeeh said "I want a lawyer"?

BHS      OCR      CM      CRR      CSR

Murphy - cross - Friedman                    130

A    It was hours later, probably three, four hours later.

Q    And did you do that yourself?

A    Yes.

Q    In other words, you didn't have Agent Finn with you?

A    No.

Q    Officer Finn?

A    I typed it and then when I was done, I gave it to him, he looked at it, said "this is accurate," signed it, and that was it.

Q    Now, the items on the handwritten Defendant's Exhibit A, that is exactly as Aref Elfgeeh told them to you?

A    I'd have to look at it.  I don't recall.

     THE COURT:  Yes?

Q    I think he wanted to look at it.  The question is whether -- whether what is down on the piece of paper that you wrote, does that accurately reflect what Mr. Aref Elfgeeh said to you?

A    It does not reflect, I did not write verbatim his answers.

     To answer your question as I believe you're asking it, no.

Q    Are you saying that it doesn't -- it doesn't accurately reflect what he said; it's inaccurate?

A    The notes have the purpose of refreshing my memory, and I use them for that purpose.  I wrote the notes.

BHS        OCR        CM        CRR        CSR

Could you ask the question again. I don't understand your question.

Q    When you -- you wrote the notes and you wrote the notes at the same time Mr. Elfgeeh was talking about the particular subject that you wrote on the note?

A    That's correct with.

Q    And the note accurately reflects what Mr. Elfgeeh told you?

A    Yes.

Q    And you used Defendant's Exhibit A to create your 302?

A    That's correct.

Q    In fact, the book requires you to keep notes of the interview of Aref Elfgeeh, doesn't it?

A    No.

Q    The book does not?

A    Nope.

Q    Are you aware of what is called the legal handbook, FBI Legal Handbook?

A    Yes.

Q    Are you aware of Section 7-13?

A    Not as you describe it, no.

        MR. FRIEDMAN:  Your Honor, may I go to my bag to get the handbook?

        THE COURT:  Yes.

        MR. KNOX:  I object on relevance grounds, your

Murphy - cross - Friedman                          132

Honor.

THE COURT:  I don't know where you're going with it.

MR. FRIEDMAN:  Your Honor, the --

MR. KNOX:  What does this have to do with the voluntariness issue?

THE COURT:  I don't know.  I'm going to let him explore this a little bit.

MR. FRIEDMAN:  Could we mark this collectively as Defendant's Exhibit B.

THE COURT:  Mark it for identification.

MR. FRIEDMAN:  I would ask to put it into evidence.. it's an official FBI document.  I would ask that you take judicial notice of it.

THE COURT:  Do you have any objection to this?

MR. KNOX:  Your Honor, I don't know what it is.

MR. FRIEDMAN:  Let's ask the witness.

THE COURT:  The issue before me, Mr. Friedman, is the voluntariness of any statement made by the defendant.  I haven't heard you address that.

MR. FRIEDMAN:  Well, your Honor, I would really -- I'd like to argue the point, but I would like to do it at the sidebar.

THE COURT:  There's nobody here but us.

MR. FRIEDMAN:  There is a witness.  Sometimes if we argue a real point or an evidentiary point, the witness is

BHS      OCR      CM      CRR      CSR

subliminally affected by the legal argument and I just want to eliminate that.

THE COURT:  The only issue that I'm going to decide is was the statement made by your client voluntary or was it not voluntary.

MR. FRIEDMAN:  Well, I think in every case there is an issue as to whether the witness is accurately describing what happened.

If your Honor finds that he's not being accurate, you could reject his testimony.  Also, there is an issue of -- let me use the term bias.  Bias is always relevant.

THE COURT:  I go back to the same thing.  Was it voluntary or not voluntary?

MR. FRIEDMAN:  I understand.  As a matter of impeachment, if a witness is biased, his testimony may be rejected no matter what he says.

THE COURT:  I still don't understand it.  The witness said that he took notes and that they were not verbatim statements made by your client.

MR. FRIEDMAN:  Right.  He's also going to testify that he violated FBI guidelines and FBI -- the book that he says he always follows.

MR. KNOX:  Objection.

MR. FRIEDMAN:  That's what I intend to prove.

THE COURT:  I'm going to let you explore this a

BHS        OCR        CM        CRR        CSR

Murphy - cross - Friedman                    134

little more and then I'm going to cut it off unless you have something else.

MR. FRIEDMAN:  I have other points, your Honor, but I would like to show that this agent did not follow the protocols that he was mandated to follow.

MR. KNOX:  Objection.

THE COURT:  The issue is, was the statement voluntary or was it not voluntary?

MR. FRIEDMAN:  Right.  If the witness did not follow the protocols that he was supposed to follow, that may show that bias on his part, which is relevant to what he testified to on direct.

My client doesn't agree with the version of the facts as stated.

THE COURT:  That will go to weight and not admissibility.

MR. FRIEDMAN:  I should have the opportunity to show that this witness took acts to show --

THE COURT:  You're wasting time.

Q    Could you look -- put the first page aside a for a second.

Could you look at the legal handbook, Section 7-13.

A    All right.

Q    I think it's on page 17 at the bottom, on the lower right it says 17.

BHS        OCR        CM        CRR        CSR

Murphy - cross - Friedman                    135

A    All right.  7-13?

