UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------
UNITED STATES OF AMERICA,

      -against-               Docket No.:
                                  03-CR-0133 (SJ)

AFEF ELFGEEH,

               Defendant.
--------------------------------

# SENTENCING MEMORANDUM ON BEHALF
# OF DEFENDANT AREF ELFGEEH

Arthur S. Friedman
275 Madison Avenue
Suite 1000
New York, New York 10016
212-986-1144

## TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Sentencing Under *Booker* . . . . . . . . . . . . . . . . . . . . 2

Application of the Statutory Sentencing Factors to the Facts of this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Nature and Circumstances of the Offense and the History and Characteristics of the Offender . . . . . . . . . . . . . . . . . 5

    Nature and Circumstances of Offense . . . . . . . . . . . . 5

    History and Characteristics of Aref Elfgeeh . . . . . . . 6

The Need for the Sentence Imposed To Promote Certain Statutory Objectives . . . . . . . . . . . . . . . . . . . . . . 7

    To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense . 7

    To afford adequate deterrence to criminal conduct . . . . 9

    To protect the public from further crimes of the defendant . . . . . . . . . . . . . . . . . . . . . 11

    To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . 11

General Objections to Pre-Sentence Report . . . . . . . . . . . 12

Objection to Application of the Statutory 16-level Enhancement Pursuant to Aref Elfgeeh's Accountability for $1,615,000 . . . . . . . . . . . . . . . . . . 12

    The Insufficiency of the Evidence . . . . . . . . . . . . 13

    The Conduct is Not Charged in the Indictment . . . . . . 17

Objection to the Two Level Enhancement for Obstruction of Justice . . . . . . . . . . . . . . . . . . . . 19

Aref Elfgeeh is Entitled to a Downward Departure Based Upon Minimal or Minor Participation . . . . . . . . . . . 21

Purposes of Punishment . . . . . . . . . . . . . . . . . . . . 24

Statement of Reasons Pursuant to 18 U.S.C. §3553(c) . . . . . 25

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

## Exhibits

A.    Letters to the Court in Support of Aref Elfgeeh

B.    Letters to Probation Officer Shayna Bryant dated
      December 14, and December 22, 2000

## SENTENCING MEMORANDUM ON BEHALF OF AREF ELFGEEH

*As a profession, and as a people, we should know what happens after the prisoner is taken away. To be sure the prisoner has violated the social contract; to be sure he must be punished to vindicate the law, to acknowledge the suffering of the victim, and to deter future crimes. Still, the prisoner is a person; still, he or she is part of the family of humankind.*

Justice Anthony Kennedy speaking before the ABA Annual Meeting, August 2003.

**Introduction**

The past few years have brought congressmen, governors, captains of industry, entertainers, and sports legends into the defendant's chair. Both the fabulously wealthy and the famous have stood, like their poor cousin the "common criminal," before a sentencing judge. Unlike their more unfortunate relations, however, this privileged class of wrongdoer possesses the wherewithal to produce hundreds, if not thousands, of letters of support from those similarly privileged and powerful, all attesting to the various good works performed by the defendant.

Aref Elfgeeh does not travel in such rarified company. His support comes from his community; those who know him to be a "hard-working," "devoted family man." Aref Elfgeeh is a father and husband who has devoted his energies to benefit the life of his wife and children. It is his family who are the real victims of this lengthy prosecution and conviction.

Counsel submits this memorandum to the sentencing Court. The government will ask the Court to sentence Aref Elfgeeh to a lengthy

1

term in jail. The defendant asks for this Court to impose a lower sentence. Set forth below is a brief description of present federal sentencing law, an explanation of the offense which hopefully places it in context, and a compilation of relevant facts we believe justify either a downward departure from the guidelines or a non-guideline sentence below the guideline range.

**Sentencing under *Booker***

Given this Court's participation in the development of federal sentencing law, this brief summary of recent developments is presented at the risk of carrying coals to Newcastle. In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that its Sixth Amendment holding in *Blakey v. Washington,* 542 U.S. 296 (2004) and *Apprendi v. New Jersey,* 530 U.S. 466 (2000) applies to the Federal Sentencing Guidelines (the "Guidelines"). Due to the mandatory nature of the Sentencing Guidelines, the Court found no relevant distinction between the sentence imposed pursuant to the Washington statutes in *Blakely* and the sentences imposed pursuant to the Guidelines. Reaffirming its holding in *Apprendi,* the Court concluded that

> any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved by a jury beyond a reasonable doubt.

*Booker, supra,* 543 U.S., at _, 125 S.Ct., at 756.

2

Based upon this conclusion, the Court found those provisions of the federal Sentencing Reform Act of 1984 which make the Guidelines mandatory, 18 U.S.C. §3553(b)(1), or which rely upon the Guideline's mandatory nature, 18 U.S.C. §3742(e), incompatible with its Sixth Amendment holding. *Booker,* 543 U.S., at _, 125 S.Ct., at 756-757. Accordingly, the Court severed and excised those provisions, making the Guidelines effectively advisory. *Id.*

Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by *Booker,*

> requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C. §3553(a)(4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, *see* §3553(a).

*Booker,* 543 U.S.. at _, 125 S.Ct., at 757. Thus under *Booker,* sentencing courts must treat the Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. §3553(a).

The primary directive of Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

3

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, Section 3553(a) further directs sentencing courts to consider the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;..

(3) the kinds of sentences available;..

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C.A. §3553.

Other statutory sections also give the district court direction in sentencing. Under 18 U.S.C. §3582, imposition of a term of imprisonment is subject to the following limitation. In determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to "recogniz[e] that imprisonment is *not* an appropriate means of promoting correction and rehabilitation." Emphasis added.

Pursuant to 18 U.S.C. §3661, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statutory language certainly overrides

4

the (now advisory) policy statements in Part H of the Sentencing Guidelines, which list as "not ordinarily relevent" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See,* U.S.S.G. § 5H1.

## Application of the Statutory Sentencing Factors to the Facts of this Case

In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Offender

### (a) Nature and Circumstances of Offense

The statute criminalizes the operation of an *unlicensed* money transmitting business. 18 U.S.C. §1960(b)(1)(A). The government argued that it did not have to prove that the defendant knew that the money transmitting business was, in fact, unlicensed. This creates a strict liability criminal statute requiring no criminal *scienter.* The government offered no evidence to even suggest that Aref Elfgeeh knew that his uncle's money transmitting business was unlicensed. Nevertheless, Aref Elfgeeh faces a lengthy term in jail for conduct which is not on its face criminal, dangerous, nor against public welfare.

5

**(b) History and Characteristics of Aref Elfgeeh**

Aref Elfgeeh has never been convicted of a crime. He came to the United States to earn money so that he could provide comfort – a home and suitable education – for his wife and children who reside in Yemen. As the Second Circuit Court of Appeals noted in approving Judge Glasser's downward departure in *United States v. Jagmohan*,

> ...the picture painted of [the defendant] is one of a person with an entirely stable background, indicated by his employment history, and whose unusually unsurreptitious conduct in undertaking the bribery constituted a mitigating factor 'of a kind, or to a degree' not adequately considered by the Guidelines. The district court therefore stated valid grounds for a downward departure. Having set forth proper grounds for a departure, the district court's decision to depart was not unreasonable. See Lara, 905 F.2d at 603; Palta, 880 F.2d at 639. Furthermore, the district court did not abuse its discretion in determining that probation, rather than some period of incarceration below that set forth by the Guidelines, was an appropriate sentence in light of the circumstances presented.

909 F.2d 61, 65 (2d Cir.,1990).

These comments could have been written to describe Aref Elfgeeh. By all accounts he has been a model citizen, as demonstrated by the letters of support submitted by his community. "Hard working," "responsible," "law-obedient," "of good character," "exhibit[ing]...a kindness to those less fortunate." These are the terms those who know Aref Elfgeeh use to describe him.

As the trial evidence clearly demonstrated, Aref Elfgeeh is not sophisticated in the sometimes intricate and arcane world of

6

matters financial. "Can we really say we have a rational system of justice when the court, in imposing sentence, is stripped of the power to even consider the socio-economic and educational background of the defendant?" *United States v. Genao*, 831 F.Supp. 246, 254 (S.D.N.Y.,1993).

## 2. The Need for the Sentence Imposed To Promote Certain Statutory Objectives:

(A) <u>to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense</u>:

Mental state and intent of the defendant is at the heart of every sentencing decision. Judge Weinstein has observed that

> Evaluation of mens rea is critical in sentencing. Guilty state of mind is 'a moral prerequisite to the imposition of punishment.' Susan L. Pilcher, Ignorance, Discretion and the Fairness of Notice: Confronting "Apparent Innocence" in the Criminal Law, 35 Am.Crim.L.Rev. 1, 1 (1995); see also United States v. Cordoba-Hincapie, 825 F.Supp. 485, 521 (E.D.N.Y.1993) ('operation of the mens rea principle takes on a special character at sentencing'); Fred A. Bernstein, et al., The Denigration of Mens Rea in Drug Sentencing, 7 Fed.Sent.Rep. 121, 121 (1994) ('Mens rea, a principle central to our criminal law, is crucial in linking punishment to individual culpability.'). Moreover it is critical in predicting future dangerousness of the defendant.

*United States v. Gamez,* 1 F.Supp.2d 176, 180 (E.D.N.Y.,1998).

