1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

UNITED STATES OF AMERICA,    MAR 2 9 2006    *03 CR 133

        v.    :    U.S. Courthouse

P.M. _____    Brooklyn, New York

AREF ELFGEEH,    TIME A.M. _____

February 7, 2006

      Defendant.:    9:30 a.m.

- - - - - - - - - - - - - - - - - X

TRANSCRIPT OF SENTENCE
BEFORE THE HONORABLE STERLING JOHNSON, JR
UNITED STATES DISTRICT JUDGE

RECEIVED
IN CHAMBERS OF
HON. STERLING JOHNSON, JR.

MAR 16 2006

TIME    A.M.
P.M. _____

APPEARANCES:

For the Government:    ROSLYNN R. MAUSKOPF
United States Attorney
BY:  PAMELA CHEN
JEFFREY KNOX
Assistant U.S. Attorneys
One Pierrepont Plaza
Brooklyn, New York 11201

For the Defendant:    ARTHUR FRIEDMAN, ESQ.

Court Reporter:    Burton H. Sulzer
225 Cadman Plaza East
Brooklyn, New York 11201
(718) 260-4526
Fax # (718) 260-4504

Proceedings recorded by mechanical stenography, transcript
produced by CAT.

BHS    OCR    CM    CRR    CSR

(Open court-case called-appearances noted.)

(Interpreter sworn:  Fouad Elshiekh.)

THE COURT:  Mr. Elfgeeh, have you read and discussed the presentence report with your lawyer.

THE DEFENDANT:  Yes.

THE COURT:  Do you wish to be heard, do you want to say something?

THE DEFENDANT:  Yes.

THE COURT:  Go ahead.

THE DEFENDANT:  First of all, good morning, your Honor.  Your Honor, I came to United States in 1995 and I came with a visa through my father who carried the American citizenship and my goal was to continue my education in the university here and also to improve my economical and social level here in the United States, but the circumstances, the financial circumstances, stopped me from continuing my education in United States and I start to work here in United States from one place to another.

Your Honor, I am a poor person.  More than 45,000 were spent on this case, including the attorney's fees, and I have also my children in Yemen and I have a house, am building a house for them and they still living in the basement because I wasn't able to finish building the house and they suffer from financial problem because of this case and psychological and educational problems, to the point that their education

level went down so much it could affect their future and all of that because of what happened to me during the past two years.

Your Honor, before three years ago I had an operation in my vertebral column to excise a tumor in my back and I suffer a lot because of the pain that I was suffering from and I still suffer from the pain and the doctors advise me not to carry more than five pounds because of my injury or my surgery.

Your Honor, I came to your country because of the freedom, because of the justice and because of the free market. This country that I love even before I saw it and my love increased when I live in it and all what I aim and my goal was to continue building my future and to raise my kids and educate them and raise them the right way, and I gathered with them here in this country and am waiting anxiously to receive my citizenship, my American citizenship here to swear to be in this country, one of this country.

Your Honor, I want you to feel pity for me and give me some justice here in this case because I suffered a lot and return my happiness back to me and to my family who suffered tremendously because of this case.

Thank you very much, your Honor.

THE COURT: Counsel.

MR. FRIEDMAN: Your Honor, the government wants to

4

put Aref Elfgeeh in jail for upwards of four years.

THE COURT:  The guideline range is 51 to 63 months; is that correct?

MR. FRIEDMAN:  No, your Honor, 41 to 51.

THE COURT:  Okay.  There's an error in the presentence report.

MR. FRIEDMAN:  I'm going to get to that.  There are a lot of errors in the presentence report.

I'm reminded, your Honor, in light of that recommendation, what your Honor told the Kennedy Commission not so long ago in an address that you gave to the ABA.

You said, quote:  A longer sentence isn't necessarily the best answer for some offenders.  We can't jail our way out of a problem."

THE COURT:  When I said that I was referring to drugs.

MR. FRIEDMAN:  You had were referring to money, your Honor, also.

THE COURT:  Go ahead.

