The Law Office of

# James M. Branden

551 Fifth Avenue
New York, New York 10176
Tel. 212-286-0173
Fax 212-286-0495

September 15, 2008

BY FACSIMILE AND OVERNIGHT MAIL
Hon. Sterling Johnson, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Abad Elfgeeh
>      Docket No. 03 Cr. 0133 (SJ)

Dear Judge Johnson:

The above-referenced defendant, whom I represent, was convicted of structuring and two counts of operating an illegal money transmitting business and related conspiracy counts.  In February 2006, he was sentenced to a term of imprisonment of 188 months, forfeiture of $22,435,467.00 and a fine of $1,250,000.00. The Second Circuit affirmed his conviction but remanded for re-sentencing.  Specifically, the Circuit "vacate[d] the sentence of Abad Elfgeeh and remand[ed] for reconsideration of the amount of his fine[.]" See United States v. Elfgeeh, 515 F.3d 100, 140 (2d Cir. 2008).

## STATEMENT OF THE CASE

Given that the trial of this matter took place three years ago, and the original sentencing took place in February 2006, a review of the charges, the trial, Mr. Elfgeeh's background as set forth in the presentence report, and the original sentencing is set forth below in considerable detail.

### The Charges

In Counts One and Two of the Indictment, Abad Elfgeeh was charged with the conspiracy to operate an illegal money transmitting business and the substantive offense (18 U.S.C. §§371,

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 2


1960(a) (1994)) for activities from January 1995 to October 2001 .
In Counts Three and Four, he and his nephew Aref Elfgeeh were
charged with the same offenses for conduct from November 2001 to
January 2003, following the amendment of the section 1960(a) of
Title 18 of the United States Code.[1]  In Count Five, Mr. Elfgeeh
was charged with structuring transactions with domestic financial
institutions (31 U.S.C. §5313(a)) from 1995 to 2003.

<u>The Trial</u>

<u>The Government's Case</u>

New York State Banking Law, article 13(b), requires that money
transmitting businesses be licensed.  In order to secure the
license, the business must complete an application and post a
surety bond of at least $500,000.  There are 72 such businesses in
New York and 29,000 licensed money transmitting agents.

Federal law requires that currency transaction reports issue
when deposits of more than $10,000 were made in cash, checks
payable to cash, by money orders, and wire transfers.

Mr. Elfgeeh lived and worked at 473 Fifth Avenue, a four-story
walk-up in the Park Slope section of Brooklyn.  On the first floor
was Carnival French Ice Cream Store [hereafter "CFI"], a
convenience store he operated, and, on the fourth floor, was his
residence.  Carnival French Ice Cream Store, a retail business, had
a checking account at JPMorgan Chase Bank (hereafter the "CFI
Account").  The account holders were Hazam Alsaydi and Nasser

---

[1]

As set forth in the italics below, 18 U.S.C. §1960(b)(1)(A)
was amended so that, *inter alia*, "money transmitting business":

> [M]eans a money transmitting business which
> affects interstate or foreign commerce in any
> manner or degree and is operated without an
> appropriate money transmitting license in a
> State where such operation is punishable as a
> misdemeanor or a felony under State law,
> *whether or not the defendant knew that the*
> *operation was required to be licensed or that*
> *the operation was so punishable[.]*

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 3


Elfgeeh.

The annual total deposits – from twelve "feeder" accounts – into the CFI Account, from 1996 to 2002, were, approximately: $1.7 million, $3.1 million, $4.5 million, $3.8 million, $3.8 million, $4.1 million, and $1 million.  The total for these seven years was $22,190,642.21.  Of that amount, $21,995,556.54 was withdrawn, $21,717,495.79 by wire transfer.  The transfers were made to accounts in over 20 foreign countries.[2]  The money ultimately made its way to Yemen.

Mr. Elfgeeh was not licensed to transmit money; nor was the CFI or any of the other people or entities linked to the "feeder" accounts.