Q    Yes.  I'm sorry.

A    Okay.

Q    Yes.  It's on another page, on page 18.  Sorry.

First of all, do you recognize the document that these pages come from?

A    Yes.

Q    What is it?

A    It is an instructional manual that we're given, that we learn off of at the FBI Academy, to be used later if we need it.

Q    It's the FBI legal handbook for agents?

A    That's correct.

Q    And that is a manual of operating procedures that you are mandated to follow?

A    Yes.  Those are the rules that we're supposed to go by.

Q    7-13 says that where preparation of a 302 is --

THE COURT:  Sustained.

MR. FRIEDMAN:  Your Honor, I now move to put Defendant's Exhibit B in evidence.

MR. KNOX:  Objection.  Relevance.

THE COURT:  I'm going to allow it for a limited purpose.  Go ahead.

(So marked.)

Q    Could you read 7-13.

Murphy - cross - Friedman                    136

THE COURT:  He read it.

Q    Did you follow the procedures of 7-13?

A    Yes.

Q    Okay.  Now, in sum, like a summary, 7-13 says if you take notes you have to keep them?

A    Yes.

Q    Okay.  On your handwritten -- you considered it important that when you arrived at FBI -- at 26 Federal Plaza at 10:50, you wrote that down, Defendant's Exhibit A?

A    Yes, I wrote it down.

Q    All right.  You did not put whether it was a.m. or p.m.?

A    It's my notes.  I know it's a.m.

Q    Now, did you write down anywhere that you informed Mr. Aref Elfgeeh of the crime he was being arrested for?

A    I would never write that down in my notes.

Q    You would never could do that?

A    Generally, no.

Q    Does the book require it?

A    I don't believe it does.

Q    So if the book does require it, you did not follow the book with respect to that?

MR. KNOX:  Objection.

THE COURT:  Sustained.

Q    Now, your notes, your handwritten notes say that Abad opened accounts; is that correct?

BHS     OCR     CM     CRR     CSR

Murphy - cross - Friedman                                137

A    That's what it says.

Q    That's all I asked you.

And you wrote on your paper, your handwritten, quote, when first arrived took Aref's papers; is that correct.

A    I don't see that.

Q    At the bottom.

A    Yes, it's correct.

Q    And in your mind that was Aref's personal papers?

A    No.  No.

Q    It was not?

A    Nope.

Q    Did you know what Mr. Aref Elfgeeh was referring to when you wrote it down?

A    Yes.

Q    And did you ask him?

A    I did, yes.

Q    You asked him to clarify that?

A    This particular sentence, I can't answer your question yes or no.

THE COURT:  I'm giving you ten more minutes.

Q    Now, you say that Mr. Elfgeeh understood -- told you that he understood the advice of rights at 26 Federal Plaza?

A    Yes.

Q    Did you write that down on your handwritten notes?

A    No.

BHS      OCR      CM      CRR      CSR

Q    But you did write on the advice of rights form that he refused to sign, yes or no?

A    Well, I'd like to answer the previous question.  I was wrong with my answer to the previous question.

Q    All right.

A    I did write that he understood his rights on the notes.

Q    But you did not write down that he refused to sign on the handwritten notes?

A    I wrote them on the form itself.

Q    Yes.  You wrote it on the form, but on the form you didn't write Aref Elfgeeh understood the rights; is that correct?

A    I wrote it in my notes that he understood.

Q    You didn't write it on the form?

A    No.

        THE COURT:  Go on to something else.  He wrote that he understood on the notes and refused to sign on the form.

Q    Does the legal handbook require you to write both on the form that on the occasion a witness or a suspect or an arrestee refuses to sign the waiver of rights but he will answer questions, that you're supposed to write both on the form, that's the waiver of rights form?

        MR. KNOX:  Objection.

        THE COURT:  I'm going to allow it.  You've got ten minutes.

BHS      OCR      CM      CRR      CSR

Murphy - cross - Friedman                          139

A    The FBI handbook requires us to keep accurate notes.

Q    You didn't -- are you saying that it doesn't require that you do what I said it does?

A    Can you repeat the question.

Q    The FBI handbook, does it deal with a situation where an arrested person will answer questions but refuses to sign the waiver of rights form?

A    I'm not sure if it does.

        MR. FRIEDMAN:  Can I look at my notes, your Honor, because I only have ten minutes left?

        THE COURT:  Eight minutes.

        (Pause.)

BY MR. FRIEDMAN:

Q    Does the FBI legal handbook for agents also require that you fill out a log of every time you interview a suspect and you give Miranda warnings?

A    I'm not sure exactly what it says.

Q    Why don't you take a look at page 11, Section 7-9.3.

        (Pause.)

Q    May want to start with 7-9.1.

        (Pause.)

A    Okay..

Q    Does it require you to keep an interview log on those occasions where you give Miranda warnings to a suspect?

A    It requires you to log in basically, you know, when the

BHS     OCR     CM     CRR     CSR

Murphy - cross - Friedman                    140

person was arrested, where they were arrested, who did it, like that.

Q    It also says the time the interview began, the time a suspect was informed of his or her rights?

A    Yes.

Q    By the way, on your 302, you didn't write that you read the Miranda warnings to Mr. Elfgeeh at the airport; is that correct?