18 U.S.C. §1960(a) criminalizes one who "knowingly conducts, controls, supervises, directs of owns all or part of an unlicensed money transmitting business." Aref Elfgeeh falls into *none* of these categories. The government offered no evidence establishing, or even suggesting, that Aref Elfgeeh was even aware that his uncle's

7

money transmitting business was unlicensed or even needed a license.[1]

A person of Arabic heritage would be accustomed to the use of unlicensed money transmitters (*hawala*) as a societal norm. Moreover, as a new immigrant, Aref Elfgeeh would naturally rely upon his uncle for direction and advice. *See, United States v. Carbonell,* 737 F.Supp. 186 (E.D.N.Y.,1990): "The cohesiveness of first generation immigrant communities in the United States engenders loyalty, responsibility and obligation to others in the community, even if they are strangers. It is these sentiments that prompted [the defendant's] misguided behavior."[2]

How can any punishment, particularly one carrying a lengthy prison sentence be classified as "just" or "reasonable" when the defendant did not know he was committing an act forbidden by the law, much less a crime? A term of imprisonment for Aref Elfgeeh would not promote "*respect* for the law," but generate distrust and fear in a large segment of the community.

---

[1]    New York State Banking Law §641 is the applicable licensing statute. Research has disclosed one reported state prosecution for failure to obtain a license. *People v. Kassim,* Kings County Ind. No.: 3247/2003. In this state prosecution, the Kassim plead guilty to a violation of the Banking Law as a misdemeanor, and received a sentence of probation. Disparate treatment for same conduct under state law constitutes a mitigating factor. *See, United States v. Bariek,* 2005 WL 2334682, at *6 (E.D.Va.,2005).

[2]    As an alien subject to deportation, Aref Elfgeeh would not be eligible for certain programs, minimum security facilities or the benefits or early release if incarcerated. This is a mitigating factor. *See, United States v. Bakeas,* 987 F.Supp. 44 (D.Mass.,1997): imposing sentence of probation and home confinement from guideline sentence of 12 months incarceration.

8

From the time he was arrested in December 2003 until the date of sentence, Aref Elfgeeh has either been incarcerated or subject to home detention. In fashioning an appropriate and reasonable sentence, this Honorable Court should consider the period of home confinement. "(I)t may have been proper to depart because of the six months of home detention [the defendant] had already served. The fact that [the defendant has] already been punished to some extent is certainly relevant to what further sentence is needed to punish her and deter others. See 18 U.S.C. § 3553(a)(2) (sentence should reflect these and other considerations). And because the Commission seems not to have considered the issue of compensating for time erroneously served, the district court was free to depart. See 18 U.S.C. § 3553(b)." *United States v. Miller*, 991 F.2d 552, 554 (9th Cir.,1993). To the same accord is *United States v. Romualdi,* 101 F.3d 971, 977 (3rd Cir.,1996).

(B) <u>to afford adequate deterrence to criminal conduct</u>:

Given the nature of the crime, and more particularly, the actions of the defendant, a non-incarceratory sentence would adequately serve the interests of general deterrence. As Judge Cacheris observed in sentencing a defendant who was <u>the</u> operator of a unlicensed money transmitting business in Virginia, responsible for $4.9 million in transferred funds, to an 18-month jail sentence, less than half of the Guideline recommended period:

> a significant penalty would not provide substantial general deterrence. Insofar as 18 U.S.C. § 1960 imposes

9

a federal penalty for failure to obtain a state money transmission license, it operates in patchwork fashion, only prohibiting such conduct where state law prohibits the unlicensed operation of a money transmission business. For this reason, the operator of a money transmission business could legally engage in conduct identical to the defendant's by operating in a state that did not prohibit the practice. A significant penalty would likely do little to deter would-be money launderers, as they could simply move their operations to states where they would not face the federal penalty.

*United States v. Bariek,* 2005 WL 2334682 (E.D.Va.,2005).[3]

As noted above, not only is Aref Elfgeeh chargeable with a far less dollar amount, but the government acknowledges that he acted as a mere functionary.

The District Judge reached the same result in *United States v. Habbal,* 2005 WL 2674999 (E.D.Va, 2005): Court imposes sentence of one year plus a day on operator of an unlicensed money transmitting business responsible for $6.3 million despite Guideline calculation of 37 to 46 months incarceration.

---

[3]    The October 3, 2002 testimony of Alvin James before the United States Senate Committee on Banking, Housing and Urban Affairs corroborates Judge Cacheris's assessment. Mr. James served 27 years as a law enforcement officer in the Treasury Department, the last five years with "Financial Crimes Enforcement Network (FinCEN) concluding the last two years as its Senior Anti-Money Laundering Policy Advisor." Mr. James testified that criminal sanctions have little deterrent effect, concluding that "an attempt to outlaw this system will only drive it from the front of the bodega to the back room or the parlor upstairs. Attempts to outlaw this system will also thwart its substantial legitimate purposes. One key use is foreign exchange for the 'unbanked' third world, thus promoting desperately needed commerce in these areas. Another important function is money transmissions to family 'back home.' In addition to being legal and harmless this is arguably our most efficient and least costly form of foreign aid. In any case, as with all the systems described here, *this system exists because there is a demand for it that has not been met otherwise. As long as the demand exists there will most likely be a similar system to meet it, whether we try to outlaw it or not.* (Emphasis added.)

10

In a case arising in the Eastern District of New York, Judge Gleeson sentenced a defendant convicted after trial of unlicensed money transmitting to a term of five months' incarceration and five months' home confinement. *United States v. Kassim,* Docket No.: 02 Cr 00747 (JG).

In *United States v. Eltaib Yousif,* 05 Cr 0035 (N.D.Cal., 2005), the Court sentenced the defendant to 3-years probation upon his plea to an indictment charging transfers of $1.5 million in the operation an unlicensed money transmitting business. The Court imposed the same probationary sentence in *United States v. Alocozy,* Docket No.: 05 Cr 0279 (N.D.Cal.,2005).

Moreover, a sentence of imprisonment for Aref Elfgeeh would be unreasonable in light of the fact that the government has opted not to charge at least three individuals -- Adel Elfgeeh, Moshin Qatabi, and Ado Shoubah -- who have been identified as having roles equal to or greater than the defendant's.

(C) to protect the public from further crimes of the defendant. The defendant has demonstrated that he is a law-abiding individual. A jail sentence is not warranted to protect the public from recidivist conduct.

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

This factor is not applicable.

11

**General Objections to Pre-Sentence Report**

Aref Elfgeeh objects to numerous factual determinations in the Pre-sentence Report ("PSR"). These objections as well as supporting exhibits are fully set forth in the letters of counsel to Shayna Bryant filed December 13, and December 22, 2005. Aref Elfgeeh reasserts each and every objection in the Bryant correspondence as if specifically set forth in this memorandum. Exhibit A.

**Objection to Application of the Statutory 16-level Enhancement Pursuant to Aref Elfgeeh's Accountability for $1,615,000**

Aref Elfgeeh was found guilty of having violated 18 U.S.C. §1960(a) [as defined in 18 U.S.C. §1960(b)(1)(A)} and conspiracy to commit the same crime. The Sentencing Guidelines establish a base offense level of **6**, 2S1.3(a)(2), statutorily allowing a non-custodial sentence and subjecting the defendant to a maximum period of incarceration of six months. The PSR increases the base score by **16** levels after imputing Aref Elfgeeh's accountability for $1,615,000, mandating a term of imprisonment of 41-51 months. In effect, the enhancement has swallowed the offense. *See, McMillan v. Pennsylvania*, 477 U.S. 79, 87 (1986) (due process will be violated when the finding of a sentencing factor becomes "a tail which wags the dog of the substantive offense"). Given the constitutional considerations underlying the decisions of the Supreme Court in

12

*Apprendi, Booker, Blakely*, such an enhancement is not supported by the evidence and thus legally improper.[4]

**The Insufficiency of the Evidence**

> The Due Process Clause is implicated whenever a judge determines a fact by a standard lower than "beyond a reasonable doubt" if that factual finding would increase the punishment above the lawful sentence that could have been imposed absent that fact.[5]

*United States v. Kelley,* 355 F.Supp.2d 1031, 1035 (D.Neb.,2005).

As Justice Thomas declares in his dissent in *Booker*, "The commentary to § 6A1.3 states that '[t]he Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.' The Court's holding today corrects this mistaken belief. The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant." 543 U.S., at _, 125 S.Ct., at 798, fn. 6.

---

[4]    "(A)t least five Justices have said that sentence enhancements are of sufficient importance to warrant application of the reasonable doubt standard in some instances. See *Apprendi, Blakely,* and *Booker, supra." United States v. Siegelbaum,* 359 F.Supp.2d 1104, 1108 (D.Or.,2005).

[5]    Pursuant to *Booker, supra,* "reasonableness" becomes the lynchpin of any sentence. "The fact that this court's discretion is cabined, post-Booker, by the requirement of reasonableness means that the court cannot sentence a defendant above a reasonable point within a sentencing range without affording procedural protections under the Fifth and Sixth Amendments." *United States v. Kelley,* 355 F.Supp.2d 1031, 1035 (D.Neb.,2005).

13

Citing Justice Thomas's comments, Judge Battalion held "that it can never be 'reasonable' to base any significant increase in a defendant's sentence on facts that have not been proved beyond a reasonable doubt." *United States v. Huerta-Rodriguez,* 355 F.Supp.2d 1015, 1028 (D.Neb.,2005), *aff'd.* -F.3d-, 2005 WL 3440785 (8th Cir.,2005). In *United States v. Malouf,* 377 F.Supp.2d 315 (D.Mass.,2005), Judge Gertner held that the Court must employ a reasonable doubt standard in the determination of the applicable drug amount in sentencing a defendant whose plea agreement did not contain such amount. "If the Sixth Amendment's jury trial right was not implicated under *Apprendi,* then at the very least, the Fifth Amendment's Due Process protections should have been triggered. Even if the full formality of a jury were not required, at the very least, the 'beyond a reasonable doubt' standard was required." 377 F.Supp.2d, at 31.