MR. FRIEDMAN:  Why does the government want to put Mr. Elfgeeh in jail for such an extended range at the top of the permissible punishment?  Is it the crime itself, is it a crime of violence?  Does it show a disregard for property?  Does it show a disregard for the lives, the interests of his fellow Americans?  No.

5

The crime itself is weighed by the guidelines as six, which would entitle to him to probation, in your Honor's judgment.

In this regard, your Honor, the federal crime --

THE COURT:  Isn't there, under the guidelines, a 16 point enhancement?

MR. FRIEDMAN:  I'm going to get to that.  I'm talking about the naked crime itself.  The crime itself is comparable to the New York State crime of not having a banking license, which the federal crime references and, if you want to call it, incorporates.  Both the federal crime and the state crime allow the court to give a sentence of probation, in the state up to four years, in the federal up to five years.

Is it him?  Is it something about the defendant's character that requires and moves the government to say put him in jail for almost four years?  Did he show an evil motive?  Did he show a lack of respect for property?  Did he prey on unsuspecting victims to his own benefit?  No, your Honor.

The evidence shows, and your Honor has all those letters, the evidence showed that when the government put those evidence in at the trial, shows him to be hard-working, he worked long hours for low pay to support his family.  He has no prior convictions, his only arrest, as the government

BHS        OCR        CM        CRR        CSR

concedes, was a trumped up charge when he, Mr. Aref Elfgeeh, was protecting the property. He worked in a store and some guy tried to come in and rob him, and he protected himself and the property of his employer.

He made a complaint to the police and the man who he made a complaint against made a complaint against him for assault and the District Attorney of Kings County recognized it was a trumped up charge and dismissed it.

Is it because Mr. Elfgeeh assumed a leadership role, was he a major figure in this case? Did he direct or organize? No. Your Honor, I've said this and repeated it till I'm blue in the face, but the government said to the jury, in describing Mr. Elfgeeh's role, they called him a shlepper. You don't have to be Yiddish to understand what that is.

He did not transfer money out of any account, with the exception of those three checks or two checks after the arrest of Abad. I'll get to that later, too.

The government concedes that he's a minor player, granting him a downward departure of two points. He did not supervise, direct, control anybody. There's no proof that Mr. Elfgeeh knew that his actions were prohibited or that the business needed a license.

Now, this lack of mens rea, this criminal mind, evil intent, whatever you want to call it, recalls the observations

of Justice Weinstein of this court, and I want to quote to you, because I think it's very, very important in this case, that the moral prerequisite to the imposition of punishment is a mens rea, is an evil mind.

This defendant, the proof showed, had none.

THE COURT:  How do you explain the fact that he was concealing what he was doing?

MR. FRIEDMAN:  He didn't conceal anything.

THE COURT:  Go ahead.

MR. FRIEDMAN:  In this case, for this defendant, for what this defendant did on the charge that the government laid against him, jail equates to an immoral sentence.

The conduct of Mr. Elfgeeh in this case can be viewed as aberrant.  He had no role in the creation of the operation, he's otherwise honest, hard-working, which in itself justifies a downward adjustment, just like Judge Glasser gave in the case of Jagmohan, where Justice Glasser -- and I know Justice Glasser because he was my teacher in law school, and he is no bleeding heart -- he gave a sentence, where the guidelines had it 15 to 21 months in jail, he gave three years probation based upon this, based upon the fact that the defendant was unsophisticated, who, like this defendant, was an immigrant, who, like this defendant, was relying upon the advice of those who came before him, in this case his uncle.

And the evidence showed that in this case the uncle was a center around which this community revolved.  In fact, one of the government witnesses testified, Sure, I gave my address as the defendant's address because I knew the defendant was going to be there.  He had a store, he had a family, he owned the building.  A lot of people in the community did that.

Like the defendant in Jagmohan, Mr. Aref Elfgeeh has a long history of employment, of working, and the Court of Appeals sustained, upon challenge from the government, sustained that downward departure.

Why then, why, your Honor is asking, just as I asked, why are they seeking such a harsh sentence for Mr. Elfgeeh?