Banking records of the feeder accounts showed that 3,252 cash deposits were made totaling $14,212,894.  On approximately 300-400 days, more than $10,000 in cash was deposited into a combination of the accounts.  Only one deposit, however, totaled more than $10,000,  requiring the filing of a Currency Transaction Report (CTR).

Abdul Hizam had known Mr. Elfgeeh and his brother, Yehya, for approximately 30 years.  They were born in the same village in Yemen.

From the proceeds of the sale of his house in the United States, Hizam wanted to purchase a home in Yemen.  He contacted Yehya in Yemen and was told he should speak with Mr. Elfgeeh.  The two men met at the CFI and Mr. Elfgeeh advised Hizam to have his lawyer, who was holding the proceeds of the sale, issue checks to CFI in amounts less than $10,000 and with different dates (298-99). Hizam forwarded checks drawn on his lawyer's account totaling $110,000 (300-05).  The checks, some made out in Hizam's name, some in his wife's or brother's name, which were endorsed by them, and some to cash, were deposited into various accounts, including the CFI account.  The checks totaled $110,000.  Yehya told Hizam that he had to pay Mr. Elfgeen $2,900 for the service.

---

[2]

Those countries were: China, Egypt, France, Germany, Holland, Hong Kong, India, Indonesia, Italy, Japan, Jordan, Kenya, Korea, Lebanon, Malaysia, Pakistan, Singapore, Sweden, Taiwan, Tunisia, Turkey, United Arab Emirates and Yemen.

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 4


                    The Defense Case

     Mr. Elfgeeh testified in his own defense.  He was born in 1954
in Yemen.  He was one of six children.  Mr. Elfgeeh's father had
owned a small grocery store and passed away when Mr. Elfgeeh was
four or five years old.  Mr. Elfgeeh left school in the third
grade.  When he was sixteen or seventeen he immigrated to the
United States.  Mr. Elfgeeh worked as a stock boy at a sporting
goods store in lower Manhattan.  He then worked as a janitor for
the Board of Education in downtown Brooklyn.

     In 1974, Mr. Elfgeeh returned to Yemen for six months, during
which time he married.  Upon his return to New York, he was
employed as a waiter, then a maintenance worker for a real estate
company, and a handyman for a Manhattan apartment building.  In
1979, Mr. Elfgeeh, a devout Muslim, became a naturalized United
States citizen.

     In 1982, his brother and a partner, opened CFI on the ground
floor of 473 Fifth Avenue, in a Brooklyn neighborhood with a
considerable Yemeni population.  Mr. Elfgeeh moved in to the top
floor of the building with his wife and children and started
working at the store.  At first, he made the ice cream and the ice
cream cakes the store sold.  Later, he took over operational
control of the store.  In time, he also became bookkeeper for
businesses owned by other family members.

     In or around 1995, for members of his local Yemeni community
only, Mr. Elfgeeh first began to send funds abroad.  He charged for
expenses but did not intend to make a profit, and may even have
suffered losses over the years.  He did not solicit this service
and he did not know that sending money overseas required a state
license.

     As a general matter, a person of Yemeni background would
provide Mr. Elfgeeh with money, which he would then deposit in the
CFI Account, which was a business account and charged fees, or one
of the other accounts bearing his name, many of which did not
charge fees.  Then he would instruct the bank, Chase Manhattan, to
transfer the money to his brother Yehya in Yemen for the intended
beneficiary.  The bank charged $25 for the service.  He was
permitted to act as Nasser with a duly-executed power of attorney.

     Sometimes, to reduce bank fees, he would bundle requests and

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 5

send one lump sum intended for numerous beneficiaries. Sometimes also, he would send money to foreign suppliers, who would then provide supplies for certain Yemeni merchants, who had paid Yehya for the supplies and those monies (in Riyals) would be paid to the intended beneficiary of the Brooklyn depositor. The service, and his regular banking, required a visit to his local Chase Bank branch "a few times a week." No one at the bank ever advised him that he needed to acquire a license in order to send money. No one at the bank advised him of the currency transaction reporting requirements and he did not have independent knowledge of them.