A    No, I didn't write that down.

Q    And you didn't write it on your handwritten notes either?

A    No.

Q    And I think that you didn't -- you didn't fill out a log; is that correct, an interview log, as required by 7-9.1?

A    Sure I did.

Q    You did?

A    My notes here are a log of what happened.

Q    You consider that the log?

A    Yes, I do.

Q    Is that what you're saying?

A    Yes.

Q    All right.  Did Mr. Elfgeeh ever tell you that his back was bothering him at 26 Federal Plaza?

A    No.

Q    You say you left the room for a little while?

A    Yes.

BHS       OCR       CM       CRR       CSR

Q    When you came back was Mr. Elfgeeh laying on the floor?

A    Nope.

Q    Did Mr. Elfgeeh ask you to get any food or water?

A    I asked him whether he was hungry because I myself was hungry, and he said he was and I told him I'll get him water, coffee and a bagel or whatever we could find on a Sunday morning.

Q    Did you get him a bagel?

A    Yes.

Q    Isn't that required in the interview log, that information, a suspect's request for food and the FBI's compliance?

A    I'm not sure.

            (Continued next page)

CONTINUING CROSS-EXAMINATION

BY MR. FRIEDMAN:

Q    Why don't you take a look?  How about number 17 on page 12?

A    He neither made a request nor complaint of me.  I asked him whether he was hungry, wanted something to eat.

Q    He requested food?

A    He said yes.

Q    Did you write down on any piece of paper that Mr. Elfgeeh wanted food and that you gave it to him?

A    No.

THE COURT:   After you filled out --  there came a time that Mr. Elfgeeh informed you that he wanted a lawyer?

THE WITNESS:   Correct.

Q    Before that time did you ever read back to him what you had written down on your piece of paper, your handwritten piece of paper and say oh, is this accurate or words to that effect?

A    We talked about what I've written down on this piece of paper for a long period of time.  If I had a question as to what he said, I would ask him is this accurate?  Yes, we did that.

Q    Did you ask him to sign the piece of paper?

A    I asked him to sign --

Q    The Waiver of Rights form.

SS      OCR      CM      CRR      CSR

A    Yes.

Q    Which he declined to do.

A    Correct.

Q    Did you ask him to sign your notes?

A    No.

Q    You didn't ask him to sign the notes that it was accurate?

A    No.

Q    At any time did you ever ask him to sign your notes?

A    No.

Q    There came a time that you, I think you said you went down to get some water or something and it just popped in your mind, maybe I'll get a translator; is that correct?

A    What happened was the place where the water is, I think 25 cents, we all put in money, you can withdraw water, so there was nothing open, no stores really open down on the street level.  I went there, that is the same floor where the translators are located at.  I wasn't sure if there were any working.  I saw a translator, asked him if you could help me out.

Q    You just, I'll use the term, sua sponte, out of your own mind, you thought this may be a good idea?

A    At that time I was thinking of ways in which I could get Mr. Elfgeeh to tell us the truth.  I thought that was a way to do it.

SS        OCR      CM      CRR      CSR

Q    A strategy.

A    Yes.

Q    You wanted to bond with him, somebody could talk in his native language, loosen him up?

A    That's not why I wanted to use the interpreter.

Q    Would it be fair to say there was nothing about the conversation itself that you were having with him that made you want to get an interpreter?  It wasn't that you were having difficulty understanding him or you felt that he was having difficulty understanding you?

A    That's correct.

Q    It wasn't because you were talking about complex financial items that you thought you should get a translator?

A    I thought --  I can't say yes or no.

THE COURT:   You have two minutes.

Q    When you read Aref Elfgeeh the rights at the airport and he said something to you indicating that he understood, you didn't write that down anywhere?

THE COURT:   Asked and answered.

Q    You didn't write his words down verbatim is what I'm saying.

A    No.

Q    When you had this discussion with Mr. Elfgeeh at 26 Federal Plaza, you didn't make it verbatim, didn't write down on your paper verbatim what he said, something like I

understand?

THE COURT:    Asked and answered.

Q    You have worked with many New York City Police Department personnel over the seven years?

A    Yes.

Q    You had worked along with investigators into terrorist activities?

A    Yes.

Q    In fact, this was part of that investigation?

A    Yes.

Q    You believe Abad Elfgeeh was somehow involved with that funding for terrorism?

MR. KNOX:    Objection.

THE COURT:    Your time is up.  Any redirect?

MR. HANCOCK:    I object to the last question.

THE COURT:    What lawyers say is not evidence.

MR. FRIEDMAN:    Most respectfully, I object to the court truncating my cross-examination of this witness.

THE COURT:    Let the record reflect this witness testified on direct examination approximately 20 minutes. You've been almost an hour and a half.  Your objection is noted.

MR. FRIEDMAN:    Thank you.

THE COURT:    Any redirect?

MR. KNOX:    I have a couple of questions.

SS        OCR        CM        CRR        CSR

REDIRECT EXAMINATION

BY MR. KNOX:

Q     In what have form do you record the content of an interview?

        MR. FRIEDMAN:   Objection.

        THE COURT:   I'll allow it.

A     I recorded in a 302.

Q     Showing you what's been marked for identification as Government Exhibit 3, what is this?

A     This is the 302 that I wrote after the interview.