In *United States v. Pimental,* 367 F.Supp.2d 143 (D.Mass.2005), Judge Gertner dealt with the inordinate effect of the "loss" table on sentencing.

> The United States Sentencing Guidelines have always put a premium on quantitative measures like the amount of loss, or the quantity of drugs. SeeU.S.S.G. § 2F1.1. That makes sense, Guidelines or no Guidelines. Someone who steals more may be more culpable than someone who steals less. The size of the offense is an important starting point in sentencing whether under the Guidelines or more generally under 18 U.S.C. § 3553(a) (stating that sentences should provide 'just punishment' and reflect 'the seriousness of the offense').

14

> *The question raised by the recent Supreme Court decisions culminating in Booker is who should decide facts like loss that are of considerable significance to sentencing, by what standard of proof they should be decided, and to what degree those findings should determine the sentence.*

*Id.,* 367 F.Supp.2d, at 149; emphasis added.

Harkening to protections offered by both the Sixth and Fifth Amendments, Judge Gertner answered her own question – judicial fact-finding had to be decided employing the "beyond a reasonable doubt standard."

> Even if *Watts* emerged unscathed from *Booker,* and a judge may consider all facts, including acquitted conduct, *the standard of proof to be applied should be beyond a reasonable doubt.* As I noted above, we are in a hybrid regime, neither fish (totally indeterminate) nor fowl (totally mandatory.) Whether the Guidelines are presumptively reasonable, see *Wilson I* and *Wilson II,* carefully considered, see *United States v. Jaber,* 362 F.Supp.2d 365 (D.Mass.2005), or something in between, see *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005), they continue to play a critical role. *Certain facts like the amount of loss continue to assume inordinate importance in the sentencing outcome. So long as they do, they should be tested by our highest standard of proof.*

> In effect, the impact of the case law on sentencing from Apprendi to Booker is anomalous. It has added both more flexibility and more formality to the sentencing process. The *Booker* remedy decision made the Guidelines advisory, i.e. more flexible. *But the principal decision in that case and those that had foreshadowed it reflected the Court's new concern with the formal procedures for determining facts essential to sentencing.*

> *Indeed, even if the Sixth Amendment's jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth Amendment's Due Process requirement is.* See, e.g., *United States v. Nixon,* 418 U.S. 683, 711, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ('The Fifth Amendment [ ] guarantees that no person shall be deprived of liberty without due process

15

of law ... It is the manifest duty of the courts to vindicate those guarantees.'). Certain facts are significant, whether or not they play a dispositive role. See, e.g., *United States v. Huerta-Rodriguez*, 355 F.Supp.2d 1019, 1027 (D.Neb.2005) (finding that '[i]n order to comply with due process in determining a reasonable sentence, this court will require that a defendant is afforded procedural protections under the Fifth and Sixth Amendments in connection with any facts on which the government seeks to rely to increase a defendant's sentence'); id. at 1027 n. 8 ('This approach may not be mandated by *Booker*, but it is not inconsistent with, nor prohibited by, *Booker*.').

*United States v. Pimental*, 367 F.Supp.2d 143, 153-154 (D.Mass. 2005).

The government's own evidence demonstrates that Aref Elfgeeh was not responsible for the $1.6 million attributable to him by the PSR. SA Murphy testified that the defendant told him that his role was limited to opening bank accounts and making small deposits. Although the government introduced numerous checks drawn on the Prospect Deli account bearing the name "Aref Elfgeeh" as maker and payable to the Carnival account, the government's handwriting analysis concluded that Aref Elfgeeh did not write any of the submitted checks to the Carnival account.[6]

Because of the drastic sentencing enhancement imposed by the 16-level increase, the Court should require a heightened quantum of proof. *United States v. Kikumura*, 918 F.2d 1084 (3rd Cir.,1990). To the same accord, *United States v. Townley*, 929 F.2d 365, 370 (8th Cir.,1991), *cert. denied*, 506 U.S. 897 (1992): not "foreclos[ing]

---

[6]     Osborn concluded that Abad Elfgeeh was the creator of the examined checks and the vast majority of the deposit slips.

16

the possibility that in an exceptional case, such as this one, the clear and convincing standard adopted by our sister circuit might apply" for extraordinary upward adjustments or departures.

In *United States v. Hopper*, 177 F.3d 824 (9th Cir.,1999), *cert. dismissed United States v. Reed,* 529 U.S. 1063 (2000), the Court noted that a 7-level enhancement which increased defendant's incarceration from 24-30 months to 63-78 months satisfied the "disproportionate impact" criteria, and required re-sentencing "using the clear and convincing standard." *Id.,* at 833.

The Second Circuit Court of Appeals endorsed a heightened standard of proof in *United States v. Shonubi,* 103 F.3d 1083, 1087-92 (2d Cir., 1997). "(T)hough the Sentencing Commission has favored the preponderance-of-the-evidence standard for resolving all disputed fact issues at sentencing, U.S.S.G. § 6A1.3., p.s., comment., *we have ruled that a more rigorous standard should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence.*" Emphasis added.

## The Conduct is Not Charged in the Indictment

The instant indictment did not charge, nor did the jury make any factual findings, regarding Aref Elfgeeh's responsibility for the $1.6 million deposited in the Prospect Deli account and subsequently transferred to the Carnival account. As stated herein, accountability for this $1.6 million is the driving force behind

17

the draconian period of incarceration confronting Aref Elfgeeh. It is no answer to claim that the defendant could be sentenced to 5 years without any jury finding as to amount. For as the Supreme Court commented in *Booker* in it discussion of indeterminate sentences,

> The effect of the increasing emphasis on facts that enhanced sentencing ranges, however, was to increase the judge's power and diminish that of the jury. *It became the judge, not the jury, that determined the upper limits of sentencing, and the facts determined were not required to be raised before trial or proved by more than a preponderance.*
>
> As the enhancements became greater, the jury's finding of the underlying crime became less significant. And the enhancements became very serious indeed. See, e.g., *Jones*, 526 U.S., at 230, 119 S.Ct. 1215 (judge's finding increased the maximum sentence from 15 to 25 years); respondent Booker (from 262 months to a life sentence); respondent Fanfan (from 78 to 235 months); *United States v. Rodriguez*, 73 F.3d 161, 162-163 (C.A.7 1996) (Posner, C.J., dissenting from denial of rehearing en banc) (from approximately 54 months to a life sentence); *United States v. Hammoud*, 381 F.3d 316, 361-362 (C.A.4 2004) (en banc) (Motz, J., dissenting) (actual sentence increased from 57 months to 155 years).
>
> As it thus became clear that sentencing was no longer taking place in the tradition that Justice BREYER invokes, the Court was faced with the issue of preserving an ancient guarantee under a new set of circumstances. The new sentencing practice forced the Court to address the question how the right of jury trial could be preserved, in a meaningful way guaranteeing that the jury would still stand between the individual and the power of the government under the new sentencing regime. And it is the new circumstances, not a tradition or practice that the new circumstances have superseded, that have led us to the answer first considered in Jones and developed in *Apprendi* and subsequent cases culminating with this one. It is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance.

18

*United States v. Booker*, 543 U.S. 220, at _, 125 S.Ct., at 751-752 (2005). Emphasis added.

**Objection to the Two Level Enhancement for Obstruction of Justice.**

The PSR enhanced the defendant's Offense Level by two points citing that his trial testimony amounted to an obstruction of justice. USSG §3C1.1. In light of the policies underlying *Booker*, such finding is impermissible. As Justice Thomas presaged in *Blakely*, 542 U.S. at 308, n.11, "Why perjury during trial should be grounds for a judicial sentence enhancement on the underlying offense, rather than an entirely separate offense to be found by a jury beyond a reasonable doubt (as it has been for centuries, see 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 136-38 (1769)), is unclear."

"Insofar as the jury was not specifically asked and instructed to find beyond a reasonable doubt (as is required with the elements of charged offenses) whether (the defendant) committed perjury while on the stand, and thus obstructed justice, imposing this enhancement under a mandatory guidelines regime was error under the Sixth Amendment." *U.S. v. Holmes*, 406 F.3d 337, 364 (5th Cir.,2005). *United States v. Galaviz-Luna*, 416 F.3d 796, 801 (8th Cir.,2005): "Insofar as the district court did not specifically ask and instruct the jury to find beyond a reasonable doubt whether Galaviz-Luna committed perjury, and thus obstructed justice, the district court's imposition of this enhancement under a mandatory Guidelines regime was an error that was plain under the Sixth

19

Amendment. *United States v. White,* 406 F.3d 827, 835 (7th Cir., 2005); *See, United States v. Jaber,* 362 F.Supp.2d 365, 379 (D.Mass.,2005): "'obstruction of justice' enhancements raise concerns under both *Booker* and *Blakely* where the government has a choice of charging a separate offense--which would have been subject to a jury trial and the full panoply of procedural safeguards--but instead seeks to enhance a sentence for another offense."

Measured under any standard, especially in light of the defendant's admitted difficulties with the English language, there is simply not the quantum of evidence to support the conclusion that Aref Elfgeeh intended to obstruct justice. This point is especially pertinent to the defendant's description of his interaction with SA Murphy. *United States v. Agudelo,* 414 F.3d 345, 350 (2nd Cir.,2005): "enhancement is appropriate only where the defendant acts 'with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory.'" citing, *United States v. Dunnigan,* 507 U.S. 87, 94 (1993). Especially in light of the defendant's limited comprehension of English and his inability to express himself in English, counsel respectfully asserts that an obstruction of justice enhancement is not justified.