The government says -- and the government is going to speak for themselves and can speak for themselves very eloquently -- they want to hold him responsible for 1.6 million dollars.

In that respect, the government's reasoning is completely different from the reasoning of the Probation Department in the PSR where they imposed a 16.enhancement. But in the PSR, the Probation Department justifies the 16 point enhancement by saying Mr. Elfgeeh was responsible for transferring the 1.6 million dollars out of the Prospect Deli account -- remember that's the account that was in his name --

to the Carnival account.  That is the account that his uncle ran, the center account, and the Prospect Deli account, in the terms of the government was the quote -- one of the feeder accounts.

Well, the defense objected and said, Wait a minute, the evidence didn't show that.  The government acknowledges the defense is right in that respect.  They say, Wait a minute, Mr. Elfgeeh is responsible for 1.6 million dollars which the conspiracy, the larger conspiracy, transferred overseas from November 2001 to January 2003.

Let me step aside here.  Right now the Probation Department never responded by giving your Honor or the defense or the government an addendum to the PSR where they attempted to resolve the factual basis for this 16 point increase, which is itself a violation of Rule 32.G.

Let's address the government's theory.  It's a quantum leap to say that a man who is a shlepper, which the evidence showed at most, was told to open up three bank accounts, and the evidence only showed that he made deposits in one bank account that's related to the hawala.

There's no testimony -- in fact, Mr. Osborn only testified that 12 deposit slips -- I may be wrong it could be 13, but 12 deposit slips bore the handwriting of Mr. Elfgeeh.

It's quite a quantum leap to now say Mr. Elfgeeh should be held responsible, to use the words of the

government, for 1.6 million which was transferred overseas from people, based upon the actions of people he didn't know were part of this conspiracy or, at least the evidence didn't show it, and the government's letter says well, he must have, should have, probably did.  There's no proof, there is a total absence of proof as to what the scope of the agreement between his uncle and Mr. Elfgeeh was.

I submit to you, your Honor, that the prosecution, when it spoke to the jury, told the jury what the scope was. If you remember, Miss Chen said, quote, Abad would fill out these deposit slips and maybe Aref would write in the numbers. Abad would say put in 3500 in this one or put in 2000.  They worked together and this is the whole point.

That's exactly what the evidence shows, a limited, truncated, constricted role.  Accepting the government's theory, the proof at trial showed that Aref worked under one man, obeyed one man with specific limited instructions and responsibilities.

It's just downright unfair to have Mr. Aref Elfgeeh punished for some speculative, far reaching, guesswork 1.6 million.

I don't quarrel with 1.6 million being transferred overseas, what I quarrel with is there is not enough evidence to show, one, that he knew or could have foreseen that he was going to be responsible for that or the action of the others.

I sent a letter to your Honor for support the Studley case.  Studley was a marketer, a telemarketer, like a boiler room, your Honor-

THE COURT:  Is this your letter of December 13th?

MR. FRIEDMAN:  No, later than that.  February 2nd, your Honor.

THE COURT:  All right.  I have read several of your correspondence.

MR. FRIEDMAN:  Of course.  Studley worked in a boiler room.  He was in a big room.  There were 20 or 30 other people doing the same thing, making fraudulent phone calls.  The District Court, when it sentenced him said, yes, you're responsible for the actions of all those other people, you had to know what was going on, you were sitting there next to them.  The Circuit Court of Appeals said not so fast.  The evidence at trial showed a very limited understanding with his boss.

Now I'm not saying, your Honor, that the government could never prove their allegation, what I'm saying is so far they haven't proved it for your Honor to make the specific findings required by Studley.  If we want to have a hearing on it, we're ready to go.

Now, if we're going to have a hearing, I suggest, your Honor, that the proof has to be beyond a reasonable doubt, not to a preponderance.  I submit they can't, the

government can't prove to a preponderance, but I submit that if we're going to have a hearing, or if you're going to make judgments, your Honor, on the evidence that's before you, that came out at the trial, that it has to be beyond a reasonable doubt. Why? Because the Court of Appeals in the Shonubi case, again cited to you, says because we have a six level case that now jumps to 22 because of a 16 point enhancement, the enhancement swallows up the crime.