In 2001 or 2002, because he had heard others suggest that he might need a license or to formalize the service, Mr. Elfgeeh decided to incorporate it and to name it Eagle Financial and Wire Transfer, Inc. (hereafter, "Eagle"). He retained a lawyer to file the paperwork. The lawyer called Mr. Elfgeeh months later to tell him that he received a letter from an agency that advised that he needed a license to provide the intended corporate service. The lawyer advised that Mr. Elfgeeh should contact the agency. Mr. Elfgeeh did so and ordered an application. His subsequent review of it suggested, however, especially because the completed application required a $500,000 bond, that it did not apply to him but was intended to apply only to banking institutions. Mr. Elfgeeh never used Eagle to transfer money.

He also denied that he advised Hizam to break down the money to send to Yemen into amounts less than $10,000. Mr. Elfgeeh believed that he provided a community "service" and did not run a "business" because he did not intend to make a profit, charged only what was required to cover costs,[3] and because it was only available to Yemeni in his neighborhood and not the public at large.

The Government's Rebuttal

Michael Ficchi was an attorney and he incorporated the CFI in 2000 (900).

In 2001, Mr. Elfgeeh visited Ficchi and told him that he wanted to wire money and that friends and family members had been

---

[3] Mr. Elfgeeh estimated that from 1995 through 2002, he paid $40,000-50,000 in bank charges, fees and costs (825).

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 6


making "good money" doing it.  Ficchi told him that he would
incorporate such a business for him but that more was probably
needed, such as "something" from the State Bank Department.  Later,
he forwarded a letter from that Department, told Mr. Elfgeeh that
an application for a license had to be submitted and provided  a
contact name for obtaining the application.  When Mr. Elfgeeh
obtained the application, he visited Ficchi again (907).  Ficchi
told him that he was not experienced with the form and he again
provided Mr. Elfgeeh with the name of someone whom he thought could
help.  Mr. Elfgeeh left the office indicating that he would try to
fill in the form himself.

As noted above, Mr. Elfgeeh was found guilty of the five
counts against him.  The jury also returned a forfeiture order of
$22,435,467.00.

Sentencing

Mr. Elfgeeh is 53 years old.  His father died in 1958 and his
mother, who is 87 and in ill health, resides in Yemen.

Mr. Elfgeeh immigrated to the United States in 1971, in search
of better economic opportunities.  Three years later, he returned
to Yemen to marry.  With his wife Saleh, Mr. Elfgeeh has five
children, aged 10 to 27.

Mr. Elfgeeh and Saleh divorced in 1997 because Saleh refused
to live in the United States.  She lives now with Mr. Elfgeeh's
mother and her two youngest children.  In 1998, Mr. Elfgeeh
remarried in the United States and he and his wife, Saba, have two
children, aged 4 and 5.

Mr. Elfgeeh has no prior criminal record.

In his original sentencing submission, Mr. Elfgeeh requested
a sentence well below the advisory guideline range of imprisonment
of 188 to 235 months.  He did so noting that such a sentence would
result in multiple levels of disparity.  Mr. Elfgeeh requested a
non-guideline sentence or a departure for the additional reason
that a sentence of fifteen years or more was inappropriate for an
offense, like 18 U.S.C. §1960, with no *mens rea*.  Last, Mr. Elfgeeh
argued that the remaining factors set forth in 18 U.S.C. §3553(a)
favored a non-guideline sentence as well.

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 7


At sentencing, defense counsel made plain that "the specter of terrorism . . . has been floating around this case from the beginning." He added that Mr. Elfgeeh knew of Sheik Al Moayad, who was tried and convicted of terrorism activities, but had never even met the man. He therefore asked the court not to consider unsupported allegations of terrorism. He also argued for a term of probation in lieu of imprisonment and noted other similar sentences based on similar conduct, one recently prosecuted in New York County.