        MR. KNOX:   Offer that in evidence, your Honor.

        MR. FRIEDMAN:   No objection.

        THE COURT:   Received.

        (So marked.)

Q     When you prepare a 302, do you rely solely on you're notes or also rely on your recollection?

A     My recollection and the notes.

        MR. KNOX:   No further questions.

        THE COURT:   Recross?

        MR. FRIEDMAN:   Your Honor, my recross --  I really don't have any recross.

        THE COURT:   You can step down.

        (Witness excused.)

        THE COURT:   I make the following finding that --

        MR. FRIEDMAN:   May I argue the issue on the legal

points?

THE COURT:    Go ahead.

MR. FRIEDMAN:    I'll be very brief, your Honor, unlike my cross.

THE COURT:    Thank you.  The court reporter thanks you, too.

MR. FRIEDMAN:    I'm going to pay for it.

THE COURT:    You just might.

MR. FRIEDMAN:    I meant the transcript.

The government has a fairly stringent burden on these types of hearings.  They must show Mr. Elfgeeh was knowingly and voluntarily and intelligently waiving his rights.  It's by a clear preponderance of the evidence, your Honor.

Of the evidence at this hearing I think is equivocal and it's all in the agent's mind, all very subjective with the agent.  Your Honor has to make an objective determination based on the evidence that is submitted.

First of all, Agent Murphy said the first thing that he said to Mr. Elfgeeh, of substance, was he read him the rights in English, not knowing educational background, not knowing whether he knew what the words meant and I believe the warnings given at the airport are, one, I don't think they ever happened because there's no documentation for it and I don't think that's sufficient.

Two, Agent Murphy purposely violated Rule 5.  There was a complaint.  He brought back Mr. Elfgeeh to the FBI at 26 Federal Plaza for the express purpose of getting a statement and also fingerprinting, but there was certainly a violation of Rule 5.

The argument I'm going to make here --

THE COURT:  Don't tell me what you're going to make. Make the argument.

MR. FRIEDMAN:  The argument I'm going to make, since there was a complaint, Mr. Elfgeeh could not waive it in the absence of counsel; that he had an indelible right to a Sixth Amendment right to an attorney which Agent Murphy foreclosed by bringing him instead of to the magistrate where he knew that he would get an attorney, but he brought him to the FBI so he could isolate him, interrogate him.

Three, this is borne out by the fact he refused, Agent Murphy, even though he knew the law required him to advise Mr. Elfgeeh that since he was arrested as a foreign national, that Mr. Elfgeeh had the right, not the agent, Mr. Elfgeeh had the right to ask the agent to call his consulate.  Excuse me, I want to put Mr. Elfgeeh on the stand.

THE COURT:  You want to put him on the stand?

MR. FRIEDMAN:  Yes.

THE COURT:  Why didn't you tell me?

MR. FRIEDMAN:  Another senior moment.

SS        OCR        CM        CRR        CSR

THE COURT:   Put him on the stand.

A R E F    E L F G E E H,

having been duly sworn/affirmed, was examined and testified as follows:

THE WITNESS:  Yes, God willing.

THE COURT:   Your full name?

THE WITNESS:  Aref Abdullah Elfgeeh.

DIRECT EXAMINATION

BY MR. FRIEDMAN:

Q    Where were you born?

A    I was --

THE COURT:  What I'm going to do in fairness to the lawyers here, I'll let you get some lunch, come back at 3:00 o'clock.  You can do your openings.

Do you have any witnesses?  Then we can continue this because my clerk tells me there are a couple of jurors that have to leave early.

MS. CHEN:   The only difficulty, I was going to refer to the statements Mr. Elfgeeh gave to Agent Murphy.  The outcome of this hearing could affect my opening.

THE COURT:   What I wanted to do --  I don't want to keep the jury.

How long are you going to be with him?

MR. FRIEDMAN:   15, 20 minutes.

MS. CHEN:   It seems to me I could do my opening at

SS        OCR       CM       CRR       CSR

4:00 o'clock, for example, as opposed to 3:00 o'clock.

THE COURT:   I might have to let the jury go at 4:00 o'clock.

MR. FRIEDMAN:   Why don't we let the jury go now? The openings I don't think are going to be very long. Mr. Hancock is short.

MR. KNOX:   The government's cross would be short. We would like to get the trial started today.

THE COURT:   That's fine, go ahead.

MR. FRIEDMAN:   There's some communication between the translator and the court reporter as to where he was born.

THE INTERPRETER:   May I transliterate what was written in Arabic?

A     Talab Lalriacha Radaa, Yemen.

Q     What education did you have in Yemen?

A     High school.

Q     Did you take any English studies in Yemen.

A     No.

MS. CHEN:   I notice about scheduling, the government is willing to take a short break between the suppression hearing and opening in the interest of getting the openings started today.

THE COURT:   My clerk tells me there's a juror that has an appointment at 4:00 o'clock.

THE CLERK:   Another one has one at 5:30.

SS        OCR        CM        CRR        CSR

MS. CHEN:   Perhaps we could start the openings at 3:00?  We're willing to start at 3:00 o'clock if the court would allow us to do that.

MR. HANCOCK:   My colleague is going to walk me down the Bruton issue, implicated my client, brought out an ongoing terrorism investigation.