20

## Aref Elfgeeh is Entitled to a Downward Departure Based Upon Minimal or Minor Participation

As Judge McKenna recently observed in a somewhat analogous case involving narcotics:

> Determination of the issue whether a defendant was a minor participant within the meaning of U.S.S.G. §§ 3B1.2(b) (as to which the defendant bears the burden of proof by a preponderance of the evidence, *United States v. Imtiaz*, 81 F.3d 262, 265 (2d Cir.1996) (*per curiam* )) is fact specific, "to be made not with regard to status in the abstract but rather with regard to the defendant's culpability in the context of the facts of the case." *United States v. Garcia*, 920 F.2d 153, 155 (2d Cir.1990) (*per curiam*) (citing U.S.S.G. §§ 3B1.2 Background Commentary). "[T]he district court is required to gauge the [defendant's] culpability relative to the elements of the offense of conviction as well as in relation to the co-conspirators." *United States v. Neils*, 156 F.3d 382, 383 (2d Cir.1998) (*per curiam* ). The defendant's role must be considered not only in relation to those of co-conspirators, but also in relation to those of "the average participant in such a drug crime."

*United States v. Rodriguez,* not reported in F.Supp.2d, 2002 WL 31098497, at *1 [S.D.N.Y.2002].

Judge McKenna's comments regarding the defendant's role are pertinent to this case:

> There is no evidence to support a suggestion, no less a finding, that defendant could have purchased the drugs Yuen wanted to sell (or, after his arrest, pretended to want to sell) or could have come to an agreement on behalf of Radhames, or Tony, or could even have negotiated a price for a future transaction.
>
> In the particular circumstances of this case, *defendant was a facilitator* whose culpability, compared to Fong or Yuen on the one side, or Radhames or Tony on the other, was minor.

*Id.,* at *3; emphasis added.

21

Judge Block similarly recognized that a defendant's status as "a low-level employee" in the co-defendant's operation whose function consisted of "primarily taking orders from the [co-defendant]," justified as a mitigating factor. *United States v. Koczuk,* 166 F.Supp.2d 757, 763 (E.D.N.Y.,2001).

Judge Sweet granted a two-level reduction based upon the defendant's minor role, notwithstanding the fact that the defendant "had transported a substantial amount of heroin in five separate trips to Detroit within a four-month period, and had on at least one occasion helped handle, prepare, and package the heroin for shipment." *United States v. Martinez,* Not reported in F.Supp.2d, 2002 WL 1041318 at *1 (S.D.N.Y.,2002). Notably, Martinez's participation did not preclude receipt of the reduction pursuant to 3B1.2(b) although his conduct was clearly more "pro-active" and "integral" to the overall operation than defendant's.

Comparison with Aref Elfgeeh's role is inevitable. The evidence showed that, at most, Aref Elfgeeh opened up bank accounts, and made deposits at the request of his uncle and mentor who then utilized the accounts to "feed" the Carnival account from which the funds would be transmitted. Aref Elfgeeh's role was extremely limited and purely functionary.

"....We've never said he wrote the checks.

What we said he did was he made deposits. In fact, that's what Aref Elfgeeh told Agent Murphy. He was the depositor. He helped fill out the deposit slips. He ran to the banks. *He was essentially, for lack of a better*

22

*term, the shlepper.* He was the one who went over and made those deposits."

This description of Aref Elfgeeh's role was provided by AUSA Pamela Chen in her summation. TR 1006. Aref Elfgeeh never arranged for monetary transfers; he never solicited customers, negotiated financial terms on behalf of the business, or created the documents ancillary to facilitate the transfers.

As recognized by the Second Circuit Court of Appeals in *United States v. Galante,* 111 F.3d 1029 (2d Cir.1997),

> ...although the sentencing law seeks to eliminate sentencing disparities between similarly situated defendants, it also aims to maintain "sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors" not accounted for in general sentencing practices. 28 U.S.C. § 991(b)(B); *see* 18 U.S.C. § 3553(b). As an aid to maintaining this flexibility, Congress provided in 18 U.S.C. § 3661 that: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Referencing the downward departures authorized in *United States v. Johnson,* 964 F.2d 124 (2d Cir.1992)) and *United States v. Alba,* 933 F.2d 1117 (2d Cir.1991), the *Galante* Court noted the overarching societal goal

> In those cases, as in this one, the reduction or elimination of time to be served in prison permitted the defendants to continue to discharge their existing family responsibilities, avoided putting the families on public assistance and spared traumatizing the vulnerable emotions of defendants' children.

23

The proposed 16-level enhancement overstates not only the seriousness of the crime, but the defendant's involvement. The Second Circuit Court of Appeals supports the position of awarding a defendant a departure below the four-level downward adjustment for a minimal role in the offense. *United States v. Restrepo*, 936 F.2d 661 (2d Cir.,1991), *United States v. Alba,* 933 F.3d 1117 (2d Cir.,1991), and *United States v. Lara,* 47 F.3d 60 (2d Cir.,1994).[7]

**Purposes of Punishment**

> A number of factors determine whether a particular sentence is 'just.' A punishment is 'just' insofar as it 'fit[s] the crime,' Wilson, 350 F.Supp.2d at 916, and 'reflect[s] the gravity of the defendant's conduct.' *Id.* (quoting S. Rep. 98-225, 1984 U.S.C.C.A.N. 3182, 3258-59). It also 'requires the court to consider society's views as to appropriate penalties, not just a judge's own personal instincts.' A 'just punishment' must also take into account the cost of the defendant's criminal conduct and the cost society must undertake to punish for the offense. *United States v. Zakhor,* 58 F.3d 464, 466 (9th Cir.1995).

*Simon v. United States*, 361 F.Supp.2d 35, 43 (E.D.N.Y.,2005, Sifton, J.).

This Honorable Court has publicly rejected the simplistic concept that jail is the universal answer to crime.

> But a longer sentence isn't necessarily the best answer for some offenders. Judges need to have the discretion to depart from the sentencing guidelines in those cases.

---

[7]    An aggregation of factors may combine to create a mitigating factor by taking a case out of the "heartland" of typical cases. *United States v. Coleman*, 188 F.3d 354 (6th Cir. 1999). The Commentary to § 5K2.0 provides that "the Constitution does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the "heartland" case covered by the guidelines in a way that is important to then statutory purpose of sentencing, even though none of the characteristics or circumstances individually distinguish the case."

24

We can't jail our way out of a problem. With over 2 million people in the federal, state and local prison systems, we will have to address the problems of mental health, an aging prisoner population, AIDS and HIV. Who will pay for it?

Testimony of Hon. Sterling Johnson before the American Bar Association Justice Kennedy Commission November 2003.

Notably, the Commission made the following recommendations:

(1) Lengthy periods of incarceration should be reserved for offenders who pose the greatest danger to the community and who commit the most serious offenses.

(2) Alternatives to incarceration should be provided when offenders pose minimal risk to the community and appear likely to benefit from rehabilitation efforts.

Report of Kennedy Commission, June 2004.

## Statement of Reasons Pursuant to 18 U.S.C. §3553(c)

The government admits the limited role played by Aref Elfgeeh:

"...He *helped fill out the deposit slips*. He ran to the banks. *He was essentially, for lack of a better term, the shlepper.* He was the one who went over and made those deposits."

Summation of AUSA Chen, TR 1006; emphasis added.

As the *shlepper,* Aref had no decision-making authority, collected no funds from individuals, completed no transfer documents. AUSA Chen continued to describe how, with Aref Elfgeeh acting as the *shlepper,*

Abad would fill out these deposit slips presumably with Aref there and maybe Aref would write in the numbers. He [Abad] probably would say, put in thirty-five hundred in this one or put in two thousand. They worked together and this is the whole point. That's exactly what this evidence shows you."

25

TR 1007.

Based upon Aref Elfgeeh's role as *shlepper*, incarceration is not justified.

Aref Elfgeeh stands before this Court as a first-time offender, convicted of a crime which required no criminal mind -- no intent to evade the law. Conspicuously absent from the government's evidence is any proof that Aref Elfgeeh personally gained from the unlicensed money transmitting operation.

Those who know Aref Elfgeeh call him a "kind hearted, hard-working man, struggling to support his four children." Letter of Keith Greenberg. A constant theme running through the letters of his friends defines Aref Elfgeeh as "honest," "honorable," "kind," and of "good character."

Aref Elfgeeh came to America to provide for this wife and children. Working long hours for a meager wage, he commenced construction on a house in Yemen for his family, and was able to afford a school for his young children. His recent incarceration endangers the family welfare and stability. For this reason alone, a non-incarceratory sentence is justified. *United States v. Ranum*, 353 F.Supp.2d 984, 990-991 (E.D.Wisc.,2005): "defendant's absence would have a profoundly adverse impact on both his children and his parents." Aref Elfgeeh is now destitute. Further incarceration will only serve to wreck havoc upon his family who look to him for financial and emotional support.

26

Among all the attestations of support for Aref Elfgeeh, perhaps the most telling are the letters of Khalil Almontaser and Abdulbasser S. Montasser. Both of these young men are United States Marines, having both recently served their country in Iraq. LCPL Montaser describes how he was emotionally affected by defendant's arrest. The support given by these men provides this Honorable Court with sufficient reasons to sentence Aref Elfgeeh to probation.

The statutory aims of 18 U.S.C. 3553(a) can be fulfilled without destroying Aref Elfgeeh, destroying his family, and destroying any hope that he has of reconstituting a productive and contributing life. A sentence that promotes a prompt return to his family with the opportunity for employment and service meets the statutory requirements.

27

## Conclusion

For the foregoing reasons, Aref Elfgeeh respectfully submits that a sentence of incarceration equal to the time he has already served and/or probation is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. §3553(a).

Dated:    New York, New York
          January 9, 2006

                              Respectfully submitted,

                              THE DEFENDANT,
                              AREF ELFGEEH


                         By _Arthur S. Friedman_
                              Arthur S. Friedman (AF7578)
                              275 Madison Avenue
                              Suite 1000
                              New York, New York 10016
                              212-986-1144

28

# EXHIBIT A

Honorable Judge Sterling Johnson, Jr.