To quote a case or to paraphrase a quote of a case, it's not the tail wagging the dog, it's the spot on the tail wagging the dog.

Your Honor, this is a major point because this is the case, this is why Mr. Elfgeeh is going to spend the next four years in jail or he's going to go home, subject to your Honor's approval.

Even if somehow the government could prove at this hearing their allegation, their position, the defendant's actions, without criminal intent, without knowing or even being able to foresee or appreciate that the unlawfulness or the illegality of his conduct constitutes actions which are outside the heartland of this criminal statute.

If you remember the criminal statute, it doesn't say anybody who runs or participates in an unlicensed money transmitting business, it's very specific. It talks about the manager, the operator, the owner. Mr. Aref Elfgeeh was so far

13

removed from that, he was the shlepper, the gofer.

Again, as the Supreme Court said in the Kuhn case, because it's outside the heartland, that is enough to justify a downward adjustment.

There are other reasons why jail is unfair. You know, children, they get it, they get life quite easily by the time they are eight years old, they don't argue in statutes and philosophical principles but they know in their heart what is unfair, what is unjust.

Other co-conspirators in this case, who have a role possibly greater than Mr. Elfgeeh here, have not even been charged. Mahmood Elfgeeh, Adel Elfgeeh, Hizam Alsaydi, Abdullah Satar, and some of those, as my original objection to the PSR states, are living in America and are American citizens. They are not off in some far off land where a prosecution would be irrelevant.

The sentencing guidelines itself, the reason we had the sentencing guidelines in part was to eliminate the disparity that in New York someone guilty of a crime would get probation while somebody who was in the Southern District of California would get ten years for the same crime due to differences in philosophy.

In this case we have cited and put in our papers examples of people who were organizers, who were leaders, who owned the unlicensed money transmitting business, and they

received sentences of 18 months, five months.  Judge Gleeson of this court gave a person on a par, let's say, with his uncle, Mr. Aref Elfgeeh's uncle, five months in jail.

In particular reference, I want to recall the Youssef that I cited in our memo, where the money involved was around the money that the government cites here, 1.5 million. Sentence imposed three years probation.  That's for an organizer.  This is a shlepper.

Your Honor, this defendant, counting pretrial, post-trial detention, plus home confinement has been confined three years.

Now we mentioned the state statute, and your Honor recalled the state statute when he sentenced Mr. Aref Elfgeeh's uncle.  Research has shown two prosecutions under the state statute, an equivalent statute, if you will, to the federal statute, has an indeterminate sentence.  The state is zero to four, the federal is zero to five.  The two prosecutions one by your good friend Bob Morganthau in New York, one by your good friend Joe Hynes in Brooklyn, both misdemeanor pleas, probation.

Now, the argument here is what does the state have to do with the federal?  Your Honor, there was a very, very recent case, United States versus Clarke, decided just last month, 4th Circuit, another circuit that's not known to be a pro defendant circuit.  The judge in the District Court had

15

considered a disparity between federal and state sentencing. The Circuit Court of Appeals said, Oh, no, we're going to send that back because you used the wrong guideline, because that's the wrong thinking. Disparity in sentence is federal to federal. However, Judge Ludig, who supposedly was on the short list for the Supreme Court of the United States, he said, he wrote a concurring opinion and he made specific reference that there are particular circumstances when a District Court should consider state/federal sentencing disparity, and he said especially when the federal statute embraces the state statute. And guess which statute he gave a perfect example of? 18 U.S.C. 1960, the case you have before your Honor.

I want to turn to why the government is wrong; I want to be positive, I want to try to impress upon you, your Honor, why a nonincarceratory sentence should be imposed in this case because jail would serve no purpose for this crime without an evil motive on the part of this defendant, based upon this defendant's conduct, which was minor, for no personal gain, who did not design or control, supervise or manage one single person. The man does not require jail.