For its part, the government reminded the court that while it had not sought a "terrorism enhancement . . . . it is important for the Court to know, as I think you do, how this case came about. And that was mainly" that Mohammed Al-Moayad, a now convicted material support defendant, named Mr. Elfgeeh as someone who could get money to Al-Moayad in Yemen and "that money was going to support terrorism."

The court noted counsels' arguments and said that it was "treating this case as an unlawful, unlicensed money transferring business," not as a terrorism case. The court sentenced Mr. Elfgeeh to an aggregate term of imprisonment of 188 months and a $1.25 million fine. The court found this "sufficient" after consideration of the advisory guidelines and the other factors mentioned in 18 U.S.C. §3553(a).


**ARGUMENT**

MR. ELFGEEH SHOULD BE RE-SENTENCED
*DE NOVO* TO A LESSER TERM OF
IMPRISONMENT AND NO FINE.

To be sure, re-sentencing should generally be limited [not *de novo*] when the Court of Appeals upholds the underlying convictions but determines that a sentence has been erroneously imposed and remands to correct that error." See <u>United States</u> v. <u>Quintieri</u>, 306 F.3d 1217, 1228 (2d Cir. 2002); <u>see also</u> <u>United States</u> v. <u>Stanley</u>, 54 F.3d 103 (2d Cir. 1995). There are, however, exceptions to the limited remand rule. One such exception provides that district courts may depart from the law of the case and a limited remand to reconsider their own decisions for cogent and compelling reasons, such as intervening changes in the law or the need to prevent a manifest injustice. <u>Quintieri</u>, 306 F.3d at 1230.

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 8

In this regard, the Supreme Court's recent case law - Kimbrough and Gall – is a "change" in the law significant enough to warrant a full re-examination of the sentence previously imposed here.   A second exception compels the district court to hear and determine issues whose factual basis arose after the original sentence.  Id.

        Change in the Law

        In Rita v. United States, 127 S.Ct. 2456 (2007), the Supreme Court held that Circuit Courts of Appeals "may" presume a sentence "reasonable" when it comports with a properly calculated guideline range.  This Circuit, however, does not so presume.  See United States v. Fairclough, 439 F.3d 76, 80 (2d Cir. 2006).

        In this most recent term, the United States Supreme Court issued two opinions concerning sentencing procedure and substance. In Gall v. United States, 128 S.Ct. 586 (2007), the Court addressed the "converse" of the situation addressed in Rita, to wit, when the sentence is outside the guideline range, must it be supported by extraordinary circumstances.  Id. at 591.   In reaching its conclusion, the Court reiterated that all sentencing proceedings should commence with a correct guideline calculation, and that the resulting guideline range of imprisonment or probation "should be the starting point and the initial benchmark."  Gall, 128 S.Ct. at 596.  Thereafter, the sentencing court should allow the parties to speak and then it should consider all of the sentencing factors listed in 18 U.S.C. §3553(a) to determine whether those factors support a party's position.  Id.  The court may not "presume that the Guidelines range is reasonable."  Id. at 597.  On appeal, the Circuit Court must review the sentence for reasonableness (both procedurally and substantively) and under an abuse-of-discretion standard.  Id. at 594, 597.  With these procedures and standards in mind, the Court held in Gall that:

> In reviewing the reasonableness of a sentence outside the guidelines range, appellate courts may . . . take the degree of variance into account and consider the extent of a deviation from the guidelines.  We reject, however, an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range.  We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 9


        determining the strength of the justifications
        required for a specific sentence.

Id. at 594-95.