THE COURT:   The only issue was it voluntary or not voluntary.

MR. HANCOCK:   Absolutely right.

THE COURT:   We'll bring the jurors back at 3:00 o'clock.

Q    The last question was, did you study English in Yemen?

A    I studied it in school.

Q    When did you first come to the United States?

A    The year of '95.

Q    Did you subsequently go back to Yemen?

A    Yes.

Q    Did you come back to the United States?

A    Yes.

Q    In or about February of 2003, did you go back to Yemen?

A    Yes.

Q    When did you come back?

A    2003, the 12th month.

Q    Could you tell us what happened --  withdrawn.

When you were away from the United States did you

Aref Elfgeeh-direct-Friedman                    152

have any medical issues?

A    Yes, I have had an operation in my back in Jordan.

Q    When was that operation?

A    I don't recall exactly the date.  It happened like ten months before my return.

Q    You returned in December and you had the operation ten months prior to that?

A    It must have been the third month of the year.

Q    What kind of operation did you have on your back?

A    I had a tumor in the back.

Q    When you came back in December, did you have any physical effects from that operation?

A    Yes, and the results are still until now on me.

Q    What were the results of that?

A    It is pain in the back and in the leg.

Q    How long was the flight from Yemen to the United States when you landed on December 21st, 2003?

A    Around 12 hours.

Q    What happened when you got off the plane?

A    I exited the plane.  We walked along with the people who were in line.  When they came to my turn, they took my passport and the policeman or soldier asked me to follow him.

Q    How do you know he was a soldier?

A    He had a uniform as it is in the office.

Q    Did he have any sidearm?

SS        OCR        CM        CRR        CSR

Aref Elfgeeh-direct-Friedman                    153

A     I wasn't concentrating on that.

Q     What did he do after he took you?

A     He took me to the office.

Q     What happened in the office?

A     After that, he asked me do sit down.  Then four other officers came to me, about four and they were talking about this and that.  Then I sat and a policeman stood nearby, near me.

Q     Then what happened after that?

A     The policeman stood continuously near me, but then a lady officer came over to me and told me, she asked me how many bags am I carrying.  I told her one.

Q     How long were you in that office before Agent Murphy came?

A     Around an hour, like an hour.

Q     What happened when Agent Murphy came?

A     He entered towards me.  I stood up.  He told me, Mr. Elfgeeh, and then he told me you are under arrest.  That's what I was made to understand by his words.

Q     What happened then?

A     Before his arrival, they took my photo and then my fingerprints.  They took my picture and my fingerprints.  Then he came, he told me you're under arrest and he spoke to them for a while.  He spoke to them again and then he took me out to the car.

Aref Elfgeeh-direct-Friedman                    154

Q    Did you have a conversation from the time you were walking to the office until the time you were walking to the car, did you have a conversation with Agent Murphy concerning your back?

A    No.

Q    Did anybody have a conversation with Agent Murphy regarding your back?

THE COURT:    He's walking with Agent Murphy, somebody else is having a conversation?

MR. FRIEDMAN:    Yes, Officer Finn.

A    I told him, I told him as he was making me enter the car, I told him my back was giving me pain.

Q    Who was him?

A    Brian.

Q    Agent Murphy?

A    Yes.

Q    Was your bags or bag that was checked, was that brought to the car?

A    Yes.

Q    Were any contents of the bag talked about or displayed at this time?

A    No.

Q    There was no conversation concerning your MRI or your x-rays?

A    No.

Q    Did you ever have a conversation where your x-rays were placed with Agent Murphy?

MR. KNOX:    Objection, leading.

THE COURT:    It's leading.  I'll allow a little bit of it.

A    This happened in the office.

Q    Tell us what happened during that conversation.

A    Like what?  I didn't understand the question.

Q    The conversation with Agent Murphy regarding his x-rays or MRI's.

A    When they opened my bag in the office, he told me what is this?  I told him this is the x-ray for my back.

Q    Who asked what is this?

A    Murphy.

Q    Continue.

A    Then I told him I had an operation in the back and these are my documents and these are the x-rays.  I told them I am in pain.  My back is in pain.  They didn't pay much attention to what I was saying.  They put back these x-rays back in the bag and that's it.

Q    Did they say anything to you or in front of you about those x-rays?

A    They were motioning like this, they were doing this (indicating).

Q    Like indicating with their hands out --

SS        OCR        CM        CRR        CSR

Aref Elfgeeh-direct-Friedman                    156

THE COURT:    Now you're testifying.

MR. FRIEDMAN:    That's what --

THE COURT:    You're testifying.

Q    Could you describe what motions they were making?

A    That's how they always do it.  They took those x-rays and they put them back in the bag.

Q    You heard Agent Murphy tell you --  tell the court -- that he read you some rights at the airport?

A    He did not read anything to me like that at the airport. I did not understand anything from him except I was under arrest.  In English I understood that.

Q    When you got to 26 Federal Plaza, describe what happened, what they said to you, what you said to them.

A    As soon as we reached the building, he took the cuffs from my back.  Then he said to me whose bag is this.  I said mine.  I tried to carry it or carried it to walk.  He told me take it, take it.  I took it until we're up to the office.  We reach up to the office.  Then we arrive to the office.  He kept me there.  He went out or down to get some paper, documents.  Then he put the papers on top of the office and he sat.