Senior United State District Judge

225 Cadman Plaza

Brooklyn, NY 11201

November 18, 2005

Honorable Judge Sterling Jr.,

I am writing you this letter on behalf of my cousin Aref Elfgeeh . My name is Abdullbasset Montaser . I was born and raised in Brooklyn NY . I joined theUnited States Marine Corps. On November 2001.  During my tour to Iraq (Jan.2003-Oct.2004), I heard of the horrible news about my cousin. The news affected me more emotionally than mentally. I tried to stay focused on the job in hand .It was my only choice. I have known Aref for about ten years now .The last thing I would expect from Aref. is for him is to do something that would affect his family, ruin his  reputation, and destroy the opportunity and privilege he has to do better in this country of ours. This letter is to show my support for my cousin Aref. Your honor, Aref is a good man and I cannot find one person who says otherwise. Please take what I wrote under consideration. Thank you for taking the time to read this letter.

Sincerely,

Abdulbasset  S Montaser

LCPL   U.S.M.C

Khalil Almontaser
703 Carroll Street
Brooklyn, NY 11215

October 30th, 2005

To:        The Honorable Judge Sterling Johnson, Jr.
           Senior United States District Judge
           225 Cadman Plaza
           Brooklyn, NY 11201

The Honorable Judge Sterling Jr.,

My name is Khalil Almontaser. I am a United States Marine and I've served ten months in Iraq. Your Honor, I am writing this letter regarding Mr. Aref Elfgeeh who emigrated from Yemen ten years ago to make a decent living in the United States. He is a very hard working person who wants to bring his kids to America so that they get a good education just as my father did with his family.

As a person living in the United States, I have confidence in our justice system. His case is in your hands; please show us the justice we are familiar with for all Americans.

Thank you

Sincerely Yours,

Khalil Almontaser

November 20, 2005

Honorable Sterling Johnson, Jr.
Judge, Eastern District Court of New York
255 Cadman Plaza
Brooklyn, NY 11201

Dear Sir:

I'm an author and television producer (currently working for the new Geraldo Rivera show on Fox) who's known Aref Elfgeeh since 1998 or 1999, when he began working at the candy store around the corner from my home in Park Slope, Brooklyn. We'd talk frequently, and I grew to know Aref as a kind-hearted, hard-working man struggling to support his four children in Yemen. When he'd receive a new photo of his kids, he'd proudly display it, and tell my young son that, maybe one day, we could go to Yemen to meet his family.

Aref seemed to always be in the store – early in the morning, preparing the newspapers for neighbors heading towards the subway, and late at night, closing up. Despite his fatigue, he always managed a smile, and greeted my family warmly.

This is not the type of man who should be incarcerated. He's contributed to society since the day he arrived in the United States, and I hope to see him granted his freedom to remain in the community, and continue supporting his family.

I appreciate your consideration,

Keith Elliot Greenberg
343 Sixth Avenue, #2R
Brooklyn, NY 11215
(646) 258-1822

Honorable Judge Sterling Johnson, Jr.

Senior United States District Judge

225 Cadman Plaza

Brooklyn, NY 11201

November 19, 2005

Re:Aref Elfgeeh

Your Honor,

My name is Saleh Montaser, and I write you today on behalf of myself, my wife and my four children.

I write this letter with a shattered heart and tears in my eyes. It is devastating for me to realize the impact that this trial has had upon all of our lives. It has shaken and turned our world upside down. I have known Aref my entire life. I can confirm that he is a man of great integrity, is extremely dedicated to his family and work, and is entirely peace-loving, dependable, reliable, hard-working, conscientious, honest,and courteous. He exhibited a passion for life and a kindness to those less fortunate.

Therefore, I am pleading for leniency on his behalf, because when weighing all the good against the bad, the Scales of Justice tip heavily in his favor. Thank you for your consideration in this matter. I have faith that God will guide you in your decision.

Very Truly,

Saleh Montaser

Abdu Alsoba'ie

November 13th, 2005

To:        The Honorable Judge Sterling Johnson, Jr.
           Senior United States District Judge
           225 Cadman Plaza
           Brooklyn, NY 11201

The Honorable Judge Sterling Johnson, Jr.,

I am writing this letter to plea for Mr. Aref Elfgeeh. Mr. Aref is a friend of mine. My family and his have known each other for ages, as we come from the same village. I have never known him to be anything but kind and honorable. He has never violated any laws and is always peaceful and loved by the people he deals with. He is a father of four children who reside in Yemen, and depend on him to support them in their living, tuition and all other expenses. I appeal to your mercy and humanity that you please release him for his children's sake.

Sincerely Yours

Abdu Alsoba'ie

We are the children of Aref Elgjuh writing this letter to you while we are far from our father whom we haven't seen for a couple of years. We got surprised and frightened when we heard that he has been sent to jail. We, like other children, are in need for our father's care and passion.

Your honor, you must know that we have no one else to take care of us except our father who remains in prison now in the United States of America which he travelled to in order to support us. We seek your honor's help to free our dad whom we are in need for his support and miss very much.

Truly yours,
Duwaid Aref Elgjuh
Jasmin Aref Elgjuh
Jamal Aref Elgjuh
Khadijah Aref Elgjuh

November 14, 2005

Honorable Sterling Johnson, Jr.
Judge, Eastern District Court of New York
255 Cadman Plaza
Brooklyn, NY  11201

Dear Sir:

This is to confirm that I know Mr. Abad Elfgeeh and his nephew Aref
Elfgeeh. They are both a well respected and a good standing members in the
community.

They are both married and have children and they are both responsible
parents. The youngest children of Abad are a two year old boy and a one
year old daughter. I have known both of them more than 25 years and they
are both known to be a hard working and responsible individuals.

Sincerely,

Ahmed Zanta
162 15th Street
Brooklyn, NY  11215

Yahya Almontaser
703 Carroll Street
Brooklyn, NY 11215

November 2nd, 2005

To:        The Honorable Judge Sterling Johnson, Jr.
           Senior United States District Judge
           225 Cadman Plaza
           Brooklyn, NY 11201

The Honorable Judge Sterling Jr.,

I am writing this letter regarding Mr. Aref Elfageeh whom I've known for at least a decade. He is a hard working person whose goal is to provide a decent life for his kids. Mr. Aref Elfgeeh is a law-obedient individual who has not violated it since he came from Yemen. I have confidence in your just judgment towards his case.

Thank you

Sincerely Yours,

Yahya Almontaser

Yasser Saleh Abdullah

November 15th, 2005

To:   The Honorable Judge Sterling Johnson, Jr.
    Senior United States District Judge
    225 Cadman Plaza
    Brooklyn, NY 11201

The Honorable Judge Sterling Johnson, Jr.,

   I am writing this letter regarding Mr. Aref Elfgeeh. He is a strigtful and hardworking person who does his best to improve his family's life. I've known him since we were young kids in our tiny village in Yemen, and during this long time, I never knew that he was involved in any illegal activities. Since he came to the United States, nearly a decade ago, he has worked hard and nothing more. Mr. Aref Elfgeeh has a good character that everyone in our community is pleased with. He is also that type of person who wished well for others. Your Honor, I would highly appreciate if you allow him to go back to his family and his four kids, they really miss him.

Thank You

Yasser Saleh Abdullah

Yahya Alsoba'ie

November 15th, 2005

To:        The Honorable Judge Sterling Johnson, Jr.
           Senior United States District Judge
           225 Cadman Plaza
           Brooklyn, NY 11201

The Honorable Judge Sterling Johnson, Jr.,

I am writing this letter regarding Mr. Aref Elfgeeh. I would like to tell you that he is a nice and kind-hearted person. Aref is a hardworking person who came to the United States to make a decent life for himself, his family and his four kids. I've known him since he was a young kid in our tiny village in Yemen, and since he came from Yemen and I never knew that he was violated the law. Mr. Aref Elfgeeh has a good character that everyone in our community is pleased with. I hope that your honor will release him to go back to his family.

Thank You
Sincerely Yours

Yahya Alsoba'ie

To whom it may concern:

I Nemeh Fattah have known this Person AREF EIFGEEH for a very long time, I have known this person as a family man, have a normal life and have always heard good things about him ethically and morally. This is my notification and Personal opinion to whom it may concern at the circumstance

Thank You

Nemeh Fattah

Saleh Abdullah

November 15th, 2005

To:       The Honorable Judge Sterling Johnson, Jr.
               Senior United States District Judge
               225 Cadman Plaza
               Brooklyn, NY 11201

The Honorable Judge Sterling Johnson, Jr.,

     I am writing this letter regarding Mr. Aref Elfgeeh. I would like to tell you that he is a nice and kind-hearted person. Aref is a hardworking person who came to the United States to make a decent life for himself, his family and his four kids. I've known him since he was a young kid in our tiny village in Yemen, and since he came from Yemen and I never knew that he was violated the law. Mr. Aref Elfgeeh has a good character that everyone in our community is pleased with. I hope that your honor will release him to go back to his family.

Thank You,

Sincerely Yours

Saleh Abdullah

Fuad Saleh Abdullah

November 15th, 2005

To:         The Honorable Judge Sterling Johnson, Jr.
            Senior United States District Judge
            225 Cadman Plaza
            Brooklyn, NY 11201

The Honorable Judge Sterling Johnson, Jr.,

        I am Fuad Saleh Abdullah, born and raised in the United States. I am writing this letter regarding Mr. Aref Elfgeeh. I would like to tell you that he is a hardworking person who came to the United States to make a decent life for himself, his family and his four kids. I've known him since he came from Yemen and I never knew that he was involved in any illegal activities or violated the law. I hope that your honor will release him to go back to his family.