The people who know Aref Elfgeeh the best are witnesses today attesting to the defendant's being kind hearted. This is what they say in their letters.

You know, your Honor, we live -- a lot of people say

we live in bad times because of what's going on in the world. A lot of people don't want to have any contact with the government. People who are born in the United States, who have lived in the United States for many years, don't want to have any contact with the government.

In my personal practice, for example, the Hasidic community is particularly wary of the government, but it takes something to put your name on a piece of paper and say, I support a man who this government convicted, and send it to the court and send it to the government.

They describe Mr. Elfgeeh as hard-working to support his wife and four children. They describe how he contributed to society, he was a role model, he was dependable. They describe how hearing about this case, quote, shattered their heart, and it was shocking and that he's honorable.

Your Honor, would they describe him that way if they knew he was breaking the law? Aref Elfgeeh came to the United States to work hard, work hard for his family. He has done that. They rely upon him. His incarceration is having a devastating effect -- and I'm using the word devastating -- I think there is a stronger word but I can't think of it in my mind. They could lose their home because of this case if they don't get him to support them.

Two final points. Your Honor has been provided with many, many letters. In particular are letters from two

BHS        OCR        CM        CRR        CSR

marines, both of whom fought in Iraq, and one of them is in the court -- they are both in court, your Honor.

Stand up a for a second. Thank you.

They are here to support Mr. Elfgeeh. These men have share a common heritage with Mr. Elfgeeh. They risked their lives serving in Iraq, supporting this country and its institutions, including justice and fair treatment for everybody.

Do you think that they, as individuals, could support anybody, could support Aref if they knew he was involved in anything that would hurt them personally or their country?

Your Honor, in the last analysis, the letters from Mr. Elfgeeh's children speak the loudest.

THE COURT: The letter of November 3rd?

MR. FRIEDMAN: I think so.

THE COURT: From the children?

MR. FRIEDMAN: Yes, your Honor.

THE COURT: With a picture?

MR. FRIEDMAN: I do have a picture.

THE COURT: I said with a picture.

MR. FRIEDMAN: Yes, I'm glad you have that picture. I was looking for it to show you. Now I don't have to show it.

As the Circuit Court of Appeals has said in the

BIIS      OCR      CM      CRR      CSR

18

Galante case, elimination of time to be served in prison permitted the defendant to continue discharging his existing family responsibilities and spared traumatizing the vulnerable emotions of defendant's children.

Give them back their father, your Honor. Mr. Elfgeeh now stands before the court. He and his cousins, his family, his friends ask for what America and these brave men fought for, compassion, understanding and fairness. I thank you, your Honor.

THE COURT: Just a second.

MR. KNOX: I'll be very brief, your Honor. You had asked Mr. Friedman during his presentation to you what about Aref Elfgeeh concealing what he was doing? I think you hit the nail on the head, and the proof at trial, not what was argued here, the proof at trial showed that he was concealing.

He opened up these feeder bank accounts without informing the bank or anyone else that these were really for a hawala business, an illegal hawala business. He made not 12 cash deposits, he made hundreds of deposits into a Prospect Deli account for five years after the business was closed, again not telling anyone that this wasn't from selling groceries or subs or something, but for a hawala business. He hid it. He did conceal. Then he lied repeatedly on the witness stand both at the suppression hearing and at trial.

You found during the suppression, after the

BHS        OCR        CM        CRR        CSR

suppression hearing, denying the suppression motion, that his testimony was incredible and that Special Agent Murphy's testimony was credible.

In that suppression hearing and at trial he basically denied everything; said he had nothing to do with the hawala business; said Special Agent Murphy made up everything he said about Aref Elfgeeh's interview after his arrest; said he had never told Agent Murphy that he opened any bank accounts; said he never told Agent Murphy that he made any deposits or was involved in the hawala business, and that false testimony was directly contradicted by documentary evidence at trial which clearly showed that he did in fact open those accounts and had made numerous cash deposits into the Prospect Deli and other accounts.