    Kimbrough v. United States, 128 S.Ct. 558 (2007) also involved a non-guideline (below the guideline) sentence. There, the government argued that in a crack-cocaine case, the sentencing court could not deviate from the resulting guideline range based on disparate guideline treatment between crack and powder cocaine ("100 to 1"), "because the ratio is a 'specific policy determinatio[n] that Congress has directed sentencing courts to observe.'" The Court rejected the government's argument, however, resting its decision largely on what the Second Circuit deems the "parsimony clause" of 18 U.S.C. §3553(a). See United States v. Ministro-Tapia, 470 F.3d 137 (2d Cir. 2006)(recognizing that the sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [§3553(a)]"). It held, therefore, that:

        [I]t would not be an abuse of discretion for a
        district court to conclude when sentencing a
        particular defendant that the crack/powder
        disparity yields a sentence "greater than
        necessary" to achieve §3553(a)'s purposes,
        even in a mine-run case.

Id. at 575.

    These sentencing procedures, standards and applications were not in place at the time of Mr. Elfgeeh's sentencing and the sentencing did not transpire as now prescribed. As such, the sentencing should be de novo, and, as set forth below, a lesser sentence and no fine should be imposed.

    Under 18 U.S.C. §3553(a), the district court must consider: 1) the nature and circumstances of the offense and the history and characteristics of the defendant; 2) general sentencing purposes, including the need for the sentence to A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, B) afford adequate deterrence to criminal conduct, C) protect the public from further crimes of the defendant, and D) provide the defendant with needed educational or vocational training, medical care or other correctional treatment

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 10

in the most effective manner; 3) the kinds of sentences available; 4) the sentencing range established by the guidelines; 5) any pertinent policy statements; 6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and 7) the need to provide restitution to any victims.  After due consideration of all of these factors, the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the generally recognized purposes of sentencing as set forth in 2) above."  Id.

At trial, the government repeatedly informed the Court that Mr. Elfgeeh was originally suspected of terrorism and that his name surfaced in the successful prosecution of Sheik Al-Moayad as someone Al-Moayad could use to transmit money to Hamas and al Qaeda, among other terrorist groups. At sentencing, the government again reminded the court of that fact and, indeed, went on at some length to establish that, for example, "[Mr. Elfgeeh] was named by Mr. Al-Moayad as somebody who could get money to Mr. Al-Moayad in Yemen.  And Mr. Al-Moayad represented that that money was going to go to support terrorism."  Though it could not establish that Mr. Elfgeeh knew that money he sent was used for terrorism, the government argued that a guideline sentence of 188 to 235 months was appropriate based on this "terrorism" link between Mr. Elfgeeh and Al-Moayad and the need generally to combat terrorism.[4]

While the Court was careful to note that it was sentencing Mr. Elfgeeh based on the hawala offense and not his link to terrorism, the sentence is simply too severe for that offense.

Mr. Elfgeeh is 51 years old and has never previously been convicted of a crime.  The instant offense involved no violence, no guns, no weapons and no drugs.  In short, it was not the type of offense that generally warrants more than fifteen years in prison. This is, of course, especially true given that 1) the money transmitting offense does not require proof of *mens rea*, which

---

[4]

In light of the fact that the government cannot prove that Mr. Elfgeeh knowingly promoted terrorist activities, it is respectfully requested that paragraph 21 of the presentence report be deleted. That paragraph is causing Mr. Elfgeeh significant problems during his incarceration, including increased scrutiny and draconian restrictions of telephone use.

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 11


historically results in sentences of less than one year, 2) money transmitting without a license is not even punishable as a crime in parts of the country; and 3) that similarly situated federal defendants received prison terms not in excess of eighteen months.

Mr. Elfgeeh's advisory guideline range is 188 to 235 months' imprisonment. See 18 U.S.C. §3553(a)(4). Addressing the other 3553(a) factors in turn, the nature and circumstances of the offense favor a lesser term of imprisonment. See id. at (1). At bottom, Mr. Elfgeeh was convicted of failing to obtain a license for sending money from Yemeni immigrants to their homeland. When he learned in 2001 that New York State may require a license to send money, he tried to obtain one. As noted earlier, this non-violent, public welfare offense, would normally receive a light punishment. There was nothing so aggravated about Mr. Elfgeeh's conduct (though he did receive enhancements for obstruction and managerial role, which are not contested here), such that the light punishment somehow warranted a ten or fifteen year enhancement.