The first thing he told me I will put you in jail for 15 years.  I got depressed on hearing this because I was not --  I didn't understand what to do, what was happening.

Then he spoke to me about matters and put questions

SS        OCR        CM        CRR        CSR

Aref Elfgeeh-direct-Friedman                            157

to me.  He showed me my uncle's photo and a number of other papers.  Then at the end he showed me that paper which is Arabic and -- and English -- and after that I told him I don't understand you.

Then he gave me that paper.  I read it.  Then he went out and brought me someone who asked me -- before that, he asked me before that do you want to eat?  Do you want coffee and bagel?  Then he walked out but he did not come back with anything.

Then he brought back the interpreter.  Then I read the paper.  Then I read my rights in the Arabic language. Then I spoke to the officer who was accompanying him because I had much pain in my back, I asked him, could I spread myself on the floor, sleep on the floor.  Yes, he told me it is possible.  I don't recall how long I stayed on the floor. Then Brian came back.  He entered the office and someone was near him.  He was talking.  The one who was with him or near him spoke to me in Arabic.  I couldn't understand everything he was saying. At that moment I told him I want my lawyer, I want a lawyer.

Then he put back the same questions to me as it was put by Brian.  I told him I want my lawyer.  Then they took me out of the office.  They took me to fingerprint and then they made me exit and then they took me to jail.

Q    Could you speak any words in English?

SS        OCR        CM        CRR        CSR

Aref Elfgeeh-direct-Friedman                          158

A     I speak a little.

Q     Can you understand if somebody speaks to you in English?

A     If it is easy I understand part of it.

Q     If somebody writes in English a letter, can you read that letter?

A     I may be able to read the letters but I may not be able to understand a sentence.

          MR. FRIEDMAN:   Your witness.

CROSS-EXAMINATION

BY MR. KNOX:

Q     Mr. Elfgeeh, do you remember coming to court a week and a half ago?

A     Yes.

Q     You remember there was a status conference?

A     Yes.

Q     Do you remember that you were late?

A     Yes.

Q     And you walked up to the front and the proceeding was already going on; do you remember that?

          THE INTERPRETER:   Once more the question?

Q     Does he remember when he walked in the proceeding was already going on?

A     Yes, I came here late.

Q     There was no interpreter at that status conference, was there?

          SS      OCR      CM      CRR      CSR

A    Yes.

Q    Do you recall that Judge Johnson spoke to you in English?

A    Yes, he did address me in English.  I understood some.

Q    He admonished you for being late; do you recall that?

A    Yes, that was what I was made to understand from him.

Q    He was speaking in English, wasn't he?

A    Yes.

Q    And you told Judge Johnson in English why you were late, didn't you?

A    Yes, I did.

Q    You told him that it wouldn't happen again?

A    Yes.

Q    And that was in English?

A    Yes, in English.

Q    Then you walked outside the courtroom and had a discussion with Mr. Pugash in English?

A    Who?  Mr. Who?

Q    The individual sitting in the chair right here (indicating).

A    I don't know, I don't think I spoke to him.

Q    Regarding your testimony about events at JFK Airport and the FBI offices, you testified an officer asked you about how many bags you were carrying, right?

A    Yes.

Q    That was in English?

SS       OCR       CM       CRR       CSR

Aref Elfgeeh-direct-Friedman                    160

A    Yes.

Q    And you answered in English?

A    Yes.

Q    Several other questions were asked of you in English; is that right?

A    Yes, what I was able to understand, yes.

Q    And you answered those questions in English, right?

A    What I could answer I did answer.

Q    In fact, you testified that you explained to Agent Murphy that you had back pain and had back surgery; is that right?

A    Yes, I did speak with him.

Q    That was in English?

A    Yes.

Q    And you had a conversation with Agent Murphy about x-rays, right?

A    Yes, English and also denoting with my hand where had I the pain.

Q    But you spoke to him about that in English, right?

A    What I was able to express; yes, I did.

Q    You told Special Agent Murphy of the FBI that Abad Elfgeeh operated a hawala?

         MR. FRIEDMAN:   Objection, your Honor.

         THE COURT:   Overruled.

A    I did not understand the question.

Q    At the FBI offices you told Agent Murphy that Arbad

SS     OCR     CM     CRR     CSR

Aref Elfgeeh-direct-Friedman                    161

Elfgeeh^ Abad Elfgeeh operated a hawala, right?

A     Yes.

Q     You testified that you opened several bank accounts at area banks for Arbad Elfgeeh, right?

          MR. FRIEDMAN:   Objection, been no testimony like that.

          THE COURT:   Overruled, issue of credibility.  Go ahead.

Q     At the FBI you told Agent Murphy that you opened up bank accounts at Abad Elfgeeh's request, correct?

A     No, I did not say that.

Q     You said that you opened bank accounts for Abad Elfgeeh's hawala business, didn't you?

          THE INTERPRETER:  May have I hear the question again?

Q     You told Agent Murphy of the FBI that you opened bank accounts for Abad Elfgeeh's hawala business?

A     No, I did not say that.

Q     What did you say about that?

A     What I said --  may you repeat the question to me?

Q     What did you say about opening bank accounts?

A     I told him I have a bank account or an account in a bank.