Thank You

Sincerely Yours,

Fuad Saleh Abdullah

Nov. 17th, 2005

To:     The Honorable Judge Sterling Johnson, Jr.
        Senior United States District Judge
        225 Cadman Plaza
        Brooklyn, NY 11201

        We are the Yemeni Community in Brooklyn. We would like you to know that Mr.Aref Elfgeeh is an honest and strigtful member of our community who came to the United States to make a decent life and to support his growing family. He is also known to be an individual who helps many people, especially those who are truly in need.  The Yemeni community appreciates his help and kindness very much and hopes that your honor will release him to go back to his family and four little kids.

        Thank You

| Name | Signature | Name | Signature |
|------|-----------|------|-----------|
| Abdo AlGhani Algoy | | Nanji Ahmed | Dhanfi |
| Hamod Algomes | | MTA IB AZIZ | K. AZIZ |
| Ahmed algamoos | Algomas | Fares Hajmed | Far Hajme |
| | | 'gmer dfmed | |
| | | AHMED ZANTA | |
| Abdurkam | | SICAN ALJAHMI | Silon alody |
| Mohsin Alsuberi | | | |
| | | ABCOAHuspD | |
| | | Ali Qatadey | Ali |
| Ali ELFGEEH | | ADAL zante | |

Taher Hassan

November 15th, 2005

To:        The Honorable Judge Sterling Johnson, Jr.
           Senior United States District Judge
           225 Cadman Plaza
           Brooklyn, NY 11201

The Honorable Judge Sterling Johnson, Jr.,

I am writing this letter regarding Mr. Aref Elfgeeh. I would like to tell that he is a nice and kind-hearted person. Aref is a hardworking person who came to the United States to make a decent life for himself, his four kids. I've known him since we were young kids in our tiny village in Yemen, and since he came from Yemen and I never knew that he has violated the law. Mr. Aref Elfgeeh has a good character that everyone in our community is pleased with. I hope that your honor will release him to go back to his family.

Thank You

Sincerely Yours

Taher Hassan

Dhahaba Ateeg Muthana, Raiesa Ateeg Muthana

November 10ᵗʰ, 2005

To:         The Honorable Judge Sterling Johnson, Jr.
            Senior United States District Judge
            225 Cadman Plaza
            Brooklyn, NY 11201

The Honorable Judge Sterling Johnson, Jr.,

        We are the aunts of Mr. Aref Elfgeeh and want to appeal to your honor's mercy on behalf of his mother and family.
        The news of Aref's imprisonment was, to say the least, extremely shocking to the whole family. His mother's health -- she is in Yemen- has deteriorated badly from the day she heard that her son is in prison. Neither of his mother, nor us, or even any member of the family whether they are residing the United States, or back in Yemen could believe that Aref is a law violator. We all know him as the softhearted guy who helps his family, working hard, and leaving his country to provide for them and for his children.
        We all depend on your honor's merciful judgment for the sake of Aref's sick mother and his children to please release him and let him go back to his family in Yemen.

Sincerely Yours

Dhahaba Ateeg Muthana                    Raiesa Ateeg Muthana

Abdulkani Bahiabah
126 15th Street
Brooklyn, NY 11215

November 15th, 2005

To:        The Honorable Judge Sterling Johnson, Jr.
           Senior United States District Judge
           225 Cadman Plaza
           Brooklyn, NY 11201


The Honorable Judge Sterling Johnson, Jr.,

      I am writing this letter regarding Mr. Aref Elfgeeh. I would like for your Honor to know that Mr. Aref Elfgeeh is one of those kind-hearted people whose goal in life is to improve it and make it easier, especially for his family. Times are hard in Yemen and ever since he came to America nearly a decade ago, he has worked hard and nothing more. I've known him since I was a young kid in a small village in Yemen. He became that person I called my role model. Although he was ten years older than I and other kids were, he was able to understand the minds of the youth and interact with them. His ways set him as a person with a good heart. He would also help us with schoolwork and enjoy times together. Mr. Aref Elfgeeh has a good character that everyone in our community is pleased with. He is also that type of person who wished well for others. Your Honor, I would highly appreciate for you to understand where my position is and see that Mr. Aref Elfgeeh's only goal here in America or anywhere else is to improve the condition his family is in back home.

Thank You
Very Truly Yours,

*Abdulkani Bahiabah*

Abdulkani Bahiabah

# EXHIBIT B

ARTHUR S. FRIEDMAN
ATTORNEY AT LAW
275 MADISON AVENUE
NEW YORK, NEW YORK 10016
(212) 986-1144
TELECOPIER (212) 686-0252

December 13, 2005

**VIA E-MAIL AND MAIL**

Shayna Bryant
United States Probation Officer
United States Probation
75 Clinton Street
Brooklyn, New York 11201

**Re:   United States v. Aref Elfgeeh**
**03-CR-0133 (SJ)**

Dear Ms. Bryant:

This letter constitutes the objections/comments of counsel on behalf of Aref Elfgeeh, the defendant in the above-referenced matter, to the pre-sentence report ("PSR") dated November 22, 2005.

**Paragraph 5:**   This section states that Aref Elfgeeh was one of "at least eight participants, all of whom either funneled money to Abad Elfgeeh's Carnival Bank account or received money from the account to distribute overseas." The trial evidence does not support that conclusion with respect to Aref Elfgeeh.

The government's evidence shows that Aref Elfgeeh's participation was limited to opening bank accounts and making deposits into the Prospect Deli account. SA Murphy testified that Aref Elfgeeh told him that "(he) had two responsibilities, the first was to open up several bank accounts to further the hawala business and the second responsibility was to make deposits of cash, generally between three and $4,000 into various bank accounts." TR 314; see also Paragraph 24 below. The government identified three Aref Elfgeeh-linked accounts as 'feeder' accounts supporting the money transmitting operation--the Chase Prospect Deli account, the Astoria Aref Elfgeeh-Mahmood Elfgeeh account (the "Astoria account"), and the Greenpoint joint account between Aref Elfgeeh and Abad Elfgeeh. TR 315.

The government introduced into evidence copies of checks written on the Prospect Deli account bearing the name of 'Aref Elfgeeh' as maker. John Osborn, the government's handwriting expert examined 85 of these checks, and concluded that "due to the poor quality of these reproductions, no conclusion can be rendered within a reasonable degree of certainty." Osborne did conclude, however, that "(b)ased on the penmanship ability exhibited by Aref Elfgeeh among the specimens both collected and submitted, *it is unlikely he prepared the majority of these checks.* There is some consistency with the writing of Abad Elfgeeh, however..." Report of John Osborn dated August 29, 2005, page 8; emphasis added.

Mr. Osborn's observations on this issue are supported by his conclusions regarding other checks bearing the name of 'Aref Elfgeeh.' For example, with respect to government exhibit 152, "two checks and a deposit ticket form the Chase Manhattan account of Prospect Deli bearing questioned endorsements, signatures and/or entries" (Q32), Mr. Osborne determined that "it is probable Abad Elfgeeh prepared the signatures, endorsements and/or entries on each of these items." Osborn Report dated September 10, 2005.

The government introduced into evidence statements and checks of the Astoria account. Government Exhibit 7. Mr. Osborn further identifies Abad Elfgeeh as the person who "prepared, signed and endorsed" all but one of the checks on the Astoria account comprising government exhibit 154. Included in documents associated with the Astoria account were checks payable to the 'Carnival Ice Cream' account bearing the signature of 'Aref Elfgeeh' as maker dated at a time that the government's own evidence demonstrated that Aref Elfgeeh was in Yemen. See Attachment A, and Government Exhibit 58 showing Aref Elfgeeh was in Yemen 11/7/96-4/16/97, 3/26/98-12/15/98, and 5/7/99-4/20/00.

Paragraph 5 erroneously claims that "with the exception of Aref Elfgeeh, all of the other individuals involved in this scheme reside in Yemen." While certain of the named co-conspirators, e.g., Yehya and Nasser Elfgeeh, do reside in Yemen, Adel Elfgeeh, Moshin Qatabi, and Ado Shoubah, in fact, reside in the United States. *See,* par. 49 re: Adel Elfgeeh. Qatabi was a government witness; upon information and belief, Shoubah is an American citizen, living in Detroit.

**Paragraph 17:** The indictment does not charge Aref Elfgeeh with being "employed in the hawala operation when he arrived from Yemen in 1995." This section should also be amended to eliminate the reference to withdrawals from the Prospect account allegedly made by Aref Elfgeeh in order to facilitate the money transferring

2

operation, as the evidence fails to substantiate that claim. See, Paragraph 24.

**Paragraph 18:** The PSR cites $1,615,893 as being transferred from the Prospect Deli account to the Carnival account in the 15-month period 11/2001-1/2003. It is not clear how this figure was calculated, and it appears to be erroneous. The chart at pages 8-9 of the PSR shows that in *24 month period* 2001 and 2002 a total of $1,162,649 was deposited into the Prospect account; and $1,123,500 was withdrawn in the same time period.

Irrespective of the above, the indictment does not allege, nor did the jury find that "Aref Elfgeeh transferred $1,615,893.25 in funds between the Prospect Deli and Carnival French Ice Cream accounts." The trial evidence, specifically the testimony of John Osborn, the government's handwriting expert, conclusively refutes such a claim.

The government itself acknowledges that Aref Elfgeeh's role was limited to opening bank accounts and making deposits. *See,* TR 1006; and comments in paragraph 24 below.

The trial evidence does not sustain the claim that Aref Elfgeeh made 'numerous deposits' in furtherance of the money transmitting business. Mr. Osborn was only able to say that "it is probable" that approximately 12 Prospect Deli deposit slips contained the handwriting of Aref Elfgeeh. Osborn Report September 10, 2005, §Q39.