Mr. Friedman referenced Mr. Osborn, the handwriting expert's, testimony that he only identified 12 with Aref Elfgeeh's handwriting on them. The reason for that is that he only reviewed a sample of 12. Rather than having the expert review hundreds or thousands of deposit tickets, we selected 12 random ones, like we did for every other one of these accounts, and gave it to Mr. Osborn to review, and all 12 he found were Aref Elfgeeh's. So the inference there is not that he only did those 12 but that he did all of them.

Now, regarding the issue of $1.6 million, the loss -- and Mr. Friedman kept saying that the government is

seeking this extremely harsh sentence and the government wants to throw him in jail for four years. This isn't the government, this is the United States Sentencing Commission, that developed this sentencing scheme in coordination with Congress, that thought long and hard about it and decided that this is the best way to fulfill the requirements of 3553 and the various purposes of sentencing.

Regarding this 1.6 million and Mr. Friedman saying that he has no idea -- that Mr. Elfgeeh has no idea that any of this other stuff was going on, I think he used the word quantum leap that he would have awareness of the full extent of this conspiracy.

That's just not the case. This was a family business. The other co-conspirators who Mr. Friedman said that Aref didn't even know what was going on, they were his brothers, Mahmood and Adel Elfgeeh, and his uncle Abad Elfgeeh, and his family members in Yemen; they lived together, worked together, socialized together. Of course they knew what each other was doing, and we established that at trial. We also showed that he made deposits beyond the Prospect Deli account. There were two other accounts that he opened and made deposits into.

So this was not limited to 12 cash deposits into one account, he was involved well beyond that account, and this was a family business jointly undertaken, and the extent of

the money that was involved during the time period with which he was charged was certainly foreseeable and we established that at trial.

He also mentioned repeatedly Mr. Elfgeeh's minor role in this offense and he said over and over he wasn't a manager, he wasn't a leader. That's why he's not getting an aggravating role adjustment and the government recommends that he get a mitigating role adjustment, a minor role, which is two points.

That is reflected as part of the scheme that the Sentencing Commission had in place and has worked well for so many years. He also referenced the state scheme. This isn't a state scheme, we're in Federal Court as your Honor noted last week during Abad Elfgeeh's sentencing. And Congress has its own purposes for wanting to regulate this kind of conduct and the Sentencing Commission, I think in good sense, in common sense, fashioned guidelines accordingly.

For those reasons, your Honor, the government believes that a guideline sentences of 41 to 51 months is eminently reasonable and fair in this case and comports with the factors set forth in 18 USC, Section 3553(a) and we urge the court to sentence him within the guideline range.

MR. FRIEDMAN: Could I just respond?

THE COURT: No. There comes a time when everything must end. You had your turn, the government had its turn, now

22

it's going to be my turn.

You invoked the name of some men that I love and admire. Jack Weinstein is a judge that many members of the bar admire -- prosecutors, defense counsel. He is one of the best federal judges in the nation. Judge Glasser, he is also a giant among federal judges in this nation, and I have been privileged not only to work with them but also to call them friends.

Judge Glasser also was one of my instructors in law school and I see him as often as I can; I consult with him, confer with him, and I call him a friend.

Judge Gleeson, a very young man, but he, too, is becoming a giant. And you can see by some of the work that he has done, he will be a superstar in the years to come.

However, every judge is different. There are things that Judge Weinstein and Judge Gleeson and Judge Glasser do that maybe I not may have done, sentences that they have imposed I might not have imposed. I might have given more time, might have given less time, but that is the beauty of having a position as a federal judge and, as Thurgood Marshall said, a lifetime contract, which we all have.

It all boils down to the individual judge, it all boils down to me. When I look at this case there are more questions that loom than answers that were disclosed. I had wondered why or how this defendant could arrive here in 1995,

23

get himself in such a position of trust that he would be allowed to handle funds -- was it $1.6 million over a period of a couple of years --

MR. FRIEDMAN:  That is not the government's theory, your Honor, but I'll let the government talk about that.