Further, the history and characteristics of the defendant, see id., are laudable. He is 54 years old, with no prior criminal history, and a solid employment record. He is a husband and father and suitably provides for his many children. He is a naturalized United States citizen with no history of problems with INS. He is an active member of his community. He suffers from no substance addictions.

A 188-month sentence is also considerably "greater than necessary[] to comply with the purposes set forth in paragraph (2)." See 18 U.S.C. §3553(a)(2). It is respectfully submitted that a sentence within the five-year statutory maximum for money transmitting, the core of his wrongdoing, would be sufficient to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment. See id. at (2)(A). Moreover, such a term would adequately deter future conduct (or Mr. Elfgeeh could move his operation to a State that does not require a license). See id. at (2)(B). Such a term would likewise be sufficient to "protect" the public. See id. at (2)©. As noted at some length already, this is a non-violent offense and the public's need for "protection" is hard to assess, which, again, is made still more problematic by the fact that money transmitting without a license is legal in parts of the country. Last, with regard to the sentencing purposes of paragraph (2), Mr. Elfgeeh does not appear to need educational, vocational, medical or other

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 12


correctional treatment.  See id. at (2)(D).  So, a sentence within the five-year maximum would not run afoul this sentencing purpose, either.

The other relevant factor is the need to avoid unwarranted sentence disparity (id. at (a)(6)).  As to this factor, there are four readily identifiable levels of such disparity.  Note first that the federal charge of transmitting money without a license (18 U.S.C. §1960) only applies if the defendant acts in a State that makes such conduct criminal, and not all States do.  See, e.g., United States v. Talebnejad, 342 F.Supp.2d 346, 351 (D.Md. 2004) (identifying Alabama as State that does not criminally proscribe money transmitting).  Thus, any term of imprisonment for Mr. Elfgeeh, would create a disparity vis a vis those who transmit money in states that do not outlaw the conduct.  Second, New York State penalizes money transmission based on the amount transmitted.  An E felony is warranted for those who transmit as much money as Mr. Elfgeeh did, warranting a term of imprisonment of up to one and one-third to four years.  N.Y. Bank. Law §650(2)(b); N.Y. Penal Law §70.00(2)(e).  Such offender, with no prior criminal history, like Mr. Elfgeeh, would probably, however, be sentenced to a term of probation.  See N.Y. Penal Law §65.00(3).  As such, any term of imprisonment, or, certainly one within the advisory guideline range, creates a disparity between Mr. Elfgeeh and similarly situated New York State offenders.  See United States v. Lucania, 379 F.Supp.2d 288, 296-97 (E.D.N.Y. 2005) (Sifton, J.) (court considered disparity between federal and state punishments).

Third, a guideline sentence does not fairly compare to sentences imposed on other §1960 offenders, most of whom were also convicted of structuring.  To counsel's knowledge, no other offender was sentenced to a term of imprisonment near to Mr. Elfgeeh's advisory guideline range of 188-235 months.  Indeed, all others surveyed were sentenced well within the five year statutory maximum applicable to §1960.  The most severe sentence included just eighteen months' imprisonment.  See e.g., United States v. Bariek, 2005 WL 2334682 (E.D.Va.) (eighteen months imprisonment for unlicensed transmittal of more $4.9 million); United States v. Kassim, Docket No. 04-1304-CR, E.D.N.Y. (Gleeson, J.) (five months' imprisonment followed by five months' home confinement for operation of unlicensed money transmittal business); United States v. Isse, Docket No. 02-0142-CR, E.D.Va. (Cacheris, J.) (eighteen months imprisonment for unlicensed transmission of $4.2 million).