Q     Didn't you say you opened several bank accounts?

A     No, I did not say that.

Q     Didn't you tell Special Agent Murphy that Abad Elfgeeh

SS      OCR     CM      CRR     CSR

would give you between three and $4,000 in cash to deposit at these bank accounts?

A      No, I didn't.  I did tell him but in a different way.  He told me and he started by saying I have a recording on a videotape of you doing this and that.  What I was made to understand from him, I told him yes, as much as I understood from him, yes, I used to go to the bank to deposit money.  Then he asked me what was the amount or what were the amounts.  I told him between three and four.

MR. KNOX:    I note for the record part of his answer he gave in English.

Q      Now, left me ask this question.  The amounts you deposited, you understood, were for the hawala business; isn't that right?

A      No.

Q      What did you believe they were for?

A      It belongs to the store wear I worked and belonged to me.

Q      What store was that that you worked at?

A      206 7th Avenue.

Q      What was the name of the store?

A      3rd Street Newsstand.

Q      It's your testimony that all the deposits you made were for 3rd Street Newsstand?

A      Yes, the only money that belonged to the store.  That's the only money I deposited.

SS        OCR        CM        CRR        CSR

Aref Elfgeeh-direct-Friedman                    163

Q    You told Special Agent Murphy that?

A    He did not give me a chance.  He asked me how much were you depositing in the bank.  He said what was the amount.  I told him it was between three and four.

Q    Three and $4,000?

A    Yes.

Q    And this conversation that you just talked about with Special Agent Murphy, that was in English, right?

A    Yes.

Q    Did you ever ask for an interpreter during this questioning?

A    You mean from Brian?

Q    Yes.

A    Yes, I asked for an interpreter.  He went down and got me one, an interpreter.

Q    When you speak with your attorneys and I don't want you to talk about the substance of what you say, what language do you speak in?

A    In Arabic.  When I go to talk to a lawyer, I take with me an interpreter.

Q    Every time?

A    Yes.

Q    Did you ever talk to Mr. Friedman in English?

A    Well, he addresses me in English.  If something is not understood, I tell him I'm not understanding.

SS      OCR      CM      CRR      CSR

164

MR. KNOX:   No further questions.

THE COURT:   Redirect?

MR. FRIEDMAN:   No redirect, your Honor.

THE COURT:   You can step down.

(Witness excused.)

THE COURT:   You want to argue the motion?

MR. FRIEDMAN:   Number one, I want to repeat very quickly, I want to repeat the government hasn't satisfied its burden to prove by clear and convincing, one, Mr. Elfgeeh understood and knowingly waived his "Miranda Warnings." In fact, the Advice of Rights form itself says that he refused to sign it. That's the part that says I understand my rights and I wish to make a statement.

If your Honor would look at the documents, the FBI regulations that Agent Murphy said that he went by the book, they require in that sense, in that case, that both on the Advice of Rights form and in the 302 it's noted that the witness, one, understood; two, waived; three, refused to sign.

In addition, Agent Murphy testified on direct the circumstances which, under which he brought an interpreter.

I would like to refer your Honor to the submission of the government in response to Mr. Aref's prior attorney's motion to suppress.

The memorandum of the government says under what circumstances Agent Murphy brought --

SS      OCR      CM      CRR      CSR

165

THE COURT: I'm going to decide this case based upon testimony of witnesses here and exhibits that were admitted in evidence.

MR. FRIEDMAN: This is a judicial admission on the part of the government. I ask your Honor to take notice of it.

At page 12 of the submission by the United States Attorney in this case dealing with this issue, not subsidiary issue, but this issue, it says it was only after they began to discuss complex financial issues near the end of the interview that it was decided that the assistance of an Arabic interpreter would be helpful.

That's directly contradicted by the testimony -- well, that directly contradicts the testimony of Agent Murphy. I submit the testimony --

THE COURT: Who wrote that memorandum?

MR. FRIEDMAN: Ms. Chen.

THE COURT: Was she present when Mr. Elfgeeh was arrested?

MR. FRIEDMAN: How would she get the information?

THE COURT: Was she?

MR. FRIEDMAN: No.

THE COURT: Go ahead.

MR. FRIEDMAN: I still say it's a judicial admission.

SS        OCR        CM        CRR        CSR

166

Given the lapses, failures of the government agent, Agent Murphy, to adhere to his own rules, to adhere to Rule 5, to adhere to the Vienna Convention requiring consulate notice, I most respectfully assert that the government has not shown that Aref Elfgeeh knew his rights, understood them and intelligently waived them knowing the consequences of such waiver.

In fact, the evidence shows just the contrary that when he refused to sign the waiver form --  he refused to sign it --  that the evidence clearly shows that he did not waive.

Thank you, your Honor.

MR. KNOX:   Your Honor, Agent Murphy's testimony was clear that Aref Elfgeeh understood his rights, was read them, repeatedly both given in Arabic, English.  Mr. Elfgeeh himself testified extensively about conversations that he recalls having in English on that day.

There were no violations of FBI procedures, contrary to the defense claim as you read them; that you will see they were complied to the letter.

Regarding the Vienna Convention, there was no evidence it wasn't followed and even assuming it wasn't, a violation of the Vienna Convention, no court has held that gives rise to suppression of statements.  That's not even relevant to this.