**Paragraph 20:** In light of the government's admission that "it does not have the preponderance of evidence to confirm Abad Elfgeeh's knowledge of the funds being used to promote terrorist-related activities," and more specifically the total absence of any evidence to suggest Aref Elfgeeh's connection to, or knowledge of such activities, this section should be deleted in its entirety.

**Paragraph 24:** Guidelines section 3B1.2 (Mitigating Role) governs level adjustments based upon a defendant's role in the offense. If the defendant had a minimal role, he is entitled to a 4-level downward adjustment; a minor role merits a 2-level adjustment. In the case of conduct falling between the two defined categories, the Court may reduce 3 levels.

Based upon the trial evidence, Aref Elfgeeh is eligible for a minimal adjustment based upon his "limited function." As above, the evidence shows, at most, that Aref Elfgeeh opened bank accounts and made deposits with knowledge that *some portion of the funds* represented monies that his uncle Abad Elfgeeh would later transfer in the operation of the unlicensed money transmitting business.

3

*See,* testimony of SA Murphy. The government produced no evidence that Aref Elfgeeh wrote checks on the Prospect Deli account made payable to the Carnival Ice Cream account for the purpose of effectuating the unlicensed transfers.

The statement that Aref Elfgeeh played an "integral" part in the unlicensed money transmitting operation is not supported by the evidence. In her summation, AUSA Pamela Chen admitted Aref Elfgeeh's minimal role:

> "....We've never said he wrote the checks.
>
> What we said he did was he made deposits. In fact, that's what Aref Elfgeeh told Agent Murphy. He was the depositor. He helped fill out the deposit slips. He ran to the banks. *He was essentially, for lack of a better term, the shlepper.* He was the one who went over and made those deposits."

TR 1006.

AUSA Chen acknowledged the *outer limit* of inference supported by the government's evidence, especially in the light of the testimony of John Osborn,

> "...because Abad would fill out these deposit slips presumably with Aref there and maybe Aref would write in the numbers. He [Abad] probably would say, put in thirty-five hundred in this one or put in two thousand. They worked together and this is the whole point. That's exactly what this evidence shows you."[1]

TR 1007.

Thus, Aref Elfgeeh cannot be held responsible for the entire amount deposited into and out of the Prospect Deli account during the time period alleged in counts 3 and 4. Given his admitted limited function with respect to the unlicensed money transmitting business, Aref Elfgeeh should receive a 4-point downward adjustment for his minimal participation.[2]

---

[1] In the context of the sufficiency of trial evidence, "probably" is constitutionally inadequate. Counsel submits that this quantum of evidence is similarly insufficient to justify any 2B1.1 enhancements.

[2] Note that the government has not charged Qatabi, Adel Elfgeeh and Shoubah, who the PSR identifies as Abad Elfgeeh's co-conspirators, although they reside in the United States.

4

**Paragraph 25:** The PSR provides for a 2-level enhancement based upon Aref Elfgeeh's testimony at the trial and the suppression hearing. Counsel objects to this enhancement.

A judge-based finding that a defendant's trial testimony constituted obstruction of justice under the Sentencing Guidelines clearly affects a accused's rights to effective assistance of counsel, due process and the right to present a defense guaranteed by the Fifth, Sixth and Fourteenth Amendments of the federal Constitution. *United States v. Okai*, 2005 WL 2042301, at 6. Moreover, since the decision of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), a judge finding of obstruction of justice by a preponderance of evidence standard likewise impacts on the accused's rights under the same constitutional protections. *United States v. Holmes*, 406 F.3d 337, 364 (CA5,2005): "Insofar as the jury was not specifically asked and instructed to find beyond a reasonable doubt (as is required with the elements of charged offenses) whether Holmes committed perjury while on the stand, and thus obstructed justice, imposing this enhancement under a mandatory guidelines regime was error under the Sixth Amendment."

In light of the defendant's difficulty with English, there is insufficient proof that his testimony regarding his interaction with SA Murphy, with particular relevance to the *Miranda* warnings, was not the product of "confusion, mistake or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

Other *government* witnesses undermine the accuracy of SA Murphy's version of what Aref Elfgeeh allegedly said. Moshin Qatabi, who knew both Abad and Aref Elfgeeh, and was in fact Abad Elfgeeh's cousin, TR 418, testified that he was familiar with the premises where Carnival was located and Abad Elfgeeh resided. TR 444. With relevance to SA Murphy's claim that Aref Elfgeeh received "free room and board" in return for assisting in the unlicensed money transmitting operation, and the government's suggestion that other documents showed that Aref Elfgeeh worked at Carnival and lived at the premises, Mr. Qatabi testified that he knew who lived in the building, and Aref Elfgeeh did not. TR 444. Mr. Qatabi further testified that he "never seen [Aref Elfgeeh] work [at Carnival]. TR 444.

**Paragraph 26:** This wording of this paragraph links the checks that were written subsequent to the arrest of his uncle to the operation of the unlicensed money transmitting business. The defendant testified and admitted his actions regarding these two checks. The government did not introduce any evidence connecting these funds to the money transmitting activities. Aref Elfgeeh maintains that he

5

never knowingly participated in the unlicensed money transmitting operation.

**Paragraph 28:**  Given the insufficiency of the evidence with respect to the extent of Aref Elfgeeh's participation in depositing funds into the Prospect Deli account during the relevant time period, defendant's base offense level must be set at **6**.

The indictment does not allege nor did the jury make any specific findings that Aref Elfgeeh was "responsible for a total of $1,615,893.25 in illegal wire transfer funds." Paragraph 24. The trial evidence was equivocal at best regarding Aref Elfgeeh's culpability for the funds deposited in the Prospect Deli account during the time period November 2001-January 2003. John Osborn, the handwriting expert called by the government, was not able to conclusively state that any particular deposit slip was written by Aref Elfgeeh. Thus, by either the beyond reasonable doubt or preponderance of evidence standard, no specific amount of deposits can be identified with the defendant. In the event any adjustment should be made based upon the 2B1.1 table, the relevant level must be limited to the total amount attributable to the insignificant number of deposit slips that Osborn can associate with the defendant by a constitutionally acceptable evidentiary standard.

The 16-level enhancement suggested by the PSR constitutes a paradigmatic example of the "tail wagging the dog." Such a drastic increase, subjecting the defendant to nearly five years incarceration rather than a probationary sentence is unfair and unjust, especially in light of the equivocal nature of the evidence allegedly justifying the increase.

**Paragraph 31:**  See comments with respect to Paragraph 24 above.

**Paragraph 41:**  The adjusted offense level should be **2**, calculated as base offense level (6), reduced by minimal level of participation (4).

**Paragraph 45:**  The trial evidence showed that Abad Elfgeeh handled the bulk of financial transactions for his nephew Aref, including the filing of income tax forms. Called by the government, Michael Stutland testified that his company prepared Aref Elfgeeh's personal income tax forms and the tax returns for Prospect Deli. TR 659. Mr. Stutland explained that he never met with Aref Elfgeeh, obtaining all the relevant information from Abad Elfgeeh. TR 659. This testimony is consistent with Abad Elfgeeh's possession of the Prospect Deli business records after the store closed.

6

Since Abad Elfgeeh coordinated the filing of Aref Elfgeeh's tax returns, the defendant left funds to pay his 2002 taxes in care of his uncle. The government seized these funds when it arrested Abad Elfgeeh.

From March 2003 to his arrest in December 2003, the defendant was in Yemen. Given the level of his 2003 income (see PSR Paragraph 68), it is doubtful that he earned enough to file.

**Paragraph 46:** This case was dismissed by the local criminal court. The government introduced into evidence documents associated with this arrest. See, Government's Exhibit 58. The certificate of dismissal is included as attachment B to this letter.

**Paragraph 51:** Aref Elfgeeh worked in the United States to support his wife and children. As the PSR notes in paragraph 55, he lived with two brothers and a nephew, in an "unkempt and poorly maintained" two bedroom apartment in a "lower-middle-income neighborhood." The defendant slept on a "makeshift bed in the living room which was converted from an old sofa." Clearly, Mr. Elfgeeh did not spend his meager earnings on himself, but instead provided for his family.

Since his incarceration, Mr. Elfgeeh has been unable to send funds back to his family, a situation which causes him much distress. Although Mr. Elfgeeh's family is able to provide *some* assistance to his wife and children, it cannot be considered "support" at the level the defendant previously supplied, and the family's financial condition will rapidly deteriorate as defendant's incarceration continues.

**Paragraph 53:** Aref Elfgeeh did not travel to Yemen in order to be operated on for a tumor in his back. He returned to see his family. While there, doctors discovered the tumor which necessitated the surgical procedure.

**Paragraph 59:** The facts belie the extent of Mr. Elfgeeh's use of khat referenced in this paragraph. I suggest that the language barrier contributed to the error. As the report notes, Mr. Elfgeeh was employed during August-September 2005; in fact, Mr. Elfgeeh worked from 6 pm to 6 am *seven days per week*. His conditions of bail permitted him to remain outside of his residence for only one hour prior and subsequent to his employment; in actuality, it took him the greater part of the hour to travel. There was just no time for Mr. Elfgeeh to "chew[] Khat *several times a day while*

7

*socializing* with his friends." Mr. Elfgeeh does not deny that he infrequently chewed the substance.[3]

**Paragraph 64-66:**    Anna Chu, the Pre-Trial Services Officer assigned to Mr. Elfgeeh's case, has documentation verifying employment. Mr. Elfgeeh's status as an "off the books" employee is not justified by the facts. While it is true that the employer paid Mr. Elfgeeh in cash, such fact does not equate to a conclusion that the employer is not properly accounting for such payments. (Did Aref have withholding, tax returns).