THE COURT:  We're not going to do that.  I'm looking at some of the deposits.  Just a second.

Some of the deposits that, according to J.P. Morgan, from November of 2000 until January 2003, this defendant transferred 1.6 million dollars in funds between his deli and the Carnival French Ice Cream accounts.

MR. FRIEDMAN:  Your Honor, most respectfully, the government denies that.  They wrote a letter to your Honor saying that is not true.

MR. KNOX:  Your Honor, $365,000 went from Prospect Deli into Carnival, $125,000 went from Aref's account in Astoria into Carnival during that time period.

He also admitted involvement in the Third Street Newsstand accounts, and there were eight other feeder accounts which he may or may not directly have made deposits into, but if it wasn't him it was his -- it was one of his two brothers or his uncle; they were all working together.  He was convicted of conspiracy.  It was foreseeable that they were involved and he was part of this.

THE COURT:  Notwithstanding the amount, this

24

defendant had access to large sums of money from accounts or businesses that didn't generate that type of money.

MR. FRIEDMAN: Most respectfully, the evidence at trial showed that Abad controlled the accounts, that Abad forged this defendant's name on checks. In fact, Abad, when Abad was on the stand, I showed him a check on Aref Elfgeeh's account that Abad, instead of signing Aref, signed Abad's name to. He controlled it.

I just want to respond to that. There is no proof that this defendant, even though his name is on the check and it was his account, there is no proof except for Mr. Osborn's testimony regarding the 12 deposit slips that he did anything else. We have to take the testimony at the trial and Mr. Osborn's observations that Abad wrote Mr. Elfgeeh's name on checks and other documents.

THE COURT: Notwithstanding that, the indictment accused the defendant of having participated in crimes that the Congress said should be punished. He pled not guilty and 12 citizens said that they found him guilty beyond a reasonable doubt, and he is liable for that.

MR. FRIEDMAN: I don't quarrel with that.

THE COURT: The thing that gets me, there is an old saying in my community, too, there's something in that butter milk that ain't butter. What was all of this money going to, what were they doing?

BHS        OCR        CM        CRR        CSR

I don't think that he was buying ice cream, buying goods. It doesn't pass the smell test, as far as I'm concerned.

MR. FRIEDMAN: The evidence at trial showed what it was going for. Abad was sending money to business people overseas so they could transact business in China, Thailand and other different countries. That is Abad not Aref.

THE COURT: All right.

MR. KNOX: Your Honor, that is not the case.

THE COURT: No, no, I tried the case, I'm aware of it. I have heard the eloquent presentation by counsel, I've heard the response by the government, and now it's up to me to make my decision and, if I can't do anything else, I can make a decision. It might be wrong, but I'll make a decision.

I'm going to sentence the defendant to the custody of the Attorney General or his duly authorized representative for a period of 51 months, $100 special assessment on each count, counts three and four, for a total of $300. I sentence the defendant to -- is it three years supervised release?

MS. CHEN: Yes.

THE COURT: Three years supervised release on each count, the counts to run concurrent.

Is there a forfeiture in here? Forfeiture is mandatory. I'm going to order forfeiture. I am also going to --

MR. FRIEDMAN: Your Honor, it's almost irrelevant.

THE COURT: Let me finish.

MR. FRIEDMAN: I'm sorry.

THE COURT: I'm also going to order a fine of $250,000 on each count, for a total of $500,000. I impose this because I think it's sufficient for the crime that was committed. I took into consideration the guidelines and also 3553(a).

I appreciate the marines who came here to support this defendant. I too was a marine, and I served in the Korean War so I understand what they do, and they do a great job. However, this is something that I think is the right thing.

I will advise the defendant he has a right to appeal this sentence and also appeal this conviction.

Are there any open counts?

MR. KNOX: Yes, your Honor, the government dismisses them.

THE COURT: All right.

PROBATION OFFICER: Can we impose full financial disclosure as a condition?

THE COURT: He will make full financial disclosure. All right.

* * * * * * * *

BHS        UCR        CM        CRR        CSR