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 13


Last, as to disparity, a sentence of fifteen years or more is out of line when compared with those normally imposed for public welfare offenses that have no *mens rea* requirement, like §1960. Indeed, strict liability offenses typically result in lenient, not harsh sentences. In Staples v. United States, 511 U.S. 600, 616 (1994), for example, the Supreme Court determined that a statute criminalizing possession of an unregistered firearm required scienter because of the "potentially harsh penalty" attached to a violation. A lengthy sentence here would create disparity among public welfare offenders.

Thus, on balance, only one of the six relevant factors[5] supported a guideline sentence and that was "the guidelines" factor itself. See United States v. Rattoballi, supra, 2006 WL 1699460, at *4 ("A sentence must reflect consideration of the balance of the §3553(a) factors; unjustified reliance upon any one factor is a symptom of an unreasonable sentence").

For the foregoing reasons, upon re-sentencing, Mr. Elfgeeh should receive a lesser, non-guidelines, term of imprisonment.

Finally, no fine should be imposed. Post-Booker, the Sentencing Reform Act leaves to the discretion of the district court the question of whether to impose a fine. See 18 U.S.C. §3571(a) ("A defendant who has been found guilty of an offense *may* be sentenced to pay a fine" (emphasis added)); United States v. Rattoballi, supra, 2006 WL 1699460, at *10. The determination of a fine follows the same analysis as with the determination of a term of imprisonment, to wit, consideration of the §3553(a) factors.

Here, the statutory maximum fine for counts one through four was $250,000. See 18 U.S.C. §3571(b)(3). For count five, the statutory maximum fine was doubled because Mr. Elfgeeh structured as part of illegal activity involving more than $100,000 in a twelve-month period. The statutory maximum fine therefore was $500,000. See 18 U.S.C. §3571(b)(3); 31 U.S.C. §5324(d)(2). The guidelines fine range, however, was $20,000 to $500,000. See USSG §§5E1.2(c)(3) and (c)(4).

---

[5] Restitution was not an issue in this case as there were no financial victims. See 18 U.S.C. §3553(a)(7).

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 14


In its presence report, the Probation Department noted that in light of the forfeiture order, Mr. Elfgeeh did not have the ability to pay a fine.  Counsel knows of no evidence to the contrary.  Indeed, against the $22 million dollar debt is only a positive net worth of $136,574.13, based almost entirely on equity in his home.  See PSR at 20-22, ¶¶73-80.

New Facts

As noted above, a second exception to the limited remand rule compels the district court to hear and determine issues whose factual basis arose after the original sentence.  Id.

In that regard, United States v. Bryson, 229 F.3d 425 (2000), is particularly illuminating.  In that case, the district court originally sentenced the defendant with the benefit of a downward departure and the government appealed.  Id. at 425.  The Court of Appeals found insufficient the evidentiary basis for the departure and remanded with the instruction that the district court should "resentence Bryson according to his original offense level of 31." Id. at 426.  On remand, the district court believed it had been "handcuffed" and was without discretion and therefore sentenced Bryson at level 31.  Id.  On the second appeal, the Court of Appeals acknowledged that the district court had "understandably" over-read its mandate.  Id.  It had not meant, it explained, to "preclude a departure based on intervening circumstances."  Id. Indeed, it reminded that "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." Id.

With these principles in mind, the Court should order an updated presence report for Mr. Elfgeeh, who has now served three years' imprisonment without incident.  In that way, and perhaps only in that way, the Court can be certain to have considered all intervening developments and to "sentence the defendant as he stands before the court on the day of sentencing." Bryson, supra.

Hon. Sterling Johnson, Jr.
United States District Judge, EDNY
September 15, 2008
Page 15

## CONCLUSION

For the foregoing reasons, the Court should vacate the sentence and sentence Mr. Elfgeeh to a lesser term and without imposition of a fine.  In the alternative, re-sentencing should be adjourned and a presentence report prepared.  In either event, paragraph 21 of the presentence report should be deleted.


Respectfully submitted,


James M. Branden

cc:  Jeffrey H. Know, Esq.
     Assistant United States Attorney, EDNY
          (By fax and overnight mail)