What is relevant is that Special Agent Murphy's

SS        OCR       CM       CRR       CSR

167

testimony that the rights were read, Special Agent Murphy was confident Mr. Elfgeeh understood those rights; that the questions elicited were not the product of duress, coercion, intimidation; that there was back and forth between the two in which Aref Elfgeeh said some things that were incriminating, some that weren't incriminating which suggests, again, he understood the questions, understood how to answer them.

There was also testimony from Special Agent Murphy it was Aref Elfgeeh who in fact initiated the discussion in the car on the way over and at JFK Airport itself. All these together suggest the statements were voluntary, complied with, constitutional requirements, Miranda warnings were given and should not be suppressed.

THE COURT: I make the following findings. I find the testimony given by Agent Murphy is credible and that the testimony of the defendant, Mr. Elfgeeh, is incredible.

I find the Miranda Warnings were given at the JFK Airport. I also find that when Mr. Elfgeeh sought to initiate a conversation, he was stopped by Agent Murphy until they got down to 26 Federal Plaza.

I find bringing Mr. Elfgeeh to FBI headquarters for processing is a reasonable function of the FBI, to be fingerprinted and also photographed and also conversations with Mr. Elfgeeh during this particular period of time was not offensive.

168

I also find there was no violation of the defendant's Sixth Amendment right.  After he was arrested, the right to an attorney attaches only when he is brought before the magistrate.

I find the government has sustained its burden and I am not going to suppress the statement of the defendant, Mr. Elfgeeh.

We'll bring this jury in in ten minutes.  I think I'm going to let them go because there's one juror, as I understand it, who has some sort of problems.  I'm going to speak to him when he comes in.  Then I'll let the jury go because one juror has an appointment at 4:00 o'clock.  One has one at 5:30.

We'll be ready to go tomorrow morning.  You can hang around here for ten minutes.  Have lunch and be back.

(Recess.)

(Continued on next page.)

THE COURT:  Sir, you want to see me.

JUROR # 6:  Yes, I'm juror number 6.

THE COURT:  Everything we say and do is being taken down by the court reporter.  Both sides have to a hear everything.

JUROR # 6: From what saying before, with the Thursday, I was hoping to put in some type of a request, especially with my practice, that if there's a partial day, it

SS        OCR        CM        CRR        CSR

169

really -- to come out from Suffolk County, it completely destroys my schedule for part of a day as well as my patients.

THE COURT:  What kind of practice?

JUROR # 6: Optometrist, sole proprietor.  To come all the way from Suffolk County to Brooklyn for a couple of hours --

THE COURT:  Did you hear what he's saying?

MS. CHEN:   Yes, your Honor.  I can appreciate the dilemma this gentleman has.  The only thing, we think there's a very good chance to finish the case if we have that half-day Thursday.  In the interest of everyone, it may be worth while if we could push forward.  We could assess it Wednesday evening.  We think we have a good shot finishing Thursday or Wednesday afternoon.

THE COURT:   By Wednesday we'll let you know one way or the other, whether it's a half-day or just take that day off.  It should move quite smoothly.

You can stay here, we'll bring your colleagues out. Just a second.

What are we going to do?  We're going to have openings?

MR. FRIEDMAN:   You said you were sending them home.

THE COURT:   Forgive me.  Please bring the jury in.

(Jury enters courtroom.)

THE COURT:   We're still missing two jurors.

SS     OCR     CM     CRR     CSR

170

(Pause.)

(Remaining jurors enter courtroom; all jurors present.)

THE COURT:   Since we last saw you, we have still been working.  The lawyers have not had a lunch hour.  We still have some more work to do.

What I'm going to do, I'll let you go home now, get an early break and I will continue to work with the lawyers.

How many live in Suffolk?  We have two.  We'll start at 9:30.

I wanted to start at 9:00 o'clock.  I like to ride them hard.

JUROR NUMBER 6:   It's all right with me.

THE COURT:   Let's start at 9:00 o'clock tomorrow.  Maybe the sooner we start, the faster the case will be finished.  We'll shoot for 9:00 o'clock.  Everybody has to be here.  One person, we all have to wait.

See you tomorrow.  Have a good evening.  The lawyers can go to lunch.

(Jury leaves courtroom.)

THE COURT:   Tomorrow we have openings.  How many witnesses?

MS. CHEN:   A full day, five or six lined up.

THE COURT:   Are these document witnesses, factual witnesses?

SS      OCR      CM      CRR      CSR

171

MS. CHEN:   Agent Murphy, several fact witnesses.

MR. HANCOCK:   Could this be stipulated to?

MS. CHEN:   We have stipulated most of the records. There's still a lot of information we have to get in.

MR. KNOX:   It will be faster.

MS. CHEN:   It will be quick.

(Whereupon, this matter adjourned to September 13, 2005 at 9:00 a.m.)

SS       OCR       CM       CRR       CSR

172

B R I A N       M U R P H Y                                    91

DIRECT EXAMINATION                                            91


CROSS-EXAMINATION                                            105


Government Exhibit 3                                         146

A R E F    E L F G E E H                                     149

CROSS-EXAMINATION                                           158

1                                                            95

2                                                            97

A                                                           128

B                                                           135

SS        OCR        CM        CRR        CSR