**Paragraph 75, 77:**    These paragraphs contain some erroneous statements, probably attributable to mis-communication. Mr. Elfgeeh owes a substantial amount of money to the company which built his home in Yemen.

Counsel's fee of $12,000 has not been paid in full.

**Paragraph 91:**    See comments regarding income tax.

## Statement of Reasons Pursuant to 18 U.S.C. §3553(c)

Analysis of both the defendant and his crime lead to the inescapable conclusion that the ends of justice do not require him to be incarcerated.

The substantive crime for which he stands convicted is among those unique criminal statutes which do not require a *mens rea*, that is a guilty intent. The mere fact that Aref Elfgeeh assisted his uncle and mentor in the operation of the unlicensed money transmitting business subjects the defendant to severe criminal sanctions. The crime itself is thus distinct from larceny, drug dealing, or other common law crimes. Money transmitting, unlike dealing in shotguns, alcohol or dangerous substances, is not conduct which on its face alerts one to the fact that it is a regulated activity, with substantial criminal penalties. Subjecting peripheral violators like Aref Elfgeeh to an extended jail sentence in such cases does not serve the interests of the criminal justice system. If a person does not realize that he is committing a criminal act, how does jail punish him, or is jail even reasonable and fair? Likewise, given the obscure nature of the crime, can incarceration serve as a deterrence to others?

---

[3]    Just prior to trial, Judge Johnson permitted Mr. Elfgeeh to be outside of his residence 1 additional hour per day, 4 days per week, based upon the defendant's compliance with the directives of Pre-Trial Services.

8

Aref Elfgeeh did not prey on unsuspecting victims or commit the instant "crime" for personal benefit. The persons who utilized Abad Elfgeeh's money transmitting service were willing participants of the Yemenite community; the government did not find one person who lost money, or otherwise complained about the service.

Aref Elfgeeh is a young man who came to United States like millions of others before him to earn more money to support his family. To that end, Aref Elfgeeh worked long hours in sometimes menial jobs so that he could send money to Yemen in order to build a home for his wife and children, and send his children to private school to ensure they would obtain a good education. In the ten years he has been in the United States, Aref Elfgeeh has not been convicted of a crime. There is no question that Aref Elfgeeh does not present any threat of repeating criminal conduct.

Yours truly,

Arthur S. Friedman

cc:    Pamela Chen
       Jeffrey Knox
       Assistant United States Attorneys
       United States Attorney
       Eastern District of New York
       One Pierrepont Plaza
       Brooklyn, New York 11201

9

**EXHIBIT A**

U.S. Department of Justice
Immigration and Naturalization Service

OMB #1115-0009
Application for Naturalization

## START HERE - Please Type or Print

### Part 1.  Information about you.

| Family Name | Given Name | Middle Initial |
|---|---|---|
| EL FGEEH, | AREF | A. |

U.S. Mailing Address - Care of

| Street Number and Name | Apt. # |
|---|---|
| 473    5th Avenue | |

| City | County |
|---|---|
| Brooklyn | Kings |

| State | ZIP Code |
|---|---|
| NEW YORK | 11215 |

| Date of Birth (month/day/year) | Country of Birth |
|---|---|
| 10/09/1971 | YEMEN |

| Social Security # | A # |
|---|---|
| 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 | 044653781 |

### Part 2.  Basis for Eligibility (check one).

a.  [X] I have been a permanent resident for at least five (5) years .

b.  [ ] I have been a permanent resident for at least three (3) years and have been married to a United States Citizen for those three years.

c.  [ ] I am a permanent resident child of United States citizen parent(s) .

d.  [ ] I am applying on the basis of qualifying military service in the Armed Forces of the U.S. and have attached completed Forms N-426 and G-325B

e.  [ ] Other. (Please specify section of law) _____

### Part 3.  Additional information about you.

| Date you became a permanent resident (month/day/year) | Port admitted with an immigrant visa or INS Office where granted adjustment of status. |
|---|---|
| 10/02/1995 | JFK, NEW YORK |

Citizenship
YEMEN

Name on alien registration card (if different than in Part 1)
NONE

Other names used since you became a permanent resident (including maiden name)
NONE

| Sex | Height | Marital Status: |
|---|---|---|
| [X] Male [ ] Female | 5'8" | [ ] Single  [X] Married  [ ] Divorced  [ ] Widowed |

Can you speak, read and write English ?    [ ]No [X]Yes.

**Absences from the U.S.:**

Have you been absent from the U.S. since becoming a permanent resident?    [ ] No [X]Yes.

If you answered "Yes" , complete the following, Begin with your most recent absence. If you need more room to explain the reason for an absence or to list more trips, continue on separate paper.

| Date left U.S. | Date returned | Did absence last 6 months or more? | Destination | Reason for trip |
|---|---|---|---|---|
| 11/7/96 | 4/16/97 | [ ] Yes [X] No | YEMEN | VISIT |
| 3/26/98 | 12/15/98 | [X] Yes [ ] No | YEMEN | VISIT |
| 5/7/99 | 4/20/00 | [X] Yes [ ] No | YEMEN | VISIT |
| | | [ ] Yes [ ] No | | |
| | | [ ] Yes [ ] No | | |
| | | [ ] Yes [ ] No | | |

Continued on back.

(91)N

### FOR INS USE ONLY

| Returned | Receipt |
|---|---|
| Resubmitted | |
| Reloc Sent | |
| Reloc Rec'd | |

[ ] Applicant Interviewed

**At interview**
[ ] request naturalization ceremony at court

**Remarks**

**Action**

To Be Completed by
Attorney or Representative, if any
[ ] Fill in box if G-28 is attached to represent the applicant

VOLAG#

ATTY State License #

GOVERNMENT EXHIBIT
58
03-CR-0133(SJ)





**EXHIBIT B**

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS

CERTIFICATE OF DISPOSITION
NUMBER:    13871

THE PEOPLE OF THE STATE OF NEW YORK
VS

ELFGEEL,AREF
Defendant

10/09/1971
Date of Birth

270 15TH ST
Address

1018560H
NYSID Number

BROOKLYN                NY
City           State  Zip

06/14/2001
Date of Arrest/Issue

Docket Number: 2001CK002433

Summons No:

120.00 265.01 120.14 240.26
Arraignment Charges

Case Disposition Information:

| Date | Court Action | Judge | Part |
|---|---|---|---|
| 10/03/2001 | ADJOURNED - CPL SECTION 170.55 | CALABRESE,A | APAR6 |

*To be dismissed and Sealed 4/3/02 in apar6.*

**NO FEE CERTIFICATION**

_ **GOVERNMENT AGENCY**       _ **COUNSEL ASSIGNED**

_ **NO RECORD OF ATTORNEY READILY AVAILABLE. DEFENDANT STATES COUNSEL WAS ASSIGNE**

**SOURCE** _ **ACCUSATORY INSTRUMENT** _ **DOCKET BOOK/CRIMS** _ **CRC3030[CRS963]**

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN
THIS COURT.

FLOWERS,S
COURT OFFICIAL SIGNATURE AND SEAL

01/11/2002
DATE        FEE: NONE

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT
SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)

# ARTHUR S. FRIEDMAN

ATTORNEY AT LAW

275 MADISON AVENUE

NEW YORK, NEW YORK 10016

(212) 986-1144

TELECOPIER (212) 686-0252

December 22, 2005

**VIA E-MAIL AND MAIL**

Shayna Bryant
United States Probation Officer
United States Probation
75 Clinton Street
Brooklyn, New York 11201

**Re:   United States v. Aref Elfgeeh**
       **03-CR-0133 (SJ)**

Dear Ms. Bryant:

The undersigned represents Aref Elfgeeh, the defendant on the above-referenced case. By letter dated December 13, 2005, I forwarded my comments to the pre-sentence report ("PSR") dated November 22, 2005. This letter contains further comments.

**Paragraph 65-73 (Employment Record):**   Aref Elfgeeh owned and operated the Prospect Deli during 1997 and 1998. Ali Elfgeeh disclaims telling you that Aref Elfgeeh was not the owner. I believe that the problem stems from confusion between the Prospect Deli store and the Third Street Deli, 206 Seventh Avenue, Brooklyn.

The defendant worked at Third Street Deli during two distinct time periods. Aref Elfgeeh worked at Third Street Deli for approximately 1 ½ years until he opened Prospect Deli in 1997. During this period, the Third Street Deli was owned by S. Aljani.

The defendant was in Yemen from May 1999 to the end of April 2000. Subsequent to his return, Aref again worked at the Third Street Deli which was now owned by his brother Mahmood until the defendant returned to Yemen in March 2003.

The reference to the defendant working at Kentucky Fried Chicken ("KFC") for several months in 2002 appears to be in error. I

believe that the defendant worked at KFC for two weeks in 2004, subsequent to his arrest.

Defendant did not work at the HadraMount restaurant (see Paragraph 66) for the period indicated; his employment was much shorter, approximately 2 months.

It should be noted that Aref Elfgeeh was under the supervision of Pre-Trial Services for all of calendar year 2004 through trial in September 2005. As a result, Pre-Trial Services would possess all documentation regarding employment and salaries.

**Paragraph 59:**  I believe that the defendant's chewing of khat was limited to the time he spent in Yemen. Subsequent to his arrest in December 2003, defendant was either working, traveling to or from work, or confined to his apartment. The PSR reference to the use of khat "several times a day while socializing with friends" could thus not take place in the United States.

Yours truly,

Arthur S. Friedman

cc:   Pamela Chen
      Jeffrey Knox
      Assistant United States Attorneys
      United States Attorney
      Eastern District of New York
      One Pierrepont Plaza
      Brooklyn, New York 11201

2